UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

GILLMAN CAPONE, LLC
60 Highway 71, Unit 2
Spring Lake Heights, NJ 07762
(732) 528-1166
Attorney for Debtors- In-Possession
MARC C. CAPONE MC4795

| | |
|---|---|
| In Re: | Case No.:  **24-16283** |
| **Jean-Paul and Lisa A. Romes** | Judge:   **John K. Sherwood** |
| | Chapter:   **11** |

**ORIGINAL DISCLOSURE STATEMENT PURSUANT TO SECTION 1125
OF THE BANKRUPTCY CODE DESCRIBING CHAPTER 11 PLAN
OF REORGANIZATION PROPOSED BY DEBTORS
JEAN PAUL ROMES AND LISA ROMES**

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION.  THE PLAN PROPONENTS BELIEVE THAT THIS CHAPTER 11 PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE.  THE PROPONENTS URGE THAT THE VOTER ACCEPT THE PLAN.**

Dated:  1/10/2025          By:   **/s/ Jean Paul Romes_____**
                                          JEAN PAUL ROMES, Proponent

Dated:  1/10/2025          By:   **/s/ Lisa A. Romes_____**
                                          LISA A. ROMES, Proponent

# TABLE OF CONTENTS

**Page**

**I. INTRODUCTION** .........................................................................4
    A. Purpose of This Document ........................................................4
    B. Confirmation Procedures............................................................5
        1. Time and Place of the Confirmation Hearing.....................6
        2. Deadline For Voting For or Against the Plan ......................6
        3. Deadline For Objecting to the Confirmation of the Plan ...............6
        4. Identity of Person to Contact for More Information Regarding
          the Plan......................................................... 6
    C. Disclaimer..............................................................6

**II. BACKGROUND**.............................................................7
    A. Description and History of the Debtors' Business........................... 7
    B. Principals/Affiliates of Debtors' Business................................. 7
    C. Management of the Debtors Before and After the Bankruptcy ................7
    D. Events Leading to Chapter 11 Filing................................. 7
    E. Significant Events During the Bankruptcy.............................8
        1. Bankruptcy Proceedings ............................................8
        2. Other Legal Proceedings................................. 10
        3. Actual and Projected Recovery of Preferential or Fraudulent
          Transfers.......................................................... 10
        4. Procedures Implemented to Resolve Financial Problems..............10
        5. Current and Historical Financial Conditions.........................11

**III. SUMMARY OF THE CHAPTER 11 PLAN OF REORGANIZATION**...........11
    A. What Creditors and Interest Holders Will Receive Under the Proposed
      Plan...........................................................11
    B. Unclassified Claims ...........................................................11
        1. Administrative Expenses and Fees ........................................11
        2. Priority Tax Claims................................................. 13
    C. Classified Claims and Interests......................................... .14
        1. Classes of Secured Claims.......................................14
        2. Classes of Priority Unsecured Claims......................................17
        3. Class of 11 U.S.C.§523(8) Student Loans.............................. 18
        4. Class of General Unsecured Claims......................................18
        5. Class of Interest Holders................................................18
    D. Means of Effectuating the Plan......................................... 19
        1. Funding for the Plan...............................................19
        2. Post-confirmation Management.......................................19
        3. Disbursing Agent.................................................19

E. Other Provisions of the Plan.......…………………….……….....…….....19
    1. Executory Contracts and Unexpired Leases…......………………….19
    2. Changes in Rates Subject to Regulatory Commission Approval…….....20
    3. Retention of Jurisdiction...............……………………………………20
    4. Procedures for Resolving Contested Claims ...…………….............20
    5. Effective Date.............………………………………………….....20
    6. Modification.............…………………………………………..….20
F. Tax Consequences of Plan.................………………………………21
G. Risk Factors.................………………………………...………….21


**IV. CONFIRMATION REQUIREMENTS AND PROCEDURES**.....…….……....21
    A. Who May Vote or Object..................………….……………………22
        1. Who May Object to Confirmation of the Plan…………….............22
        2. Who May Vote to Accept/Reject the Plan……………….............22
            a. What Is an Allowed Claim/Interest.......……………………22
            b. What Is an Impaired Claim/Interest.......……………….....22
        3. Who Is Not Entitled to Vote.................……………………….......23
        4. Who Can Vote in More Than One Class…..……………….............23
        5. Votes Necessary to Confirm the Plan...…………………….............23
        6. Votes Necessary for a Class to Accept the Plan………...................23
        7. Treatment of Non-accepting Classes………………………….......24
        8. Request for Confirmation Despite Nonacceptance by Impaired
          Class(es)……………………………………………………… ...... 24
    B. Liquidation Analysis ...................………………………………....24
    C. Feasibility...................……………………………………… 26


**V. EFFECT OF CONFIRMATION OF PLAN**.....……………………............28
    A. Discharge.................…………………………………………….28
    B.  Revesting of Property in the Debtors…………………………………. 28
    C. Modification of Plan.................……………………………….…28
    D. Post-Confirmation Conversion/Dismissal…..........……………………29

# I.
## INTRODUCTION

Jean Paul and Lisa Romes are the Debtors in a voluntary Chapter 11 bankruptcy case.  The case was commenced on June 21, 2024, when the Debtors filed a bankruptcy petition, pursuant to the United States Bankruptcy Code ("Code") 11 U.S.C. § 101 *et seq.*  Chapter 11 of the Bankruptcy Code allows the Debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan").  The Plan may provide for the Debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Jean Paul and Lisa Romes are the individuals proposing the Plan sent to you in the same envelope as this document and are referred to as the Proponents.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN, WHICH IS ANNEXED HERETO AS **EXHIBIT A**.

This is a reorganizing Plan.  In other words, the Proponents seek to accomplish payments under the Plan by contributing their current net monthly disposable income, in an initial amount of **$ 8,742.00** per month for **60** months of the Plan, to be used to create a fund to make payment of allowed claims under the Plan.  Payments will be made to the Disbursing Agent on a monthly basis and the Disbursing Agent will then make quarterly distributions to creditors with allowed claims.

### A. Purpose of This Document

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

(1)  **WHO CAN VOTE OR OBJECT,**

(2)  **THE PROPOSED TREATMENT OF YOUR CLAIM  (i.e., what your claim will receive if the Plan is confirmed, AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

(3)  **THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

**DURING THE BANKRUPTCY,**

>      **(4)   WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

>      **(5)  THE EFFECT OF CONFIRMATION, AND**

>      **(6)  THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

 Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a Debtors and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtors to make an informed judgment about accepting or rejecting the Plan.  The Bankruptcy Court ("Court') has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Bankruptcy Code Section 1124.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtors or who has filed a proof of claim against the Debtors and to each interest holder of record as of the date of approval of this Disclosure Statement.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.      Confirmation Procedures**

<u>Persons Potentially Eligible to Vote on the Plan</u>

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtors as undisputed, non-contingent and liquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan.  All shareholders of record as of the date of approval of this Disclosure Statement may vote on the

Plan. The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, Martin Luther King Jr. Federal Building, 50 Walnut Street, Newark, New Jersey 07102. The Clerk of the Bankruptcy Court will not provide this information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

### 1.    Time and Place of the Confirmation Hearing

The hearing at which the Court will determine whether to confirm the Plan will take place on _____ (a.m./p.m.), in Courtroom 3D, Martin Luther King Jr. Federal Building, 50 Walnut Street, Newark, New Jersey 07102.

### 2.    Deadline for Voting for or against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Marc C. Capone, Esq., Gillman Capone, LLC, 60 Highway 71, Unit 2 , Spring Lake Heights, NJ 07762.
Your ballot must be received by _____, 2025 or it will not be counted.

### 3.    Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon Marc C. Capone, Esq., Gillman Capone, LLC, 60 Highway 71, Unit 2, Spring Lake Heights, New Jersey 07762 by _____, 2025.

### 4.    Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact, Marc C. Capone, Esq., Gillman Capone, LLC, 60 Highway 71, Unit 2, Spring Lake Heights, New Jersey 07762 (#732-528-1166)

## C.    Disclaimer

The information contained in this Disclosure Statement is provided by the Debtors, Jean Paul and Lisa Romes. The financial data relied upon in formulating the Plan is based on the Debtors' books and records, financial projections, and personal knowledge. The Plan Proponents represent that everything stated in the Disclosure Statement is true to the Proponents' best knowledge.

**PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.**

## II.
## BACKGROUND

**A.       Description and History of the Debtors' Business**

The Debtors were the owners of four (4) Urgent Care Centers, two in Pennsylvania and two in New Jersey, all of which operated under Romes Urgent Care Services, LLC.  Jean Paul Romes is a doctor and was primarily responsible for operating the Urgent Care Centers. The COVID lockdowns initiated the Urgent Care Centers demise as the Centers began to lose money. Subsequently, two new medical clinics opened nearby the Debtors' Urgent Care Centers in Parsippany and Bridgewater, which caused a further decrease in revenue and larger losses monthly.

In addition to the loss of revenue, the expenses for the Urgent Care Centers increased.  The Small Business Association loans that Romes Urgent Care Services, LLC had originally taken out to help them expand into New Jersey adjusted the interest rates and the monthly payments increased from $32,000.oo to $50,000.00.  Also, the rent on the Parsippany location was increased by $35,000.00 for the year due to a miscalculation of taxes.  Finally, due to being a small Urgent Care Center and being unable to compete with the larger care centers, they had no leverage to negotiate with insurance companies and thus had not had a reimbursement increase in over 10 years.

All these factors, led to the closing of the Debtors' Urgent Care Centers.  Dr. Romes is now employed as an Emergency Room doctor by multiple hospitals and is paid as a 1099 independent contractor.

**B.       Principals/Affiliates of Debtors' Business**

The Debtors are individuals.  The Debtors affiliated business was known as Romes Urgent Care Services LLC, which no longer operates.

**C.      Management of the Debtors Before and During the Bankruptcy**

The Debtors are individuals and will be managing their personal finances.

**D.      Events Leading to Chapter 11 Filing**

Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case: The Debtors were the owners of four (4) Urgent Care Centers, two in Pennsylvania and two in New Jersey, all of which operated under Romes Urgent Care Services, LLC.  Jean Paul Romes is a doctor and was primarily responsible for operating the Urgent Care Centers. The COVID lockdowns initiated the Urgent Care Centers' demise as the Centers began to lose money.  The volume of patients dropped dramatically as no one wanted to be around sick people. Subsequently, two new medical clinics opened nearby the Debtors' Urgent Care Centers in Parsippany and Bridgewater, which caused a further decrease in revenue and larger losses monthly.

In addition to the loss of revenue, the expenses for the Urgent Care Centers increased. The Small Business Administration ("SBA")loans that Romes Urgent Care Services, LLC had originally taken out to help them expand into New Jersey adjusted the interest rates and the monthly payments increased from $32,000.oo to $50,000.00.  Also, the rent on the Parsippany location was increased by $35,000.00 for the year due to a miscalculation of taxes.  Finally, due to being a small Urgent Care Center and being unable to compete with the larger care centers, they had no leverage to negotiate with insurance companies and thus had not had a reimbursement increase in over 10 years.  Thus, their revenue had no way to continue to keep up with the increasing expenses.

Finally, in February of 2024 there was the nationwide Change Healthcare cyber-attack. This delayed processing of insurance claims and initially dropped the Center's revenue to zero. The Debtors were forced to close the Urgent Care Centers but as they were small business owners they were required to sign personally for many of the business debts. The SBA also required the Debtors execute mortgages on their residence to further secure the loans. Thus, the

Debtors had to explore options to restructure their debt.

The Debtors sought relief under Chapter 11 of the Bankruptcy Code to obtain the immediate benefits of the automatic stay of 11 U.S.C. § 362, to avoid the imposition of Judgments and the involuntary collection activities that would follow, and to obtain a fresh financial start and an opportunity to reorganize their financial affairs.

**E.      Significant Events During the Bankruptcy**

**1.   Bankruptcy Proceedings**

The following is a chronological list of significant events, which have occurred during this case:

a)   Debtors filed for relief under Chapter 11 on June 21, 2024.

b)   The Application for Retention of Gillman Capone LLC as counsel for the Debtors was filed on July 31, 2024 and the Order was entered on August 11, 2024.

c)   The 11 U.S.C. § 341(a) first meeting of creditors was conducted on July 31, 2024.

d)    The Debtors filed monthly operating report ("MOR") for June 2024 on September 24, 2024; the monthly operating report for July 2024 on September 24, 2024, and amended the July MOR on December 13, 2024; the monthly operating report for August 2024 on October 15, 2024 and amended the August MOR on December 13, 2024; the MOR for September 2024 was filed on December 13, 2024.

e)    A Status Conference was conducted by the Court on August 20, 2024.

f)   A Status Conference was conducted by the Court on November 19, 2024.

g)  The Debtors has paid all filing and quarterly trustee fees current and it has filed monthly operating reports through September as of this date and expects to file October and November MOR's in January.

The Court has approved the employment of the following professionals:  Gillman Capone, LLC. were authorized to be employed as counsel for the Debtors by Order dated August 11, 2024. Debtors' counsel has not filed a fee application, but at this time estimates it has incurred $33,500.00 for legal fees and expenses for the time spent since the Debtors has filed for relief under Title 11 in June 2024 through and including the preparation and filing of this Disclosure Statement and the Plan.  Debtors' counsel will spend additional time on a going forward basis during the Disclosure and Plan confirmation process.

### 2.  Other Legal Proceedings

In addition to the proceedings discussed above, the Debtors is currently involved in the following non-bankruptcy legal proceedings:  None.  All non-bankruptcy actions filed against the Debtors were stayed by operation of 11 U.S.C. §362.

### 3.  Actual and Projected Recovery of Preferential or Fraudulent Transfers

No preference or fraudulent conveyance actions exist, and none are expected to be filed.

### 4.  Procedures Implemented to Resolve Financial Problems

Prior to the filing of the within petition and given the impending closure of Romes Urgent Care Services LLC, Dr. Romes went back to work as an Emergency Room Doctor.  Dr. Romes is working as an independent contractor for four separate agencies.  As reflected on the filed MOR's, Dr. Romes has steadily increased his income each month.  The Debtors will be reducing their personal expenses moving forward so as to afford the required plan payments.

### 5.   Current and Historical Financial Conditions

The Debtors' current expenses are those expended by the Debtors during the course of Dr. Romes employment, ordinary living expenses, the United States Trustee's quarterly fees and counsel fees to Gillman Capone LLC as will be allowed by the Court.  Copies of the Debtors' two most recent monthly operating reports to the U.S. Trustee are annexed hereto as **Exhibit B.**

The Debtor's current income consists of payments received from four different agencies for his work as an Emergency Room Doctor The Debtor anticipates that his increase will increase over time as his pay rates and hours increase.

## III.
## SUMMARY OF THE CHAPTER 11 PLAN OF REORGANIZATION

**A.**     **What Creditors and Interest Holders Will Receive Under the Proposed Plan**

The Plan classifies claims and interests in various classes.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**B.**     **Unclassified Claims.**

Certain types of Claims are not placed into voting Classes.  They are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  Such a claim would be one for priority tax payments as governed by 11 U.S.C. §507(8).  The Debtors do not owe priority taxes to the Internal Revenue Service or to the State of New Jersey DOT.

### 1.   Administrative Expenses and Fees

Administrative Expenses are Claims for fees, costs or expenses of administering the Chapter 11 Case which are allowed under Code Section 507(a)(1), including all professional compensation requests pursuant to Sections 330 and 331 of the Code.  The Code requires that all Administrative Expenses, including fees payable to the Bankruptcy Court and the Office of the United States Trustee which were incurred during the pendency of the case, must be paid on the

Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The following chart lists all of the Debtors' unpaid administrative fees and expenses ("Compensation"), an estimate of future professional fees and other administrative claims and fees, and their treatment under the Plan:

| NAME | TYPE OF CLAIM | TREATMENT | ESTIMATED AMOUNT |
|------|---------------|-----------|------------------|
| Clerk's Office | Fees | Paid in full on Effective Date | 0 |
| Office of U.S. Trustee | Fees | Paid in full on Effective Date | $3,600.00 |
| Gillman, Bruton & Capone, LLC | Counsel Fees to date | Paid in full on Effective Date or as otherwise agreed | $35,000.00 (paid $20,000 prior to filing as a retainer) |
| Gillman, Bruton & Capone, LLC | Estimated future Counsel Fees | To be paid as otherwise agreed with Debtors' counsel over the life of the Plan | $750.00/month |
| **TOTAL** | | | $18,600.00 |

### Court Approval of Professional Compensation Required:

Pursuant to the Bankruptcy Code, the Bankruptcy Court must rule on all professional compensation and expenses listed in this chart before the compensation and expenses will be owed. The Professional Person in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Bankruptcy Court must rule on the application.  Only the amount of compensation and reimbursement of expenses allowed by the Court will be owed and required to be paid under this Plan as an administrative claim.

Each professional person who asserts a further administrative claim that accrues before the confirmation date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than 30 days after the Effective Date of the Plan.  Failure to file such an application timely shall result in the professional person's claim being forever barred and discharged.  Each and every other person asserting an administrative claim shall be entitled to file a motion for allowance of the asserted

administrative claim within 60 days of the Effective Date of the Plan, or such administrative claim shall be deemed forever barred and discharged.  No motion or application is required to fix the fees payable to the Clerk's Office or Office of the United States Trustee.  Such fees are determined by statute.  As indicated above, the Debtors will need to pay an estimated $18,600.00 in administrative claims and fees on the Effective Date of the Plan, unless a claimant has agreed to be paid later or the Bankruptcy Court has not yet ruled on the claim.

### 2.        Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years from the date of the entry of the Order for Relief under Section 301, 302, or 303, unless the claimant agrees to a different treatment.

**N/A**

### C.        Classified Claims and Interests

### 1.        Classes of Secured Claims

Secured claims are claims secured by liens on property of the estate. The following chart lists all classes of creditors containing the holders of the Debtors' secured pre-petition claims and their treatment under this Plan:

| CLASS # | CREDITOR AND CLAIM DESCRIPTION | INSIDERS/ IMPAIRED | TREATMENT |
|---|---|---|---|

| 1 | TH MSR Holdings LLC<br>c/o RoundPoint Mortgage<br>Services LLC<br>446 Wrenplace Road<br>Fort Mill SC 29715 | Not an insider.<br>Not Impaired. | TH MSR Holdings LLC is the first mortgage lien holder on the Debtors' residence. Prior to filing, the Debtors were current with their monthly mortgage payments as TH MSR Holdings LLC has filed a proof of claim indicating $0.00 of pre-petition arrears. The proof of claim provided a total amount owed of $306,916.85. The Debtors have continued to make regular monthly mortgage payments pre-confirmation to TH MSR Holdings LLC. Debtors propose to make regular monthly mortgage payments in the amount of $1,901.73 directly to TH MSR Holdings LLC. |
| 1 | Flagstar Bank, NA<br>5151 Corporate Drive<br>Troy, MI 48098 | Not insider<br>Not impaired | Flagstar Bank N.A. is the second mortgage lien holder on the Debtors' residence. Prior to filing, the Debtors were current with their monthly mortgage payments as Flagstar Bank N.A. has filed a proof of claim indicating $0.00 of pre-petition arrears. The proof of claim provided a total amount owed of $87,944.53. The Debtors have continued to make regular monthly mortgage payments pre-confirmation to Flagstar Bank N.A. Debtors propose to make regular monthly mortgage payments in the amount of $847.62 directly to Flagstar Bank N.A |
| 2 | Bank of America N.A.<br>P.O. Box 31785<br>Tampa, FL 33631-3785 | Not insider<br>Not impaired | Bank of America is the lienholder on the Debtors' 2019 Maserati Levante. Debtors is current and will continue to make regular payments directly to Bank of America. |
| 2 | Kubota Credit Corporation<br>PO Box 9013<br>Addison, TX 75001 | Not insider<br>Not impaired | Kubota Credit Corporation ("Kubota")l is the lienholder on the Kubota Lawn Tractor and Front Loader. Debtors are current with payments on the Note and will continue to make regular payments directly to Kubota. |

| 3 | M&T Bank<br>P.O. Box 1508.<br>Buffalo, NY 14240 | Not insider<br>Impaired | M&T Bank is the lender for an SBA loan that was provided to the Debtors' business, Romes Urgent Care Services LLC. The loan was collateralized with all assets of the business and further secured by a personal guaranty of the Debtors and a mortgage on the Debtors' residence. The mortgage is in third lien position on the residence. M&T Bank filed a secured proof of claim indicating a total amount due of $1,598,822.67. The Debtors intend to pay M&T Bank its secured portion of its proof of claim. Based on the Comparative Market Analysis obtained prior to filing by the Debtors, their residence is valued at $800,000.00 less the superior mortgages totaling $394,861.38, the secured portion of M&T Bank's mortgage is $405,138.62 at the interest rate of prime interest rate, 7.5% plus 1%, total interest of 8.5% over a period of 60 months at $8,312.04 per month, to begin 30 days after the effective date. The balance of its claim shall be treated as a Class 6 general unsecured claim. |
| 4 | M&T Bank<br>P.O. Box 1508.<br>Buffalo, NY 14240 | Not insider<br>Impaired | M&T Bank filed a secured proof of claim based on SBA Loan in the amount of $1,366,573.61, which loan was collateralized with all assets of the business and further secured by a personal guaranty of the Debtors and a mortgage on the Debtors' residence. M&T Bank's lien is in 4th position and is subordinate to both the MSR Holdings Company LLC and Flagstar Bank, as well as M&T Bank's prior lien and thus, its claim will be reclassified as a general unsecured claim and treated as a Class 6 general unsecured creditor. |
| 4 | M&T Bank<br>P.O. Box 1508.<br>Buffalo, NY 14240 | Not insider<br>Impaired | M&T Bank filed a secured proof of claim based on a Business Line of Credit provided to Debtors' former business in the amount of $156,129.95, which loan was collateralized with all assets of the business |

and further secured by a personal guaranty of the Debtors. M&T Bank's does not possess a lien against any of the Debtors' property and thus, its claim will be reclassified as a general unsecured claim and treated as a Class 6 general unsecured creditor.

### 2.    Classes of Priority Unsecured Claims

Certain Priority Claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7)  are required to be placed in Classes.  These types of Claims are entitled to priority treatment as follows: the Code requires that each holder of such a Claim receive cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of unsecured Priority Claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claims.  There are no Classes of 507(a)(3), (a)(4), (a)(5), (a)(6), and (a)(7) Priority Claims as the Debtors owes no wages, salaries or commissions to any employees nor any monies for contributions to employee benefit plans.

### 3.    Class of 11 U.S.C. § 523(8) Student Loans

Guaranteed student loans are non-dischargeable pursuant to 11 U.S.C. § 523(a)(8).  The Debtors do have guaranteed student loan obligations.  The following chart identifies this Plan's treatment of the Class of holders of guaranteed student loan claims:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| **5** | U.S.Department of Education c/o Nelnet 121 South 13th Street Lincoln, NE 68508 | No | The Debtors shall defer, forbear or make regular payments directly to Nelnet in accordance with the terms of the Note. |

### 4.    Class of General Unsecured Claims

General Unsecured Claims are uncollateralized Claims not entitled to priority under Code Section 507(a).  The following chart identifies this Plan's treatment of the Class containing all of Debtors' general Unsecured Claims:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 6 | General Unsecured Claims<br>Total amount of allowed claims is $5,295,245.46. | Yes | The general unsecured creditors that have allowed claims shall receive a dividend. The Debtors proposes to pay a base dividend of approximately 0.05% to such allowed general unsecured claims to be paid over a 60-month period. Debtor shall make monthly payments of $430.00 which shall be distributed on a pro-rata basis to general unsecured creditors on a quarterly basis. |

### 5.     Class of Interest Holders

Interest Holders are the parties who hold ownership interest (i.e., Equity Interest) in the Debtors.  If the Debtors is a corporation, entities holding preferred or common stock in the Debtors are interest holders.  If the Debtors is a partnership, the interest holders include both general and limited partners.  In this Chapter 11 case the Debtors is a limited liability company with a sole member, Philip I. Brilliant.  The following chart identifies the Plan's treatment of the Class of Interest holders:

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| N/A | | | |

### D.     Means of Effectuating the Plan.

#### 1.     Funding for the Plan.

The Debtors shall retain the assets of the estate and shall  fund the plan from income received from Jean Paul Romes employment as an Emergency Room doctor.

#### 2.     Post-confirmation Management.

The Debtors will continue to manage their household budget post-confirmation of the Debtors' plan.

### 3.    Disbursing Agent.

Gillman Capone, LLC shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan.  The Disbursing Agent shall be compensated, as set forth in the Plan, retainer of $1,000.00 upon Confirmation of the plan and shall bill hourly for its services as Disbursing Agent.

### E.    Other Provisions of the Plan

### 1.    Executory Contracts and Unexpired Leases

The Debtors are not a party to any executory contracts or unexpired leases
.

The Plan provides that all other Executory Contracts and Unexpired Leases, except for those specifically assumed by the Debtors in writing or previously assumed by Bankruptcy Court Order, shall be deemed rejected.  All proofs of claim with respect to Claims arising from said rejection must be filed with the Court within the earlier of (i) the Bar Date, (ii) the date set forth for filing Claims in any order of the Bankruptcy Court approving such rejection or (iii) thirty (30) days after the Confirmation Date.  Any proofs of claim which are not filed timely, will be barred forever from assertion.

### 2.    Changes in Rates Subject to Regulatory Commission Approval

The Debtors are individuals and are not subject to governmental regulatory commission approval of rates or charges.

### 3.    Retention of Jurisdiction.

The Court will retain jurisdiction as provided in the Plan.

### 4.    Procedures for Resolving Contested Claims.

The Debtors and/or the Disbursing Agent shall have 60 days subsequent to confirmation to

object to the allowance of claims.  The Debtors have reviewed the claims that have been filed, and presently do not anticipate filing an objection to any of the duly filed proofs of claim.

### 5.    Effective Date.

The Plan will become effective on the Effective Date, which is 30 days after the date on which the order of confirmation becomes final.

### 6.    Modification.

The Plan Proponents may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

## F.    Tax Consequences of Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to the Debtors.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

## G.    Risk Factors

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan.  You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors.  Based on the analysis of the risks summarized below, the Plan Proponents believe that the Plan is viable and will meet all requirements of confirmation.  The greatest risk is that the Debtors will become disabled or unemployed and will lose their financial ability to earn sufficient income to make the payments required under the Plan to fund the payments to creditors with allowed claims.

# IV.
## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Proponents CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, that creditors or equity interest holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and that the Plan is feasible. These requirements are not the only requirements for confirmation.

## A.    Who May Vote or Object

### 1.    Who May Object to Confirmation of the Plan.

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 2.    Who May Vote to Accept/Reject the Plan.

A creditor or equity interest holder has a right to vote for or against the Plan if that creditor or equity interest holder has a Claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired Class.

### (a) What Is an Allowed Claim/Interest

As noted above, a creditor or equity interest holder must first have an allowed claim or equity interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or equity interest is filed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the

claim or equity interest for voting purposes. **THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE IS <u>August 30, 2024</u>**

A creditor or equity interest holder may have an allowed claim or equity interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtors' schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An equity interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### (b) What Is an Impaired Claim/Equity Interest

As noted above, an allowed claim or equity interest only has the right to vote if it is in a Class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a Class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that Class 100% of their claim plus interest. In this case, the Proponents believe that members of classes THREE. FOUR AND FIVE are impaired and that holders of claims in those classes are therefore entitled to vote to accept or reject the Plan. Parties who dispute the Proponents' characterization of their claim or equity interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponents have incorrectly characterized the class.

### 3.    Who Is <u>Not</u> Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**4.      Who Can Vote in More Than One Class**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured Claim.

**5.      Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in Section IV A7 and 8.

**6.      Votes Necessary for a Class to Accept the Plan**

A class of claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the allowed claims that actually voted, voted in favor of the Plan.  A class of equity interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the allowed equity interest holders of such class which actually voted, voted to accept the Plan.

**7.      Treatment of Nonaccepting Classes**

As noted above, even if <u>all</u> impaired classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Code.  The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown".  The Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Equity Interests if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

**8.      Request for Confirmation Despite Non-acceptance by Impaired Class(es).**

The Proponents ask the Bankruptcy Court to confirm this Plan by cramdown on impaired classes if any of these classes do not vote to accept the Plan.

**B.**     **Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test", which requires a hypothetical liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or equity interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtors' assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed Claims.  Finally, interest holders receive the balance that remains after all creditors are paid, if any.

In order for the Bankruptcy Court to be able to confirm this Plan, the Bankruptcy Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such interest holders would receive under a Chapter 7 liquidation.  The Proponents maintain that this requirement is met here for the reasons that the fair market value of its assets at the time of its filing the petition amounted to $1,550,654.00.00. These assets consisted of real estate, vehicles, household goods, bank accounts, and business assets accounts receivable, equipment, office furniture and equipment.

 All of the business assets are subject to the blanket liens held by M&T Bank, s first lien holder, and Cross River Bank, as the secondary lienholder.  Additionally, Stearns Bank holds a purchase money security interest in the X-Ray machine.  Furthermore, Debtors no longer have access to any of the business equipment and machinery as the business leases have been terminated and upon information the business assets remain in the leasehold premises.

The Debtors' residence is fully encumbered, as it is valued at $800,000.00 and has mortgage liens which encumber the property in the total amount of $3,294,805.16.

The remaining assets of the Debtors if liquidated in a Chapter 7 proceeding, Administrative claims for a chapter 7 Trustee's compensation/commission would be approximately $18,540.98; estimated chapter 11 administrative expenses are $18,600.00 and the Internal Revenue Service, and State of New Jersey have not asserted priority claims. Thus, a sale of the Debtors' assets would

result in a payment to unsecured creditors approximately $44,027.04, and after payment of administrative claims of approximately $18,600.00 results in a distribution to general unsecured claims in the amount of $26,924.25. Thus, the Debtors' general unsecured creditors will receive a dividend in an amount equal to what they would receive if the assets of the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.  All creditors and interest holders will receive at least as much as under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation, since the administrative expenses and costs of administration of a Chapter 7 case would further reduce the net amount of sales proceeds.

**Assets**
Real Property:

| | |
|---|---|
| **Residence:** | $800,000.00 |
| First Mortgage TH MSR): | ($306,916.85) |
| 2nd Mortgage (Flagstar) | ($87,944.53) |
| 3rd Mortgage (M&T Bank) | ($1,598,822.67) |
| 4th Mortgage (M$T Bank) | ($1,366,573.61) |
| **Net Equity:** | **$0.00** |
| **1068 Tenth Ave**.: | $110,804.00 |
| Costs of Sale (9%) | ($9,972.36) |
| Chpt 7 Adm Costs | ($8,092.70) |
| _ | $92,738.94 |
| Less non-Debtor's 2/3 interest (66.66%) | ($61,819.78) |
| Exemption | ($13,950.00) |
| Net Equity in Debtor's 1/3 interest | **$16,969.15** |

Personal property

| | |
|---|---|
| Vehicles | $ 85,800.00 |
| Secured Liens | ($ 17,458.17) |
| Costs of Sale (9%) | ($7,722.00) |
| Chpt 7 Adm Costs | ($9,954.20) |
| Exemptions | ($23,740.68) |
| Net Equity | **$26,924.95** |
| Bank Accounts | $2,637.00 |
| Chpt 7 Adm/costs | ($494.08) |
| Exemptions | ($1610.00) |

Net Equity                                    **$532.92**

 Total assets                                **$44,427.04**

**Liabilities**

 Priority Claims:

| | |
|---|---|
| Chapter 7 admin. expenses | $0.00 (calculated above) |
| Chapter 11 admin. expenses | $18,600.00 |
| Other priority claims | $0.00 |
| Total priority claims | $ 18,600.00 |

Amount available for unsecured claims
 (total assets minus priority claims)          $ 25,827.04

Total unsecured claims                         $5,295,245.46.
 Estimated dividend in Chapter 7
 (amount available – unsecured claims)        0.50%

**C.      Feasibility**

     Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

     There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on such date.  The Proponents maintain that this aspect of feasibility is satisfied as illustrated here:

**Cash Debtors estimates it will have
on hand by Effective Date**

| | |
|---|---|
| To Pay: **Administrative Expenses** | In full/or as per Agreement with counsel with regard to payment of counsel fees over time once approved by the Court. |
| To Pay: **Statutory costs & charges** | In full |

To Pay**: Other Plan Payments due**   In full
**on Effective Date** -

**Balance   after   paying   these   -0-
amounts**

The sources of the cash Debtors will have on hand by the Effective Date, as shown above are:

**$7,824.57**      Cash in DIP Account as of 12/31/24

$ **0.00**      Cash in Gillman Capone, LLC Attorney Trust Account

**$21,000.00**    Anticipated additional funds available prior to confirmation

$**28,284.57**   Total

The second aspect considers whether the Proponents will have sufficient cash over the life of the Plan to make the required Plan payments.  The Proponents believe that this second aspect of the feasibility requirement is met due to the continued employment of Jean Paul Romes as an Emergency Room Doctor. The Debtors' Operating Reports from July 2024 through November 2024 indicate that the Debtors have been able to generate $240,439.00 of gross income, which is an average of $48,088.00 per month.  Additionally, the Debtors have various monthly expenses that will be coming to an end or will be reduced over the next few months.

The Debtors has prepared an analysis and projections of its cash flow over the five years of the proposed plan of reorganization.  A copy of the Personal Five Year Cash Flow Projection is annexed hereto as **<u>Exhibits C</u>**. The Cash Flow Projections illustrate that the Debtors will continue to accumulate an average of $126,000.00 per year in net income. The amount and timing of payments to creditors will be as follows:  The Debtors shall make monthly payments to the Disbursing Agent, in the amount of **$8.742.00** per **month**.  From the Debtors' monthly payments, quarterly payments shall be made by the  Disbursing Agent to pay the secured claim of M&T Bank and to general unsecured creditors.

# V.
## EFFECT OF CONFIRMATION OF PLAN

**A.     Discharge**

The Plan provides that upon completion of the Plan, the Debtors shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. §1141. However, any liability imposed by the Plan will not be discharged: If Confirmation of the Plan does not occur or if, after Confirmation occurs, the Debtors elect to terminate the Plan, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims against the Debtors or their estate or any other persons, or to prejudice in any manner the rights of the Debtors or its estate or any person in any further proceeding involving the Debtors or its estate. The provisions of the Plan shall be binding upon Debtors, all creditors and all equity interest holders, regardless of whether such claims or equity interest holders are impaired or whether such parties accept the Plan, upon Confirmation thereof.

**B.     Re-vesting of Property in the Debtors**

Except as provided in the Plan, the confirmation of the Plan re-vests all of the property of the estate in the Debtors.

**C.     Modification of Plan**

The Proponents may modify the Plan at any time before confirmation.  However, the Bankruptcy Court may require a new Disclosure Statement and/or re-voting on the Plan if the Proponents modify the Plan before confirmation.

The Proponents may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modification after notice and a hearing.  The Proponents further reserve the right to modify the treatment of any allowed claims at any time after the Effective Date of the Plan upon the consent

of the creditor whose allowed claim treatment is being modified, so long as no other creditors are materially adversely affected.

**D.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under Section 1112(b) of the Code, after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Section 1112(b) of the Code.  If the Bankruptcy Court orders the Chapter 11 Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will re-vest in the Chapter 7 estate, and the automatic stay will be re-imposed upon the re-vested property only to the extent that relief from stay was not previously granted by the Court during this case.

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.

Dated:  1/10/25          By:  **/s/ Jean Paul Romes_____**
                               JEAN PAUL ROMES, Proponent

Dated:  1/10/25          By:  **/s/ Lisa A. Romes_____**
                               LISA A. ROMES, Proponent