<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-2(c)

STARK & STARK
A Professional Corporation
By: Thomas S. Onder, Esq.
100 American Metro Boulevard
Hamilton, NJ 08619
(609) 219-7458
tonder@stark-stark.com

*Attorneys for Creditor, Bridgewater Regency, LLC*

</td></tr>
</table>

| | |
|---|---|
| In re:<br><br>Jean-Paul Romes & Lisa A. Romes,<br><br>Debtors. | Chapter 11<br><br>Case Nos. 24-16283 (JKS) |

## APPLICATION PURSUANT TO LOCAL BANKRUPTCY RULE 9021-1(b) FOR ENTRY OF CONSENT ORDER

---

       Creditor, Bridgewater Regency, LLC ("Bridgewater") and above captioned debtors (the "Debtors"), submits this application (the "Application") seeking the entry of a consent order (the "Order"), in the form attached as Exhibit 1, approving and authorizing the entry of the Consent Order Allowing Proof of Claim to be Filed Out of Time. In support of this Application, Bridgewater respectfully states as follows:

### JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.      This Application is made pursuant to D.N.J. LBR 9021-1(b).

2.      This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§1334 and 157(b). This is a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (G) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

**BACKGROUND**

3.      Jean-Paul Romes & Lisa A. Romes ("Debtors") filed for bankruptcy protection on June 21, 2024

4.      Bridgewater is a creditor and former landlord of Romes Urgent Care Services, LLC dba MedFirst Urgent Care ("Tenant"), a tenant at Chimney Rock Crossing East Shopping Center, Bound Brook, NJ 08805 pursuant to a lease dated December 20, 2018 (the "Lease").

5.      Debtors were guarantors of the Lease.

6.      On or about July 26, 2024, Bridgewater filed a complaint against tenant and Debtors. See attached a true and correct copy of the Complaint as Exhibit "A".

7.      Bridgewater was not provided notice of the bankruptcy and was not listed as a creditor.

8.      The claims deadline was August 30, 2024.

9.      Bridgewater discovered the Debtors filing after the claims deadline.

10.     Once it discovered the bankruptcy filing, Bridgewater ceased its state court efforts against Debtors.

11.     As of the petition date, Bridgewater was owed $149,394.87 in pre-petition rents, plus additional rents including attorneys' fees and costs, future rents and damages. *See accounting attached as Exhibit "C" to the Complaint, Exhibit "A".*

12.      Bridgewater has requested and the Debtors agree to permit Bridgewater to file a late proof of claim.  Bridgewater is serving the application on the Office of the United States Trustee.

**RELIEF REQUESTED**

13.     Bridgewater requests that the Court enter an order allowing it to file a late proof of claim.

2

## NOTICE

14.    Bridgewater has served a copy of this Application, the proposed form of order and the

Application on counsel for Debtor and the Office of the United States Trustee.

## CONCLUSION

WHEREFORE, Bridgewater respectfully requests that the Court enter the Consent

Order submitted herewith and grant such other and further relief as the Court deems just and

proper.

Dated:  January 23, 2025                          Respectfully submitted,
                                                 **STARK & STARK, P.C.**

                                                 _/s/ Thomas S. Onder_____
                                                 Thomas S. Onder, Esq.
                                                 tonder@stark-stark.com
                                                 100 American Metro Blvd.
                                                 Hamilton, NJ 08619
                                                 Direct: (609) 219-7458
                                                 Facsimile (609) 895-7395

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**STARK & STARK, P.C.**
Stark & Stark, P.C.
Attn: Thomas S. Onder, Esq.
100 American Metro Blvd.
Hamilton, NJ 08619
(609) 219-7458
tonder@stark-stark.com

Attorneys for Creditor, Bridgewater Regency,
LLC

Chapter 11

Case No. 24-16283-JKS

In Re:

Jean-Paul Romes Joint Debtor, Lisa A. Romes,

Debtors.

## CONSENT ORDER ALLOWING CREDITOR, BRIDGEWATER REGENCY, LLC TO FILE A PROOF OF CLAIM OUT OF TIME

The relief set forth on the following pages, numbered one (1) through (2) is

hereby ORDERED:

4927-1845-9153. v 3

Upon the request of Bridgewater Regency, LLC ("Bridgewater") by its attorneys, Stark & Stark, P.C., and Jean-Paul Romes and Lisa A. Romes (collectively, the "Debtors") by its attorneys, Gillman Capone, LLC having consented to entry of this Consent Order, and Debtors having consented to the relief set forth herein; and good cause appearing therefore, it is hereby ORDERED as follows:

1.  The Proof of Claim deadline was August 30, 2024.

2.  Bridgewater shall be allowed to file a Proof of Claim out of Time.

3.  Bridgewater shall have until February 14, 2025 to file a Proof of Claim.

4.  This Consent Order shall be binding upon Bridgewater and the Debtors, each individually and collectively, and all of their respective heirs, administrators, executors, successors and assigns.

5.  In the event the Debtors' plan of reorganization (or Any amended or modified plan) is not consistent with the terms and conditions of this Consent Order, the terms and conditions of this Consent Order shall control.

We, the undersigned, after consulting with our respective clients, consent to entry of this Stipulation and Order.

**STARK & STARK**
A Professional Corporation
Attorneys for Bridgewater Regency, LLC

By: _____
Thomas S. Onder, Esq.

Dated: January ___, 2025

**GILLMAN CAPONE, LLC**
Attorneys for Debtor and Joint Debtor

By: _____
Marc C. Capone, Esq.

Dated: January 27, 2025

# EXHIBIT A

STARK & STARK
A Professional Corporation
Attn: Thomas S. Onder
Atty. I.D. No. 00579-2004
100 American Metro Blvd.
Hamilton, NJ 08619
(609) 896-9060
*Attorneys for Plaintiff, Bridgewater Regency, LLC*

|  |  |
|---|---|
| BRIDGEWATER REGENCY, LLC, a Delaware limited liability company,<br><br>          Plaintiff,<br><br>v.<br><br>ROMES URGENT CARE SERVICES, LLC DBA MEDFIRST URGENT CARE, a Pennsylvania limited liability company, JEAN PAUL ROMES, an individual, and LISA A. ROMES, an individual,<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br><br>SOMERSET COUNTY<br><br>DOCKET NO.<br><br>Civil Action<br><br>**COMPLAINT** |

Plaintiff, Bridgewater Regency, LLC, a Delaware limited liability company ("Landlord"), by way of Complaint says:

**Parties**

1.      Landlord is the owner of a commercial shopping center known as the Chimney Rock Crossing East Shopping Center, Bound Brook, NJ 08805 (the "Shopping Center").

2.      Defendant, Romes Urgent Care Services, LLC dba MedFirst Urgent Care, a Pennsylvania limited liability company ("Tenant") has a business mailing address of 101 Pocono Commons, Suite 101, Stroudsburg, PA 18360.

3.      Defendant, Jean Paul Romes is an individual with a residential mailing address of 5125 Glenbrook Road, Stroudsburg, PA 18360.

4.      Defendant, Lisa A. Romes is an individual with a residential mailing address of 5125 Glenbrook Road, Stroudsburg, PA 18360.

5.      Defendants, Jean Paul Romes and Lisa A. Romes are each guarantors of the commercial lease subject to this complaint (collectively, the "Guarantors").  (Hereinafter Landlord, Tenant, and Guarantors shall be collectively referred to as the "Parties").

**Background – Lease**

10.      On or about December 20, 2018, Landlord and Tenant entered into a lease agreement (the "Lease") for Unit A140 within the Shopping Center (the "Premises").  (See attached a true and correct copy of the Lease as Exhibit "A").

11.      Pursuant to Articles VI, V and VIII of the Lease, Tenant agreed to pay monthly rent and other fees and costs to Landlord (collectively, the "Lease Charges").

12.      Pursuant to the terms of the Lease, including Article XVIII of the Lease, Landlord is entitled to recover certain amounts from Tenant in the event that Landlord is required to enforce its rights under the Lease, including, but not limited to, interest, late charges, attorneys' fees and costs, and an internal and external legal cost.

13.      Pursuant to the terms of the Lease, including Article XXV of the Lease, Tenant agreed to waive a trial by jury.

**Guarantee**

14.      On or about December 20, 2018, contemporaneously with the Lease, the Guarantors executed a guaranty of lease (the "Guarantee"). (See true and correct copy of the Guarantee as Exhibit "D" to the Lease, which is Exhibit "A", attached).

4865-8154-4147, v. 3

15.     The Guarantee provide for:

1.      Guarantor absolutely, unconditionally and irrevocably guarantees the prompt and complete payment and performance when due, whether by acceleration or otherwise, of all obligations, liabilities and covenants, whether now in existence or hereafter arising, of Tenant to Landlord, and arising under the Agreement, including without limitation all amounts due to Landlord as rent or otherwise under the Agreement (the "Obligations").  Guarantor hereby agrees to pay and/or perform punctually, upon written demand by Landlord, each such Obligation which is not paid or performed as and when due and payable by Tenant, in like manner as such amount is due from Tenant.  For purposes hereof, the Obligations shall be performed and/or due and payable when due and payable under the terms of the Agreement notwithstanding the fact that the collection or enforcement thereof as against Tenant may be stayed or enjoined under Title 11 of the United States Code or similar applicable law.  This Guaranty is one of payment and not of collection.  Notwithstanding the foregoing, provided that no monetary Event of Default by Tenant has occurred under the Agreement, commencing as of the first day of the forty-ninth (49th) month after the Commencement Date, Guarantor's liability hereunder, from the date Landlord has lawful possession of the Premises, shall be limited to one (1) month's installment of Minimum Rent and Additional Rent due under the Agreement, at the rate payable at the time of the Event of Default, multiplied by twelve (12); provided, however, the foregoing is a limitation of damages with respect to Tenant's failure to pay Minimum Rent or Additional Rent, and Guarantor shall remain liable for (i) all damages and amounts payable to Landlord which accrued prior to Tenant's surrender of the Premises, (ii) all other damages which arise out of or result from any other Event of Default under the Lease, (iii) all utility charges current and past due for Tenant's utility usage and (iv) all attorney's fees incurred by Landlord in connection with the enforcement of this Guaranty.

See Exhibit "A", Guarantee, Exhibit "D", ¶1.

**Default and Demand**

16.     Tenant defaulted in payment to Landlord for rent due under the Lease.

17.     On or about February 29, 2024, Landlord filed an eviction action against the Tenant. (See attached a true and correct copy of the Eviction Complaint as Exhibit "B").

18.     On or about May 3, 2024, the Court entered a Judgement of Possession in favor of the Landlord.

19.     On or about May 15, 2024, the Court's officer performed a lockout at the Premises, providing possession to Landlord.

20.     Since May 15, 2024, Landlord has attempted to re-let the Premises.

21.     Despite demand, payment has not been made on the Premises.

22.     As of July 23, 2024, there was One Hundred Sixty-Three Thousand One Hundred Thirty-Eight and 48/100 Dollars (**$163,138.48**), plus additional rents, including, late fees, attorneys'

4865-8154-4147, v. 3

fees and costs, damages and other expenses and charges. (See attached a true and correct copy of the accounting as Exhibit "C").

## COUNT ONE - BREACH OF CONTRACT

1.    Landlord hereby incorporates the prior paragraphs as if so repeated herein at length.

2.    Defendant, Tenant defaulted under their obligations to Landlord by <u>inter alia</u>, failing to make payment when due.

3.    The Lease provides that Defendant, Tenant is liable to Landlord for all amounts due and owing under the Lease, including rent, interest, damages, costs, expenses, and reasonable attorneys' fees, incurred by Landlord in obtaining or enforcing payment of the obligation evidenced by the Lease, plus damages and interest.

4.    The Guarantee provides that Defendants, Guarantors are liable to Landlord for all amounts due and owing under the Lease, including rent, interest, damages, costs, expenses, and reasonable attorneys' fees, incurred by Landlord in obtaining or enforcing payment of the obligation evidenced by the Lease, plus damages and interest.

**WHEREFORE,** Bridgewater Regency, LLC, a Delaware limited liability company demands judgment against Defendants, Romes Urgent Care Services, LLC dba MedFirst Urgent Care, a Pennsylvania limited liability company, Jean Paul Romes, an individual and Lisa A Romes, an individual, jointly and severally, as follows:

a.    For damages equal to the outstanding amount due on the Lease and Guarantee, plus interest, damages, late fees, reasonable attorneys' fees and costs, late fees and other expenses and charges; and

b.    For such other and further relief as is equitable, appropriate and just.

-4-

## COUNT TWO – UNJUST ENRICHMENT

5.      Landlord hereby incorporates the prior paragraphs as if so repeated herein at length.

6.      Tenant operated its commercial enterprise at the Premises without paying all rent due and owing.

7.      Defendants' actions and inactions have caused them to be unjustly enriched at Landlord's expense.

**WHEREFORE,** Bridgewater Regency, LLC, a Delaware limited liability company demands judgment against Defendants, Romes Urgent Care Services, LLC dba MedFirst Urgent Care, a Pennsylvania limited liability company, Jean Paul Romes, an individual and Lisa A Romes, an individual, jointly and severally, as follows:

a.      For damages equal to the outstanding amount due on the Lease and Guarantee, plus interest, damages, late fees, reasonable attorneys' fees and costs, late fees and other expenses and charges; and

b.      For such other and further relief as is equitable, appropriate and just.

STARK & STARK
A Professional Corporation
Attorneys for Plaintiff

Dated: July 24, 2024                    */S/ Thomas S. Onder*
Thomas S. Onder, Esq.

4865-8154-4147, v. 3

## CERTIFICATION

Pursuant to <u>R.</u> 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other Court or of a pending arbitration or proceeding to the best of my knowledge and belief.  Also, to the best of my knowledge and belief, no other action or arbitration proceeding is contemplated, other than an eviction action that the Landlord reserves its right to file.  Further, other than the parties set forth in this pleading and the previous pleadings, if any, at the present time we know of no other parties that should be joined in the within action.

STARK & STARK
A Professional Corporation
Attorneys for Plaintiff

Dated: July 24, 2024                 */S/ Thomas S. Onder*
Thomas S. Onder, Esq.

### CERTIFICATION OF COMPLIANCE WITH RULE 1:38-7(c)

The undersigned hereby certifies that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(c).

STARK & STARK
A Professional Corporation
Attorneys for Plaintiff

Dated: July 24, 2024                 */S/ Thomas S. Onder*
Thomas S. Onder, Esq.

4865-8154-4147, v. 3

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Pursuant to the provisions of <u>R.</u> 4:25-4, the Court is advised that Courtney A. Martin, Esquire, is hereby designated as trial counsel.

<div style="text-align: right">

STARK & STARK
A Professional Corporation
Attorneys for Plaintiff

</div>

Dated: July 24, 2024                                     <u>*/S/ Thomas S. Onder*</u>
                                                                    Thomas S. Onder, Esq.

4865-8154-4147, v. 3

# EXHIBIT A

**SHOPPING CENTER LEASE**
between

**BRIDGEWATER REGENCY, LLC**
(Landlord)

and

**ROMES URGENT CARE SERVICES, LLC**
d/b/a MedFirst Urgent Care
(Tenant)

at

Chimney Rock East
Bound Brook, New Jersey

December 20 , 20 18

INITIAL HERE
Landlord
Tenant 

CONTENTS

ARTICLE 1. INTRODUCTORY PROVISIONS ....................................................................................... 1
ARTICLE 2. PREMISES ..................................................................................................................... 5
ARTICLE 3. TERM ............................................................................................................................ 7
ARTICLE 4. RENT ............................................................................................................................ 7
ARTICLE 5. TAXES AND ASSESSMENTS ........................................................................................ 8
ARTICLE 6. TENANT'S CONDUCT OF BUSINESS ........................................................................... 9
ARTICLE 7. USE OF PREMISES ...................................................................................................... 9
ARTICLE 8. COMMON AREAS ....................................................................................................... 10
ARTICLE 9. HAZARDOUS SUBSTANCES....................................................................................... 11
ARTICLE 10. ALTERATIONS TO PREMISES .................................................................................. 12
ARTICLE 11. LIABILITY, INDEMNITY AND INSURANCE ................................................................ 13
ARTICLE 12. DESTRUCTION.......................................................................................................... 15
ARTICLE 13. MAINTENANCE ......................................................................................................... 16
ARTICLE 14. UTILITIES................................................................................................................... 17
ARTICLE 15. LIENS ........................................................................................................................ 18
ARTICLE 16. SIGNAGE................................................................................................................... 19
ARTICLE 17. ASSIGNMENT AND SUBLETTING............................................................................. 19
ARTICLE 18. DEFAULTS BY TENANT............................................................................................. 21
ARTICLE 19. LIMITATION OF LANDLORD'S LIABILITY .................................................................. 22
ARTICLE 20. SUBORDINATION AND ATTORNMENT..................................................................... 23
ARTICLE 21. ESTOPPEL CERTIFICATES...................................................................................... 23
ARTICLE 22. QUIET ENJOYMENT ................................................................................................. 23
ARTICLE 23. SURRENDER AND HOLDING OVER ......................................................................... 23
ARTICLE 24. CONDEMNATION...................................................................................................... 24
ARTICLE 25. MISCELLANEOUS ..................................................................................................... 25
ARTICLE 26. INTENTIONALLY OMITTED ...................................................................................... 27
ARTICLE 27. RADIUS RESTRICTION ............................................................................................ 27
ARTICLE 28. EXCLUSIVE ............................................................................................................... 28
ARTICLE 29. LIMIT ON COMMON AREA COSTS ........................................................................... 28
ARTICLE 30. OPTION TO EXTEND ................................................................................................ 29
ARTICLE 31. TENANT ALLOWANCE .............................................................................................. 30
ARTICLE 32. LANDLORD'S LIEN.................................................................................................... 31
ARTICLE 33. SUBORDINATION OF LANDLORD'S LIEN ................................................................ 31
ARTICLE 34. TENANT'S FINANCIAL STATEMENTS....................................................................... 32
ARTICLE 35. MEDICAL WASTE AND OTHER BIOHAZARDS ......................................................... 32
ARTICLE 36. SATELLITE DISH EQUIPMENT ................................................................................. 32
ARTICLE 37. SECURITY DEPOSIT ................................................................................................ 32
ARTICLE 38. PROPERTY SPECIFIC PROVISIONS ..................................Error! Bookmark not defined.32

EXHIBIT A  LEGAL DESCRIPTION OF SHOPPING CENTER
EXHIBIT B  PART 1 - SITE PLAN OF THE SHOPPING CENTER
EXHIBIT B  PART 2 - LEASING PLAN
EXHIBIT C  TENANT'S WORK
EXHIBIT C-1  SIGN CRITERIA
EXHIBIT C-2  LANDLORD'S WORK
EXHIBIT D  ABSOLUTE UNCONDITIONAL GUARANTY AGREEMENT
EXHIBIT E  REQUIREMENTS AND RESTRICTIONS
EXHIBIT H  SATELLITE DISH EQUIPMENT TERMS AND CONDITIONS
EXHIBIT I  LANDLORD WAIVER AGREEMENT
EXHIBIT J  EXISTING EXCLUSIVE USES AND RESTRICTIVE COVENANTS

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

CHIMNEY ROCK EAST
SHOPPING CENTER LEASE

**THIS SHOPPING CENTER LEASE** (this "Lease"), made and effective as of this 20th day of December, 20$\underline{18}$, is by and between **BRIDGEWATER REGENCY, LLC**, a Delaware limited liability company (herein called "Landlord"), and **ROMES URGENT CARE SERVICES, LLC**, a Pennsylvania limited liability company, d/b/a MedFirst Urgent Care (herein called "Tenant").

In consideration of the obligations of Tenant to pay rent and other charges as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises described herein for the Term described herein and subject to the terms and conditions set forth herein.

### ARTICLE 1. INTRODUCTORY PROVISIONS

**1.1    FUNDAMENTAL LEASE PROVISIONS.** Certain fundamental provisions and terms are presented and/or defined in this Section in summary form to facilitate convenient reference by the parties hereto:

(a) Tenant's trade name (d/b/a)  
(Section 7.1)

MedFirst Urgent Care

(b) Term

One Hundred Twenty (120) full calendar months commencing on the Commencement Date, as defined below (plus the number of months in any options to extend set forth in this Lease, provided any such options to extend are properly exercised by Tenant in accordance with the terms and conditions applicable thereto set forth in this Lease). (Article 3)

(c) Premises

Unit or space number: A140 (Exhibit "B" - Part 2)

Premises Address:
338 Chimney Rock Road
Bound Brook, NJ 08805

Tenant is responsible for independently verifying the accuracy of any Premises Address set forth above. (Section 2.2)

(d) Square footage in Premises (square footage is also sometimes referred to herein as gross leasable area or "GLA")

2,720 square feet (Section 1.5)

(e) GLA in the Landlord's Building

133,870 square feet

(f) Tenant's Proportionate Share

Tenant's Proportionate Share shall be defined as the percentage that the GLA of the Premises bears to the entire GLA of the Landlord's Building.

(g) Minimum Annual Rent (also sometimes referred to as "Minimum Rent")

| Months | Minimum Rent (Monthly) | Minimum Rent (Per Sq. ft. of the Premises per annum) | Minimum Rent (Annual) |
|---|---|---|---|
| 1 - 12 | $12,920.00 | $57.00 | $155,040.00 |
| 13 - 24 | $13,244.13 | $58.43 | $158,929.60 |
| 25 - 36 | $13,575.07 | $59.89 | $162,900.80 |
| 37 - 48 | $13,912.80 | $61.38 | $166,953.60 |
| 49 - 60 | $14,261.87 | $62.92 | $171,142.40 |
| 61 - 72 | $14,617.73 | $64.49 | $175,412.80 |
| 73 - 84 | $14,982.67 | $66.10 | $179,792.00 |
| 85 - 96 | $15,358.93 | $67.76 | $184,307.20 |
| 97 - 108 | $15,742.00 | $69.45 | $188,904.00 |
| 109 - 120 | $16,136.40 | $71.19 | $193,636.80 |

plus applicable sales tax, if any. If the Commencement Date is not the first day of a month, then Minimum Rent from the Commencement Date

1

INITIAL HERE
Landlord    _____
Tenant      _____

REGENCY
CENTERS

|  |  | until the first day of the following month shall be prorated on a daily basis (based upon the monthly Minimum Rent for Month 1 of the Term). (Section 4.2) |
|---|---|---|
| (h) | Percentage Rent | None |
| (i) | Commencement Date | The earlier of (a) one hundred twenty (120) days from the later of (i) Landlord's delivery of the Premises to Tenant in accordance with this Lease, or (ii) the date on which Tenant obtains Tenant's Permits (as hereinafter defined) or (b) the date when Tenant opens for business from the Premises. |
|  |  | (Article 3) |
|  |  | Tenant shall begin paying Minimum Annual Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance on the Commencement Date. |
| (j) | Use | The Demised Premises shall be used as an urgent care medical facility. The operation of a branded MedFirst Urgent Care medical facility operated by fully licensed doctors and other health professionals specializing in providing urgent medical care services to patients; and for no other purpose whatsoever. |
|  |  | Notwithstanding anything to the contrary, such clinic shall not be operated as a primary care or specialty care physician's office, ambulatory, same day or other surgery center or emergency room or abortion clinic and shall not be a place that regularly receives patients at and/or transports patients by ambulance. |
|  |  | (Article 7) |
|  |  | Notwithstanding the foregoing, Tenant agrees that it will not violate, and Tenant's use set forth herein is expressly subject to, the existing exclusive uses and restrictive covenants set forth in Exhibit "J" to this Lease. |
| (k) | Guarantor(s) (if none, so state) | Jean Paul Romes, MD and Lisa A. Romes (Exhibit "D") |
| (l) | Default Rate | The lesser of twelve percent (12%) per annum or the maximum lawful rate of interest permitted by applicable law. |
| (m) | Security Deposit | $31,053.32 |
| (n) | Brokers | Regency Centers, L.P. and CBRE, Inc. representing Landlord and Jeffery Realty, Inc. representing Tenant (Section 25.5) |
| (o) | Estimated Common Area Costs for 2018 | $4.56 per square foot of GLA of the Premises per annum (Subject to annual adjustment) (Article 8) |
| (p) | Estimated Taxes for 2018 | $6.08 per square foot of GLA of the Premises per annum (Subject to annual adjustment) (Article 5) |
| (q) | Estimated Insurance for 2018 | $0.86 per square foot of GLA of the Premises per annum (Subject to annual adjustment) (Article 11) |
| (r) | Promotional Fund (if not applicable, so state) | N/A |

2

INITIAL HERE
Landlord
Tenant  

(s)  Estimated Monthly Payment
     at Commencement Date

Minimum Rent                         $12,920.00

Additional Rent:

Common Area Costs                    $1,033.60

Taxes                                $1,378.13

Insurance                            $194.93

Promotional Fund                     N/A
(if not applicable, so state)
Signage Fee                          $300.00*
(if not applicable, so state)        (Article 16)

                                     * Fee commences on installation, rather than on the
                                     Commencement Date.  Fee is not included in the
                                     calculations below of Total Monthly Additional Rent,
                                     State and County Sales Tax and Total Estimated
                                     Monthly Payment at Commencement Date.

                                     In the event of any conflict between the above and
                                     the terms and conditions related to any signage fee
                                     set forth in Article 16, Article 16 shall control.

Satellite Fee                        $0.00
(if not applicable, so state)        (Exhibit "H")

                                     In the event of any conflict between the above and
                                     the terms and conditions related to any satellite fee
                                     set forth in Exhibit "H", Exhibit "H" shall control.

Total Monthly Additional Rent        $2,606.66

State and County Sales Tax           N/A as of the date of this Lease

Total Estimated Monthly Payment      $15,526.66
at Commencement Date

(t)  Address for Notices

To Landlord:                         c/o Regency Centers Corporation
                                     One Independent Drive
                                     Suite 114
                                     Jacksonville, Florida  32202-5019
                                     Attention: Lease Administration

                                     With a copy to:
                                     c/o Regency Centers Corporation
                                     One Independent Drive
                                     Suite 114
                                     Jacksonville, Florida  32202-5019
                                     Attention: Legal Department

                                     With a copy to:
                                     c/o Regency Centers Corporation
                                     150 Monument Road
                                     Suite 406
                                     Bala Cynwyd, Pennsylvania 19004
                                     Attention: Property Management

To Tenant:                           Romes Urgent Care Services, LLC
                                     101 Pocono Commons, Suite 101
                                     Stroudsburg, Pennsylvania 18360
                                     Attn: Jean Paul Romes, MD

3

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant        

(u)  Tenant Allowance

$25.00 per square foot of GLA of the Premises; subject, however, to the terms and conditions of the Tenant Allowance provision of this Lease.

4

REGENCY
CENTERS



**1.2    REFERENCES AND CONFLICTS.** Article and Section references appearing in Section 1.1 are to designate some of the other places in this Lease where additional provisions applicable to the particular Fundamental Lease Provisions appear. Each reference in this Lease to any of the Fundamental Lease Provisions contained in Section 1.1 shall be construed to incorporate all of the terms provided for under such provisions, and such provisions shall be read in conjunction with all other provisions of this Lease applicable thereto. If there is any conflict between any of the Fundamental Lease Provisions set forth in Section 1.1 and any other provision of this Lease, the latter shall control.

**1.3    EXHIBITS.** The following are attached hereto as exhibits and hereby made a part of this Lease:

(a)    Exhibit "A"    Legal Description of the land comprising the Shopping Center as presently constituted as of the date of this Lease

(b)    Exhibit "B"    Part 1 - Site Plan of the Shopping Center (the "Landlord's Building" is identified on the Site Plan of the Shopping Center as presently constituted as of the date of this Lease); and Part 2 - Leasing Plan (the "Premises" is identified on the Leasing Plan)

(c)    Exhibit "C"    Tenant's Work; and Exhibit "C-1" Sign Criteria, and Exhibit "C-2" Landlord's Work

(d)    Exhibit "D"    Absolute Unconditional Guaranty Agreement (sometimes referred to herein as the "Guaranty") (not an exhibit unless Guarantor is named in Section 1.1)

(e)    Exhibit "E"    Requirements and Restrictions

(f)    Exhibit "F"    Intentionally Omitted

(g)    Exhibit "G"    Intentionally Omitted

(h)    Exhibit "H"    Satellite Dish Equipment Terms and Conditions

(i)    Exhibit "I"    Landlord Waiver Agreement

(j)    Exhibit "J"    Existing Exclusive Uses and Restrictive Covenants

**1.4    THE SHOPPING CENTER; THE LANDLORD'S BUILDING.** The "Shopping Center" means the land described in Exhibit "A" and improvements thereon constituting an integrated retail shopping center, as the same may be modified from time to time throughout the Term. The structure or structures shown on Exhibit "B" – Part 1 as the "Landlord's Building," as the same may be altered, reduced, expanded, added to or eliminated from time to time throughout the Term, is hereinafter called the "Landlord's Building." Landlord may at any time and from time to time change the shape, size, location, number, height and extent of the improvements in the Shopping Center (and the street address and/or name of the Shopping Center) and eliminate or add any improvements to any portion of the Shopping Center and add land thereto or eliminate land therefrom. Without limiting the foregoing, it is understood and agreed that, except for Landlord's obligations specifically set forth in this Lease such as, without limitation, Article 12, Article 13, and Article 24 hereof, Landlord has no obligation to remodel or renovate the Shopping Center or any portion thereof at any time or from time to time; however, Tenant acknowledges and agrees that Landlord may elect to do so and that any remodeling or renovation shall in no way constitute an actual or constructive eviction of Tenant from the Premises, result in or give rise to any abatement in or offset against any Rent reserved hereunder, or entitle Tenant to any compensation or damages from Landlord.

**1.5    GROSS LEASABLE AREA.** At the Commencement Date, GLA is estimated to be, with respect to the Premises, the number of square feet set forth in Section 1.1(d) and, with respect to the Landlord's Building, the number of square feet set forth in Section 1.1(e). GLA will change with additions or deletions to the Landlord's Building and/or the Premises. The GLA is measured from the exterior face of exterior walls, the exterior face of service corridor walls and the centerline of interior demising walls. No deduction shall be made for columns, stairs, elevators or any internal construction or equipment. Unless another provision of this Lease expressly grants to Tenant a right to certify and/or remeasure the GLA of the Premises, Tenant shall have no such right to certify and/or remeasure or otherwise dispute the GLA of the Premises set forth in Section 1.1(d) above.

## ARTICLE 2. PREMISES

**2.1    LEASE OF PREMISES.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises for the Term, at the Rent, and upon the terms, covenants and conditions herein set forth.

**2.2    PREMISES DEFINED.** The term "Premises" means the space situated in the Landlord's Building in the location marked on Exhibit "B" – Part 2 and shall consist of the space thereat within the walls, structural floor and the bottom of the roof of the Landlord's Building. The Premises shall include only the appurtenances specifically granted in this Lease, Landlord specifically excepting and reserving for itself the roof, the air space above the roof, the space below the floor, the exterior portions of the Premises (other

5

INITIAL HERE
Landlord
Tenant

than the storefront), and the right to install pipes, ducts, conduits, wire, solar panels and other mechanical equipment serving other portions, tenants and occupants of the Shopping Center under or above the Premises, without the same constituting an actual or constructive eviction of Tenant from the Premises, resulting in or giving rise to any abatement in or offset against any Rent reserved hereunder, or entitling Tenant to any compensation or damages from Landlord.

2.3     DELIVERY OF PREMISES. Landlord agrees to deliver to Tenant, and Tenant agrees to accept from Landlord, possession of the Premises when Landlord advises Tenant in writing that the work described on Exhibit "C-2" to this Lease ("Landlord's Work") (if any) has been substantially completed to permit Tenant to commence the work described on Exhibit "C" to this Lease ("Tenant's Work") or when Tenant takes possession of the Premises, whichever first occurs.  Landlord shall have up to sixty (60) days from the full execution of this Lease to deliver possession of the Premises to Tenant.  Landlord's notice thereof shall constitute delivery of the Premises without further act by either party.  Landlord will deliver possession of the Premises to Tenant in its current "as-is" condition with the addition of only those items of Landlord's Work (if any) described on Exhibit "C-2".  If Landlord encounters delays in delivering possession of the Premises to Tenant, this Lease will not be void or voidable, nor will Landlord be liable to Tenant for any loss or damage resulting from such delay. If the delay in possession is caused by Tenant or any Tenant Parties described in Article 9 (including, without limitation, delays caused by Tenant's failure to supply the information referred to in the following sentence), then the date of Landlord's delivery of the Premises to Tenant shall be deemed to be the date such delivery would have occurred but for such delay.  Notwithstanding the foregoing, Landlord will not be obligated to deliver possession of the Premises to Tenant until Landlord has received from Tenant all of the following: (i) a copy of this Lease fully executed by Tenant, and the Guaranty, if any, executed by Guarantor(s); (ii) the Security Deposit, if any, and the first full monthly installment of Rent in accordance with Section 4.2 of this Lease; and (iii) certificates of insurance as required under Article 11 of this Lease.  If Tenant occupies the Premises prior to the Commencement Date, such early occupancy shall be subject to all of the terms and conditions of this Lease (except Minimum Annual Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall commence when provided in Section 1.1(i) of this Lease), and Tenant will not interfere with Landlord in the completion of Landlord's Work (if any).  Landlord shall not be required to give Tenant access for locks to be changed until: (A) Landlord's delivery of the Premises as provided herein, (B) Landlord's receipt of two (2) sets of drawings and specifications as set forth in Exhibit "C", and (C) Landlord's receipt of a copy of the contractor's insurance certificate.  Tenant will pay all expenses associated with changing the locks.

2.4     OPENING OF PREMISES. On or before ten (10) days after delivery of possession of the Premises to Tenant, Tenant shall commence Tenant's Work specified in Exhibit "C", diligently and continually proceed to completion, and open for business fully fixtured, stocked and staffed on or before the Commencement Date specified in Section 1.1(i).  In relation to Tenant's Work, Tenant shall execute a "notice of commencement" of construction (or similar document required by the applicable jurisdiction) as "Owner" identifying Landlord only as the titleholder for purposes of permitting.  By opening for business, Tenant shall be deemed to have acknowledged that Landlord's Work (if any) and any and all other obligations to be performed by Landlord on or before the opening of the Premises have been fully performed, and that the Premises is at such time complete and in good, sanitary and satisfactory condition and repair without any obligation on Landlord's part to make any alterations, upgrades or improvements thereto. If Tenant fails to open as and when required by this Section, then, for so long as neither this Lease nor Tenant's right to possession of the Premises under this Lease is terminated by Landlord, Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including, without limitation, Minimum Annual Rent) and as Additional Rent hereunder, an additional amount equal to one (1) day of Minimum Annual Rent for each day Tenant fails to open at the then applicable rate as stated in Section 1.1(g) hereof until such time as Tenant opens the Premises for business fully fixtured, stocked and staffed. The parties hereby agree that such amount represents a fair and reasonable estimate of the cost which Landlord will incur by reason of such delay.  Notwithstanding the foregoing, Tenant's payment of such amount shall not deprive Landlord of any other rights and remedies available to it under this Lease, at law or in equity as a result of Tenant's breach of its obligations described herein.

2.5     PERMITS AND APPROVALS FOR TENANT'S WORK AND USE. Except as specifically set forth in this Lease, Landlord has not and does not make any representations as to the commercial suitability, physical condition, compatibility or any other matter affecting or relating to the Premises in relation to Tenant's intended use and occupancy thereof, and Tenant hereby acknowledges that no such representations not otherwise expressly stated in this Lease have been made.   EXCEPT AS SPECIFICALLY SET FORTH IN THIS LEASE AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TENANT HEREBY ACKNOWLEDGES THAT (I) LANDLORD MAKES NO WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, MARKETABILITY, FITNESS OR SUITABILITY FOR A PARTICULAR PURPOSE OR OTHERWISE, AND (II) ANY IMPLIED WARRANTIES ARE EXPRESSLY DISCLAIMED AND EXCLUDED.  Tenant is responsible for ensuring, at Tenant's sole expense, that Tenant's use of the Premises complies with all applicable laws including, without limitation, applicable zoning ordinances. Without limiting the foregoing and in addition to Tenant's obligations set forth in Exhibit "C", it shall be Tenant's responsibility and obligation to obtain all permits and licenses required for transacting its business in the Premises including, without limitation, building, occupancy, use and other governmental permits and/or approvals required in connection with the construction of Tenant's Work and a certificate of occupancy for the Premises upon completion thereof (or an equivalent if the governmental authority having jurisdiction does not issue certificates of occupancy).  Tenant shall satisfy its responsibility

6

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

and obligation to obtain all of the foregoing in an expeditious manner including, without limitation, payment of all fees and charges including any available expedite fees; providing all requested information and data, including making appropriate adjustments to Tenant's plans and specifications as required by the applicable governmental authorities and resubmitting revised plans and specifications as necessary to such authorities, in a prompt and timely manner; engaging a so-called "permit expeditor" to assist with the pursuit and issuance of the permits, licenses and approvals; and otherwise cooperating with the applicable governmental authorities in an expeditious manner.  Tenant's obligations hereunder shall include, without limitation, the payment of all utility connection/hookup/meter fees and charges in accordance with Article 14 of this Lease, and any development impact fees, transportation uniform mitigation fees and/or school mitigation fees assessed with respect to the Premises and/or Tenant's use and/or Tenant's Work as opposed to the Shopping Center.  In the event Landlord pays any such fees on Tenant's behalf, Tenant shall reimburse Landlord for such fees as Additional Rent within ten (10) days of Tenant's receipt of an invoice therefor from Landlord.

2.6     **TENANT'S PERMITS.**  Within five (5) days after the date Landlord approves Tenant's Plans (as defined in Exhibit "C" attached hereto) ("Permit Filing Date"), Tenant shall, at Tenant's own expense, apply for any and all governmental permits, licenses and approvals (collectively, "Tenant's Permits") required to permit Tenant to perform Tenant's Work, and thereafter Tenant shall diligently pursue obtaining Tenant's Permits.  Tenant shall give Landlord written notice of (i) the actual Permit Filing Date, together with a dated stamped copy of the first page of Tenant's application from the applicable governmental agencies showing the actual Permit Filing Date, (ii) the date Tenant's Permits are issued, and (iii) the actual date Tenant obtains Tenant's Permits, which notice shall be accompanied by a copy of Tenant's Permits.  If Tenant has failed to obtain Tenant's Permits within sixty (60) business days after the Permit Filing Date, Landlord shall have the right, but not the obligation, (i) to pursue Tenant's Permits on Tenant's behalf and at Tenant's expense, or (ii) to terminate this Lease by giving notice of such election to terminate; provided, however, Landlord's notice to terminate shall be null and void and this Lease shall continue in full force and effect if Tenant advises Landlord within ten (10) days after receiving Landlord's termination notice that Tenant has obtained Tenant's Permits.  For purposes of this Section 2.6, the term "diligently pursue" shall include payment of all fees and charges, providing all requested information and data to the governmental agencies in a timely manner, hiring an expediter, and otherwise cooperating with the governmental agencies in an expeditious manner.  Notwithstanding the foregoing, for purposes of this Section 2.6, in no event shall Tenant's Permits be deemed to include any governmental licenses, permits or approvals related to: (a) Tenant's signs; (b) Tenant's specific uses of the Premises, or (c) a certificate of occupancy, it being acknowledged that "Tenant's Permits" shall only include permits related to Tenant's construction in the Premises.  Upon any final termination of this Lease as provided herein, (i) Tenant shall surrender possession of the Premises to Landlord in the condition required by this Lease (if Landlord has delivered possession of the Premises to Tenant in accordance with this Lease), (ii) all duties and liabilities of Landlord and Tenant under this Lease (except those which expressly survive the expiration or earlier termination thereof) shall terminate, and (iii) Landlord shall promptly return all prepaid Rent and the Security Deposit (subject to Landlord's rights under this Lease with respect thereto), if any, to Tenant.  If Tenant fails to comply with its obligations under this Section 2.6 or Exhibit "C", then the Commencement Date shall be the earlier of (a) Tenant's opening for business or (b) one hundred twenty (120) days after Landlord's delivery of the Premises to Tenant.

### ARTICLE 3. TERM

The Term shall commence on the Commencement Date specified in Section 1.1(i) and shall continue for the number of months set forth in Section 1.1(b); provided, however, if the Commencement Date is not the first day of a month, then the Term shall commence on the Commencement Date and shall continue for the balance of the month in which the Commencement Date occurs and thereafter for the number of months set forth in Section 1.1(b).  Upon Landlord's written request, Tenant shall promptly execute and deliver to Landlord documentation confirming the date of Landlord's delivery of the Premises to Tenant, the Commencement Date and expiration date of the initial Term; provided, however, execution and delivery of such documentation shall in no event delay, or be required for the effectiveness of, any such dates.

### ARTICLE 4. RENT

4.1     **TENANT'S AGREEMENT TO PAY RENT.**  Tenant hereby agrees to pay Minimum Annual Rent and Additional Rent.  The term "Rent" includes the Minimum Annual Rent and Additional Rent.  It is the purpose and intent of Landlord and Tenant that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements, and Tenant's obligation to pay Rent shall be payable in all events, unless and to the extent expressly otherwise provided herein.

4.2     **MINIMUM ANNUAL RENT; FIRST FULL MONTHLY PAYMENT OF RENT.**  The minimum amount of rent Tenant shall pay Landlord for each Lease Year (as defined below) is the amount set forth in Section 1.1(g) (the "Minimum Annual Rent") which shall be paid by Tenant in monthly installments as more specifically provided in this Lease.  The first full monthly payment of Rent shall be paid as prepaid rental upon Tenant's execution of this Lease.  The next payment of Rent shall be due on the first day of the first full month of the Term for a prorated amount of the Minimum Annual Rent and Additional Rent applicable to the period from the Commencement Date to the last day of the month in which the Commencement Date occurred; provided, however, if the Commencement Date occurs on the first day of a month, then Tenant's next payment of Rent shall be due and payable on the first day of the next full calendar month thereafter.

7

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

**4.3    LEASE YEAR DEFINED.** The "First Lease Year" means the period beginning on the Commencement Date and ending on the last day of the twelfth full calendar month thereafter; provided, however, if the Commencement Date is not the first day of a month, then the First Lease Year shall commence on the Commencement Date and shall continue for the balance of the month in which the Commencement Date occurs and for a period of twelve (12) full calendar months thereafter. "Lease Year" means each successive twelve (12) month period after the First Lease Year occurring during the Term. The First Lease Year shall also be considered a Lease Year.

**4.4    ANNUAL REPORTING.** Tenant shall furnish to Landlord within twenty (20) days after the end of each calendar year during the Term a complete statement, certified by Tenant (or a responsible officer thereof if Tenant is a corporation, limited liability company or other business entity), of the amount of annual gross revenue generated from the Premises during said year. The statement shall be broken down monthly and in such form and style and contain such details and breakdown as Landlord may reasonably require. The statements required by this Section shall be delivered to Landlord at the place to which notices are to be sent to Landlord pursuant to Section 25.3. However, if Landlord so notifies Tenant (and Tenant is able to reasonably comply), any statements shall be submitted by Tenant to Landlord electronically in accordance with Landlord's written directive therefor. If any statements required hereunder are not received by Landlord or Landlord's designee within ten (10) days following the due date therefor, then Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including, without limitation, Minimum Annual Rent) and as Additional Rent hereunder, $50.00 per day until such time as Landlord or Landlord's designee receives the same. The parties hereby agree that such amount represents a fair and reasonable estimate of the cost which Landlord will incur by reason of such delay. Notwithstanding the foregoing, Tenant's payment of such amount shall not deprive Landlord of any other rights and remedies available to it under this Lease, at law or in equity as a result of Tenant's breach of its obligations described herein.

**4.5    INTENTIONALLY OMITTED.**

**4.6    ADDITIONAL RENT.** Tenant shall pay, as additional rent (herein sometimes collectively called "Additional Rent"), all sums of money or charges of whatsoever nature (except Minimum Annual Rent and Percentage Rent, if any) required to be paid by Tenant to Landlord pursuant to this Lease, whether or not the same is designated as "Additional Rent."

**4.7    WHERE RENT PAYABLE AND TO WHOM; NO DEDUCTION; LATE CHARGE.** Rent payable by Tenant under this Lease shall be paid to Landlord in monthly installments in advance on or before the first day of each month without prior notice or demand therefor (except where such prior demand is expressly provided for in this Lease), without any deductions, offsets or counterclaims whatsoever, at the place to which notices are to be sent to Landlord or to such payee and at such place as may be designated by Landlord to Tenant in writing at least ten (10) days prior to the next ensuing Minimum Annual Rent installment payment date. Without limiting the foregoing, electronic payment is available at Tenant's election in accordance with Landlord's electronic payment procedures. Landlord shall have the discretion to direct how Tenant's payments under this Lease are applied to any then due amounts on Tenant's account for the Premises. Tenant acknowledges that, in addition to interest charged at the Default Rate commencing on the first day the applicable payment is past due and ending on the day the entire payment is received by Landlord, the late payments by Tenant to Landlord of any Rent due under this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix. Such other costs include, without limitation, processing, administrative and accounting charges and late charges that may be imposed on Landlord by the terms of any mortgage, deed of trust, related loan documents or other documents encumbering or otherwise affecting the Premises, the Landlord's Building or the Shopping Center. Accordingly, if any payment of Rent or other charges due hereunder is not received by Landlord in good funds on its due date, Tenant will pay to Landlord a late charge of five percent (5%) of the amount due. The parties agree that such late charge (as well as any other late charges or interest under this Lease) represents a fair and reasonable estimate of the costs that Landlord will incur by reason of any late payment as hereinabove referred to by Tenant, and the payment of late charges and interest are distinct and separate in that the payment of interest is to compensate Landlord for the use of Landlord's money by Tenant, while the payment of late charges is to compensate Landlord for Landlord's processing, administrative and other costs incurred by Landlord as a result of Tenant's delinquent payments. Acceptance of a late charge or interest shall not constitute a waiver of Tenant's default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies available to Landlord under this Lease, at law or in equity.

## ARTICLE 5. TAXES AND ASSESSMENTS

**5.1    TENANT'S PROPORTIONATE SHARE OF TAXES AND PAYMENT.** Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Taxes (as defined below). In the event any assessments may be paid in annual installments, only the amount of such annual installment and statutory interest shall be included within the computation of the annual Taxes for the year in question. Tenant shall pay its Proportionate Share of Taxes at the times and in the manner provided in Section 8.6. As used in this Lease, "Taxes" means and includes without limitation, ad valorem taxes; sewer taxes; front-foot benefit charges (public or private) (if applicable in the jurisdiction in which the Shopping Center is located); school taxes; real estate taxes; assessments, including, without limitation, special and general assessments (public or private) of any kind; impact fees; water and sewer rents and charges; governmental license and permit fees; charges for public or private easements benefiting the Shopping Center or any portion thereof;

8

INITIAL HERE
Landlord
Tenant

taxes on other areas made available for the common use or benefit of tenants; and all other governmental impositions and charges (extraordinary as well as ordinary, foreseen and unforeseen) which during the Term are either a lien on the Shopping Center or any portion thereof or which are charged, levied or assessed on, or imposed in connection with, the use, occupancy or possession of the Shopping Center or any portion thereof, and/or which appear as a charge on a tax bill given to Landlord by any official taxing authority; any other taxes, assessments or charges in the manner of taxes, which Landlord shall be obligated to pay arising out of the use, occupancy, ownership, leasing, management, repair or replacement of the Shopping Center or any portion thereof (e.g., taxes, license fees or other charges measured by the rents receivable by Landlord from the Shopping Center or any portion thereof; occupancy taxes; Landlord's business, professional and occupational tax, or similar taxes; interest on Tax installment payments paid over a period of more than one (1) year); and, if Landlord contests Taxes or seeks a reduction of the same, any and all reasonable costs, expenses and fees (including reasonable attorneys' and other experts' fees) incurred by Landlord in reviewing, initiating, appealing, contesting and/or negotiating Taxes with the public authorities (regardless of the outcome). Taxes shall also include impositions payable by Landlord, including payments in lieu of Taxes, under any arrangement with governmental authority. If any governmental authority or unit under any present or future law effective at any time during the Term hereof shall in any manner levy a tax on rents payable under this Lease or rents accruing from use of the Shopping Center or any portion thereof, or a tax in any form against Landlord because of, or measured by, income derived from the leasing or rental of the Shopping Center or any portion thereof, such tax shall be paid by Tenant, either directly or through Landlord. Tenant shall not be required to pay (i) any municipal, county, state or federal income tax, or (ii) any inheritance, estate, succession, transfer, franchise, corporation, net income or profit tax or capital levy imposed upon Landlord. A copy of an official tax bill with respect to a governmental tax or assessment shall be conclusive evidence of the amount of a Tax.

5.2     **PERSONAL PROPERTY TAXES.** Tenant shall be liable for, and shall pay before delinquency, all taxes and assessments (real and personal) levied against (a) any personal property or trade fixtures in or about the Premises (including any increase in the assessed value of the Premises based upon the value of any such personal property or trade fixtures), and (b) any Tenant improvements or alterations in the Premises (whether installed and/or paid for by Landlord or Tenant). If any such taxes or assessments are levied against Landlord or Landlord's property, Landlord may, after written notice to Tenant (and under proper protest if requested by Tenant), pay such taxes and assessments, and Tenant shall reimburse Landlord therefor within ten (10) days after demand by Landlord; provided, however, Tenant, at its sole cost and expense, shall have the right, with Landlord's cooperation, to bring suit in any court of competent jurisdiction to recover the amount of any such taxes and assessments so paid under protest.

## ARTICLE 6. TENANT'S CONDUCT OF BUSINESS

Tenant hereby acknowledges that Tenant's use of the Premises and ability to generate patronage to the Premises and the Shopping Center were all relied upon by Landlord and served as significant and material inducements contributing to Landlord's decision to enter into this Lease with Tenant. As such, Tenant agrees that, from and after the Commencement Date, Tenant will continuously and uninterruptedly keep open and operate its business in the entire Premises fully fixtured, stocked and staffed for the purpose specified in Section 1.1(j) and under the trade name specified in Section 1.1(a) with the public seven (7) days a week during such hours as are customary in the Shopping Center with a minimum of sixty-five (65) hours per week. Notwithstanding the foregoing, Tenant shall not operate its business at the Shopping Center between the hours of 10:00 P.M. and 6:00 A.M. If Tenant fails to operate as required by this Section, then, for so long as neither this Lease nor Tenant's right to possession of the Premises under this Lease is terminated by Landlord, Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including, without limitation, Minimum Annual Rent) and as Additional Rent hereunder, an additional amount equal to one (1) day of Minimum Annual Rent at the then applicable rate as stated in Section 1.1(g) hereof for each day until such time as Tenant resumes operations in the Premises as required by this Section. The parties hereby agree that such amount represents a fair and reasonable estimate of the cost which Landlord will incur by reason of such failure. Notwithstanding the foregoing, Tenant's payment of such amount shall not deprive Landlord of any other rights and remedies available to it under this Lease, at law or in equity as a result of Tenant's breach of its obligations described herein.

## ARTICLE 7. USE OF PREMISES

7.1     **USE AND TRADE NAME.** Tenant shall use the Premises for the purpose specified in Section 1.1(j) and for no other purpose whatsoever and shall conduct its business in the Premises solely under the trade name specified in Section 1.1(a). As of the date of this Lease and continuing throughout the Term, Tenant represents, warrants and covenants that Tenant has full legal authority to use such trade name including any related logo, brand, trade dress and/or trademark and that its use thereof does not violate applicable law or the rights of any third party. Except as otherwise specifically set forth in the Article of this Lease entitled "Exclusive", nothing in this Lease shall be construed to grant Tenant an exclusive right to the purpose specified in Section 1.1(j) or any other purpose or use. In addition, Tenant agrees that no representations have been made to Tenant that any other tenants or occupants have leased or occupy or will continue to lease or occupy space within the Shopping Center. Tenant acknowledges that it is Landlord's intention that the Shopping Center be operated in a manner which is consistent with the highest standards of cleanliness, decency and morals in the community in which it serves. Toward that end, Tenant shall not sell, distribute, display or offer for sale any item or service, or otherwise conduct its business in a manner, which is inconsistent with the quality of operation of the Shopping Center or may tend to impose

9

INITIAL HERE
Landlord
Tenant

or detract from the moral character or image of the Shopping Center. Tenant shall comply, at its sole cost and expense, with all federal, state and local laws, rules, regulations, orders and guidelines now or hereafter in force relating to or affecting Tenant's use and occupancy of the Premises, and will not use or permit the use of any portion of the Premises for any unlawful purpose or in violation of any documents or agreements to which this Lease is subject and subordinate as expressly set forth in this Lease. Without limiting the foregoing, Tenant shall comply with all federal, state and local laws, rules, regulations, orders and guidelines now or hereafter in force relating to nondiscrimination against its employees, applicants for employment, customers, contractors/subcontractors and agents and other users of the Shopping Center.

**7.2    REQUIREMENTS AND RESTRICTIONS.** Tenant agrees to comply with the Requirements and Restrictions set forth on Exhibit "E" attached hereto (Landlord hereby reserving the right from time to time to modify, amend or supplement same) (collectively, the "Requirements and Restrictions"). If Tenant violates any Requirements and Restrictions, Landlord, in its sole discretion, may give Tenant notice of such violation and, if such violation is not corrected within two (2) days after said notice is given, then Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including, without limitation, Minimum Annual Rent) and as Additional Rent hereunder, $100.00 per day per violation calculated from and including the day on which notice was given, to and including the day when all violations by Tenant cease. Notwithstanding the foregoing, Tenant's payment of such amount shall not deprive Landlord of any other rights and remedies available to it under this Lease, at law or in equity as a result of Tenant's breach of its obligations described herein.

**7.3    STORM PROTECTION.** If Landlord shall require storm shutters, sand bags or other forms of storm protection for the Premises ("Storm Protection"), Tenant shall be responsible for acquiring, storing, safe keeping and installing such Storm Protection. Tenant shall install such Storm Protection (material, aesthetic and manner and length of installation are subject to Landlord's approval) in all events where circumstances could bring damage to the Premises or Shopping Center, and/or when otherwise directed by Landlord. Tenant shall be responsible for storage, prompt and orderly retrieval, installation, removal and re-storage of the Storm Protection for the Premises. The placing of any holes in the storefront or building façade or accumulation of debris or damage caused by the Storm Protection shall be repaired immediately by Tenant, at Tenant's expense.

<div align="center">ARTICLE 8, <u>COMMON AREAS</u></div>

**8.1    MAINTENANCE.** Landlord agrees to maintain, as part of Common Area Costs, the Common Areas in good condition; provided, however, that the manner in which the Common Areas shall be maintained shall be solely determined by Landlord. If any owner or tenant of any portion of the Shopping Center maintains Common Areas located upon its parcel or premises (Landlord shall have the right, in its sole discretion, to allow any purchaser or tenant to so maintain Common Areas located upon its parcel or premises and to be excluded from participation in the payment of Common Area Costs), Landlord shall not have any responsibility for the maintenance of that portion of the Common Areas and Tenant shall have no claims against Landlord arising out of any failure of such owner or tenant to so maintain its portion of the Common Areas.

**8.2    COMMON AREAS DEFINED.** "Common Areas" means all areas, facilities, and improvements provided in the Shopping Center for the convenience and use of patrons of the Shopping Center, and shall include, but not be limited to, all parking areas and facilities, sidewalks, stairways, service corridors, truckways, ramps, loading docks, delivery areas, landscaped areas, access and interior roads, lighting facilities and similar areas and facilities situated within the Shopping Center which are not reserved for the exclusive use of any Shopping Center occupants.

**8.3    LANDLORD'S CONTROL.** The use and occupancy by Tenant of the Premises shall include a non-exclusive license to use, in common with others entitled thereto, the Common Areas, as may be designated from time to time by Landlord; subject, however, to the terms and conditions of this Lease including, without limitation, the Requirements and Restrictions. Landlord shall at all times have the sole and exclusive control, management and direction of the Common Areas including, without limitation, the right at any time and from time to time (i) to allow the sale and/or display of merchandise and/or services, (ii) to permit advertising displays, educational displays and promotional entertainment including special events, (iii) to provide amenities to the Shopping Center, (iv) to make reasonable changes to the Common Areas, (v) to exclude and restrain any person from use or occupancy thereof, (vi) to use all or any portion of the Common Areas to make repairs, improvements, alterations or changes, and (vii) to the extent necessary in the opinion of Landlord, to close all or any portion of the Common Areas to prevent a dedication thereof or the accrual of any rights to any person or to the public therein, and Landlord's exercise of such rights shall in no way constitute an actual or constructive eviction of Tenant from the Premises, result in or give rise to any abatement in or offset against any Rent reserved hereunder, or entitle Tenant to any compensation or damages from Landlord. As provided above, the rights of Tenant in and to the Common Areas are subject to the rights of others to use the same in common with Tenant.

**8.4    EMPLOYEE PARKING.** Landlord may from time to time designate a particular parking area or areas to be used by its tenants and their employees. Upon Landlord's written request, Tenant shall furnish Landlord with license plate numbers assigned to Tenant's vehicles and vehicles of Tenant's employees. If Tenant or any of its employees fail to park their vehicle in any such designated parking areas, Landlord, in its sole discretion, may give Tenant notice of such violation and, if the violation is not corrected within two (2) days after said notice is given, Tenant shall pay to Landlord an amount equal to Ten Dollars

<div align="center">10</div>

INITIAL HERE
Landlord
Tenant

($10.00) per day for each violating vehicle calculated from and including the day on which notice was given, to and including the day when all violations by Tenant and its employees cease. In addition, Tenant hereby authorizes Landlord to tow all violating vehicles belonging to Tenant or its employees, or to attach violation notices to such vehicles, or to do both. In no event, however, shall Landlord be required to enforce any parking obligation stated herein.

**8.5    COMMON AREA COSTS.** "Common Area Costs" means costs related to Landlord's maintenance, replacement and repair obligations set forth in this Lease (including, without limitation, Article 13 hereof) and all other costs incurred in a manner deemed by Landlord to be reasonable and appropriate and for the best interests of the Shopping Center in connection with the management, operation, maintenance, replacement and repair of the Shopping Center and the Common Areas including at Landlord's discretion, but not limited to, an administrative fee of fifteen percent (15%) of Common Area Costs; security; landscaping; utilities; portering and sweeping; trash and recycling collection and removal; pest control; snow and ice removal; painting; cleaning; parking lot striping; lighting; management fee of four percent (4%) of gross revenues (e.g., minimum rents, additional rents and other costs and charges) derived by Landlord from the Shopping Center; and Landlord's payments or contributions pursuant to any documents governing the maintenance of the Common Areas or portions thereof such as a master declaration, easement, operation or association agreement.

**8.6    TENANT'S PROPORTIONATE SHARE OF COMMON AREA COSTS, TAXES AND INSURANCE.** Tenant agrees to pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance (as hereinafter defined) in the following manner:

(a)    Tenant shall pay Landlord, commencing on the date specified in Section 1.1(i) of this Lease and on the first day of each calendar month of the Term thereafter, an amount estimated by Landlord to be Tenant's monthly Proportionate Share of the Common Area Costs, Taxes and Insurance. Landlord may adjust said amount at the end of any calendar month on the basis of Landlord's experience and reasonably anticipated costs. Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall be prorated on a daily basis for any partial calendar month. In connection with the determination of Tenant's Proportionate Share, (i) Landlord shall have the right, from time to time, to allocate on an equitable, non-discriminatory and consistent basis some or all of the Common Area Costs, Taxes and Insurance for the Shopping Center among different portions such as retail, office, residential or other appropriate portions of the Shopping Center (i.e., cost pools), (ii) for purposes of calculating Tenant's Proportionate Share of Common Area Costs, Landlord shall have the right to exclude from the denominator the GLA of any premises, the occupants of which (or Landlord) separately maintain a portion of the Common Areas of the Shopping Center, but in such event, Landlord shall deduct from the Common Area Costs any amounts payable for items included in the Common Area Costs in connection with such separately maintained portions of the Common Areas, (iii) for purposes of calculating Tenant's Proportionate Share of Insurance costs, Landlord shall have the right to exclude from the denominator the GLA of any premises located within buildings or on parcels which are separately insured, but in such event, Landlord shall deduct from Insurance costs any amounts payable specifically for items included in Insurance costs in connection with such separately insured buildings or parcels, and (iv) for purposes of calculating Tenant's Proportionate Share of Taxes, Landlord shall have the right to exclude from the denominator the GLA of any premises located on parcels which are separately assessed for Tax purposes, but in such event, Landlord shall deduct from Taxes any amounts payable specifically for items included in Taxes in connection with such separately assessed parcels. Additionally, notwithstanding the foregoing, Landlord shall have the right, but not the obligation, to allocate certain costs and expenses solely to occupants of a particular building(s) or parcel(s), if Landlord reasonably determines such cost or expense primarily benefits such occupants.

(b)    Within ninety (90) days following the end of each calendar year, or as soon as reasonably possible thereafter, Landlord shall furnish to Tenant a statement covering such year just ended, showing the Common Area Costs, Taxes and Insurance and the amount of Tenant's Proportionate Share of such costs for such year and the payments made by Tenant with respect to such year. If Tenant's Proportionate Share of such costs is less than Tenant's payments so made, Tenant shall be entitled, subject to Landlord's right to offset any amounts then due Landlord pursuant to this Lease, to a credit of the difference against the next regular monthly payment of Rent or portion thereof until such credit is exhausted (or payment if such credit is not exhausted prior to the natural expiration of the Term) or, if such share is greater than Tenant's said payments, Tenant shall pay Landlord the difference within thirty (30) days after receipt of such statement. Landlord and Tenant's obligations under this subsection shall survive the expiration or earlier termination of this Lease.

(c)    Any failure or delay by Landlord in delivering any estimated or final statement pursuant to this Section 8.6 shall not constitute a waiver of Landlord's right to receive Tenant's payment of Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance.

<u>ARTICLE 9. HAZARDOUS SUBSTANCES</u>

**9.1    DEFINITIONS; RESTRICTIONS.** The term "Hazardous Substances" as used in this Lease shall mean pollutants, contaminants, toxic wastes, or any other substances, the removal of which is required or the use of which is restricted, regulated, prohibited or penalized by any "Environmental Law." The term "Environmental Law" or "Environmental Laws" shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment, including, without limitation, the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1

11

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §9601 et seq.; the Water Pollution Control Act, 33 U.S.C. §1251 et seq.; the Hazardous Substances Discharge, Reports and Notices Act, N.J.S.A. 13:1K-15 et seq.; the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K-6 et seq.; the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 et seq.; and the Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C et seq.; together with any amendments thereto, regulations promulgated thereunder and all substitutions thereof.  Tenant shall not cause or permit any Hazardous Substances to be brought upon, kept or used in or about the Premises or the Shopping Center by Tenant or any of Tenant's agents, employees, subtenants, assignees, licensees, contractors or invitees (collectively, "Tenant Parties") except as may be required in the ordinary and customary course (including ordinary and customary quantities) of Tenant's business set forth in Section 1.1(j) of this Lease and provided that Tenant shall in all circumstances keep and maintain the Premises in compliance with, and shall not cause or permit the Premises to be in violation of, any Environmental Law.  If Tenant (or any Tenant Parties) breaches the obligations stated in the preceding sentence beyond the applicable notice and cure period, then, in addition to any other remedies available under this Lease, at law or in equity, Landlord shall be entitled to terminate this Lease.  If the presence of Hazardous Substances on the Premises or the Shopping Center caused or permitted by Tenant or any Tenant Parties results in contamination of the Premises or the Shopping Center, or if contamination of the Premises or the Shopping Center by Hazardous Substances otherwise occurs which is caused or permitted by Tenant or any Tenant Parties, then Tenant shall indemnify, defend and hold Landlord and Landlord's officers, trustees, directors, partners, beneficiaries, mortgagees, ground lessors, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed (and their respective successors and assigns) (collectively, "Landlord Parties") harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses which arise during or after the Term as a result of such contamination (including, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Substances present in the soil or ground water on or under the Premises or the Shopping Center, diminution in value of the Premises and the Shopping Center, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises and the Shopping Center, and other property damages arising from any adverse impact upon the marketability of the Premises or the Shopping Center, as well as sums paid in settlement of claims, reasonable attorneys' fees, consultant fees and expert fees).  Without limiting the foregoing, if the presence of any Hazardous Substances on the Premises or the Shopping Center caused or permitted by Tenant or any Tenant Parties results in any contamination of the Premises or the Shopping Center, then Tenant shall at its sole expense remove all such Hazardous Substances from the Premises and other impacted property and shall promptly take all actions at its sole expense as are necessary to return the Premises and the Shopping Center to the condition existing prior to the introduction of any such Hazardous Substances to the Premises and the Shopping Center; provided, however, that Landlord's approval of such actions shall first be obtained.  The obligations contained in this Article shall survive the expiration or earlier termination of this Lease.

      **9.2**    **DISCLOSURE OF ENVIRONMENTAL CONDITIONS.**  Environmentally impacted soil and groundwater are present on the Shopping Center from a historical on-site industrial stone processing facility formerly located on the Shopping Center that produced granules used in the roofing industry.  These environmental conditions are being addressed in order to obtain regulatory closure in accordance with Environmental Laws (New Jersey Department of Environmental Protection PI # G000014086).  Such corrective actions include but are not limited to placement of an engineered cap over the impacted soils, long-term groundwater monitoring and the establishment of institutional and engineering controls on the Shopping Center.  Upon written notice from Landlord, Tenant agrees to consent to engineering and institutional controls associated with these actions as required by Environmental Laws, including but not limited to entering into an amendment to this Lease, so long as such controls do not materially interfere with Tenant's operations.

## ARTICLE 10. ALTERATIONS TO PREMISES

      **10.1**    **ALTERATIONS; DAMAGES.**  Tenant shall make no alterations, additions or changes in or to the Premises without Landlord's prior written consent.  Without limiting the foregoing, in no event shall Tenant make or cause to be made any penetration through any roof, floor, or exterior or corridor wall without the prior written consent of Landlord.  Should Landlord consent to Tenant's penetration through the roof, Tenant shall use Landlord's roofing contractor to repair or re-flash Tenant's roofing penetrations.  Tenant shall deliver to Landlord a certification letter from such roofing contractor stating that all roof repairs and penetrations have been made in compliance with the roof warranty.  Tenant shall be responsible for any and all damages resulting from any alteration, addition or change Tenant makes, whether or not Landlord's consent therefor was obtained.  Any and all alterations, additions and changes made to the Premises shall be made under the supervision of a licensed architect or licensed structural engineer (if structural in nature) and in accordance with plans and specifications approved in writing by Landlord before the commencement of the work and all necessary governmental approvals and permits, which approvals and permits Tenant shall obtain at its sole expense.  All contractors and subcontractors utilized by Tenant shall be subject to Landlord's prior written approval.  Prior to proceeding with any alteration, Tenant shall provide Landlord with at least fifteen (15) days prior written notice.  Landlord shall have the right to record and/or post a notice of non-responsibility with respect to any such work pursuant to the laws of the state in which the Premises is located.  However, Landlord's failure to, or election not to, record and/or post any such notice shall in no way relieve Tenant of all obligations with respect to the payment in full for all such work.  Landlord

12

INITIAL HERE
Landlord
Tenant

may, in its discretion and with respect to any alterations the cost of which is reasonably estimated to exceed $50,000.00, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such alterations and naming Landlord as a co-obligee. Tenant shall deliver to the Shopping Center management office a reproducible copy of the "as built" drawings of the alterations. All work with respect to any alterations, additions and changes must be done in a good and workmanlike manner and diligently prosecuted to completion to the end that the Premises shall at all times be a complete unit except during the period of the work. Subject to the terms hereof, any work done by Tenant without Landlord's consent shall be returned to its original condition at Tenant's expense upon request by Landlord. In addition to the other provisions of this Lease governing Tenant's Work including without limitation Exhibit "C" hereto, the terms and conditions of this Article 10 shall apply to any alterations, additions or changes in or to the Premises in connection with Tenant's Work. If Tenant commences Tenant's Work or any other alterations, additions or changes in or to the Premises requiring Landlord's consent and/or approval hereunder without first obtaining such consent and/or approval, then, to the extent not prohibited by the laws of the state in which the Premises is located, Landlord has the right to lock Tenant out of the Premises until Tenant has obtained such consent and/or approval. Tenant shall pay to Landlord, as Additional Rent, the reasonable costs of Landlord's engineers and other consultants for review of all plans, specifications and working drawings for any Tenant's alterations after the completion of Tenant's Work within ten (10) business days after Tenant's receipt of invoices either from Landlord or such consultants. In addition to such costs, Tenant shall pay to Landlord, within ten (10) business days after completion of any such subsequent alterations, the actual, reasonable costs incurred by Landlord for services rendered by Landlord's management personnel and engineers to coordinate and/or supervise such alterations to the extent such services are provided in excess of or after the normal on-site hours of such engineers and management personnel.

        **10.2   COMPLIANCE WITH LAWS.** Subject to the paragraph immediately below, any permitted changes, alterations and additions made by Tenant shall be performed strictly in accordance with applicable laws, rules, regulations and building codes relating thereto including, without limitation, the provisions of Title III of the Americans with Disabilities Act of 1990 and any applicable state laws, building codes or the like related thereto, all as amended or supplemented from time to time (collectively referred to in this Section as the "ADA"). Tenant shall have the work performed (i) in such a manner so as not to obstruct the access to the Premises or to the premises of any other tenant or obstruct the Common Areas or access to the Shopping Center, (ii) so as not to interfere with the occupancy of any other tenant of the Shopping Center, and (iii) at such times, in such manner and subject to such rules and regulations as Landlord may from time to time reasonably designate.

It is Landlord's responsibility, as part of Common Area Costs, to make the Common Areas of the Shopping Center compliant with the ADA to the extent required by the applicable governmental authority and subject to grandfathering, special exceptions, safe harbors or variances to the extent applicable. Notwithstanding the foregoing, Tenant shall, at Tenant's sole cost and expense, be responsible for compliance with the ADA if required or triggered as a direct result of Tenant's specific use of the Premises, or any alterations made to the Premises by Tenant (however, Landlord may elect to perform any work in the Common Areas and bill the cost of same to Tenant).

        **10.3   INSURANCE AND RECONSTRUCTION.** Throughout the performance of Tenant's alterations (including, without limitation, Tenant's Work), Tenant shall obtain, or cause its contractors to obtain, (i) builder's risk insurance, (ii) workers' compensation insurance in compliance with applicable federal and state laws and with no less than statutory limits (providing a waiver of subrogation in favor of Landlord), (iii) employer's liability insurance, (iv) commercial general liability insurance, and (v) auto liability insurance, all such insurance meeting any requirements related thereto set forth in Article 11 of this Lease and in form and substance reasonably satisfactory to Landlord. With the exception of workers' compensation insurance, all such insurance shall name Landlord and any other parties in interest from time to time designated in writing by notice by Landlord to Tenant as an additional insured(s) thereunder. No alterations, additions or changes made by Tenant need be insured by Landlord under such insurance as Landlord may carry on the Landlord's Building, nor shall Landlord be required under any provisions of this Lease to reconstruct or reinstall any such alterations, additions or changes in the event of casualty loss, it being understood and agreed that all such alterations, additions or changes shall be insured by Tenant pursuant to Article 11 and reconstructed by Tenant (at Tenant's sole expense) in the event of a casualty loss pursuant to Article 12.

## ARTICLE 11. LIABILITY, INDEMNITY AND INSURANCE

        **11.1   LANDLORD'S LIABILITY.** Landlord shall not be liable for any damage or liability of any kind or for any injury to or death of any persons or damage to any property on or about the Premises from any cause whatsoever, except to the extent attributable to Landlord's or its agents', contractors' or employees' gross negligence or willful misconduct.

        **11.2   INDEMNIFICATION.** Tenant hereby agrees to indemnify, defend and save Landlord and any Landlord Parties harmless from all claims, actions, judgments, suits, losses, fines, penalties, demands, costs and expenses and liability whatsoever, including reasonable attorneys' fees, expert fees and court costs ("Indemnified Claims") on account of (i) any damage or liability occasioned in whole or in part by any use or occupancy of the Premises or by any act or omission of Tenant or any Tenant Parties; (ii) the use of the Premises and Common Areas by Tenant or any Tenant Parties and conduct of Tenant's business by Tenant or any Tenant Parties, or any other activity, work or thing done, permitted or suffered by Tenant or

13

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

any Tenant Parties, in or about the Premises, the Landlord's Building or elsewhere on the Shopping Center; or (iii) any breach by Tenant of any obligations on Tenant's part to be performed under the terms of this Lease. In case any action or proceeding is brought against Landlord or any Landlord Parties by reason of any such Indemnified Claims, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel approved in writing by Landlord and Landlord's insurance carrier, which approval shall not be unreasonably withheld. Tenant shall not be liable for damage or injury occasioned by the gross negligence or willful misconduct of Landlord or its agents, contractors or employees. Tenant's indemnification obligation under this Section 11.2 shall survive the expiration or earlier termination of this Lease. Tenant's covenants, agreements and indemnification in Sections 11.1, 11.2 and 11.7, are not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease.

**11.3    INSURED'S WAIVER.** Notwithstanding anything to the contrary set forth in this Lease, in the event of loss or damage to the property of Landlord or Tenant, each party will look first to its own insurance required to be maintained by such party pursuant to this Lease before making any claim against the other. To the extent possible, each party shall obtain, for all policies of property insurance required by this Lease, provisions permitting waiver of subrogation against the other party, and each party, for itself and its insurers, hereby waives the right to make any claim against the other (or its agents, employees or insurers) for loss or damage covered by the property insurance requirements of this Lease.

**11.4    TENANT'S INSURANCE.**

(a)    Tenant agrees that, from and after the date of delivery of the Premises to Tenant, Tenant will carry at its sole cost and expense the following types of insurance, in the amounts specified and in the form hereinafter provided for:

1.    Commercial general liability and property damage insurance covering the Premises and Tenant's use thereof against claims for personal injury or death and property damage occurring upon, in or about the Premises, such insurance to afford protection to the limit of not less than $1,000,000.00 with respect to injury or death of any number of persons and property damage arising out of any one occurrence and $2,000,000.00 in the aggregate, such insurance against property damage to the Premises to afford protection to the limit of not less than $500,000.00 with respect to any one occurrence; and if Tenant uses any business vehicles such as delivery vehicles in connection with the operation of Tenant's business at the Premises, auto liability insurance, such insurance to afford protection to the limit of not less than $1,000,000.00 in respect of injury or death of any number of persons arising out of any one occurrence. The insurance coverage required under this Section 11.4(a)1 shall, in addition, extend to any liability of Tenant arising out of the indemnities provided for in Section 11.2; and

2.    Tenant improvements and property insurance covering all of the items included in Tenant's Work, Tenant's leasehold improvements including those constructed as part of Tenant's Work and Landlord's Work (if any), heating, ventilating and air conditioning equipment, plate glass, trade fixtures, signage and personal property from time to time in, on or upon the Premises and alterations, additions or changes made by Tenant pursuant to Article 10, in an amount not less than the full replacement cost, providing protection against perils included within a special form property insurance policy, including earthquake and/or flood coverage where applicable, and also providing business interruption coverage including loss of income. Any policy proceeds from such insurance shall be held in trust by Tenant for the repair, reconstruction, restoration or replacement of the property damaged or destroyed, unless this Lease shall cease and terminate under the provisions of Article 12.

(b)    All policies of insurance provided for in Section 11.4(a) shall be issued in a form acceptable to Landlord by sound and reputable insurance companies with a general policyholder rating of not less than A- and a financial rating of Class VII as rated in the most currently available "Best's Insurance Reports" and qualified to do business in the state in which the Premises is located. Each such policy shall be issued in the name of Tenant and name Landlord, Ground Lessor (as defined in this Lease), and any other parties in interest from time to time designated in writing by notice by Landlord to Tenant as additional insured(s) and/or loss payee(s), as applicable. Said policies shall be for the mutual and joint benefit and protection of Landlord and Tenant and a certificate of insurance shall be delivered to Landlord upon or prior to delivery of possession of the Premises to Tenant and thereafter within thirty (30) days prior to the expiration of each such policy. Policies shall be made available to Landlord for review within ten (10) days of Landlord's written request. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent. Tenant will give Landlord at least thirty (30) days' notice in writing in advance of any cancellation or lapse, or the effective date of any reduction in the amounts, of insurance. All such liability, property damage and other casualty policies shall be written as primary policies which do not contribute to any policies which may be carried by Landlord. All such liability and property damage policies shall contain a provision that Landlord and Ground Lessor (and any other parties in interest designated as additional insureds or loss payees thereunder), although named as an additional insured and/or loss payee, shall nevertheless be entitled to recover under said policies for any loss occasioned to it, its agents, contractors and employees by reason of the negligence of Tenant. Any insurance provided for in Section 11.4(a) may be effected by a policy of blanket insurance covering additional items or locations or insureds; provided, however, that (i) Landlord and Ground Lessor (and any other parties in interest from time to time designated in writing by notice by Landlord to Tenant) shall be named as an additional insured and/or loss payee thereunder as its interest may appear; (ii) the coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance;

14

INITIAL HERE
Landlord
Tenant    

(iii) any such policy or policies (except any covering the risks referred to in Section 11.4(a)(1)) shall specify therein (or Tenant shall furnish Landlord a written statement from the insurers under such policy specifying) the amount of the total insurance allocated to "tenant improvements and property" more specifically detailed in Section 11.4(a)(2); and (iv) the requirements set forth herein are otherwise satisfied.

(c)   In addition to the types of insurance set forth in subsection (a) above, Tenant shall carry workers' compensation insurance in compliance with applicable federal and state laws and with no less than statutory limits (providing a waiver of subrogation in favor of Landlord) and employer's liability insurance with limits of not less than $500,000.00 per person or $1,000,000.00 per accident or disease in the relevant jurisdiction.

11.5   LANDLORD'S INSURANCE.

(a)   Landlord shall at all times during the Term maintain in effect a policy or policies of insurance covering the Landlord's Building and the Common Areas (excluding Tenant improvements and property required to be insured by Tenant pursuant to Section 11.4(a)) in an amount not less than the full replacement cost (exclusive of the cost of excavations, foundations and footings), providing protection against perils included within a special form property insurance policy including earthquake and/or flood where applicable, together with insurance against sprinkler damage, vandalism, and malicious mischief, and such other risks as Landlord may from time to time determine and with any such deductibles as Landlord may from time to time determine and commercial general liability insurance in such amounts as Landlord deems to be reasonable. Any insurance provided for in Sections 11.5(a) or (b) may be effected by a policy or policies of blanket insurance covering additional items or locations or insureds (and, if so, Landlord shall determine the cost of insurance attributable to the Shopping Center hereunder on an equitable basis determined by Landlord), provided that the requirements of Section 11.5(a) are otherwise satisfied. In addition, at Landlord's option, Landlord (or Landlord's parent company, provided Landlord has the right to participate in and receive the benefit of its parent company's self-insurance program, if any) may elect to self-insure all or any part of such required insurance coverage. Landlord may, but shall not be obligated to, carry any other form or forms of insurance as Landlord or the mortgagees or ground lessors of Landlord may reasonably determine is advisable.

(b)   Landlord may carry rent insurance with respect to the Premises in an aggregate amount equal to twelve (12) or more times the sum of (i) the monthly requirement of Minimum Annual Rent, plus (ii) the sum of the amounts estimated by Landlord to be payable by Tenant for Additional Rent and Percentage Rent (if any) for the month immediately prior to the month in which the policy is purchased or renewed.

(c)   All insurance described in this Section is referred to herein as "Insurance". Tenant agrees to pay Tenant's Proportionate Share of premiums for Insurance pursuant to Section 8.6 of this Lease. Tenant shall have no rights in any Insurance maintained by Landlord nor shall Tenant be entitled to be a named insured thereunder. If, at any time during the Term, any type of insurance policy required by this Lease is no longer available, discontinued or generally considered outdated within the insurance industry (such as how, as of the date of this Lease, the outdated term "public liability insurance" is now referred to as "commercial general liability insurance") (collectively referred to herein as an "Outdated Policy"), then in lieu of such Outdated Policy, Landlord and Tenant shall maintain the new type of policy replacing and most comparable to the Outdated Policy.

11.6   COMPLIANCE WITH INSURANCE AND GOVERNMENTAL REQUIREMENTS. Tenant agrees, at its sole cost and expense, to comply with all requirements with respect to the Premises, or its use or occupancy, of the insurance underwriters and any similar public or private body, and any governmental authority having jurisdiction over insurance rates with respect to the use or occupancy of the Shopping Center. Tenant shall not do or suffer to be done anything upon or in the Premises which will contravene Landlord's policies of insurance or cause an increase in Landlord's insurance rates.

11.7   LIMIT OF LANDLORD'S RESPONSIBILITY. Except to the extent such matter is attributable to the gross negligence or willful misconduct of Landlord or its agents, contractors or employees, Landlord shall not, without limiting the generality of Section 11.1 hereof, be responsible or liable to Tenant or the Tenant Parties for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying space in any other part of the Shopping Center, or for any loss or damage resulting to Tenant or Tenant's property from bursting, stoppage or leaking of water, gas, sewer or steam pipes or for any damage caused by water leakage from any part of the Premises or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other places or by dampness or by any other cause of whatsoever nature, or loss of property within the Premises from any cause whatsoever or any damage caused by other tenants or persons in the Premises, occupants of adjacent property of the Shopping Center, or the public, or caused by construction of any private, public or quasi-public work.

## ARTICLE 12. DESTRUCTION

12.1   DESTRUCTION. Subject to the provisions of Sections 12.2, 12.3 and 12.4 below, if the Premises shall be damaged or destroyed by any casualty, Landlord shall promptly restore same to its condition immediately prior to the occurrence of the damage to the extent of the items Landlord is required to insure as set forth in Article 11 and to the extent of insurance proceeds received (or would have received

15

INITIAL HERE
Landlord   _____
Tenant   _____

had Landlord maintained the insurance required of it under this Lease), and the Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall be abated proportionately as to that part of the Premises rendered untenantable.

    **12.2** **LANDLORD'S ELECTION.** If the Premises (i) are rendered wholly untenantable; (ii) are substantially damaged (i.e., the cost to repair or replace exceeds fifty percent (50%) of its value) as a result of a risk which is not required by Article 11 to be covered by Landlord's insurance; (iii) are substantially damaged during the last year of the Term or of any renewal term hereof regardless of insurance coverage; (iv) or the building of which the Premises is a part (whether the Premises is damaged or not), or all of the buildings which then comprise the Shopping Center, are damaged to the extent of fifty percent (50%) or more of the value thereof, so that the Shopping Center cannot in the reasonable judgment of Landlord be operated as an integral unit; or (v) are damaged and the holder of any mortgage, deed of trust or other lien requires the use of all or any part of Landlord's insurance proceeds in satisfaction of all or a part of the indebtedness secured by any such mortgage, deed of trust or other lien, then in any of such events, Landlord may either elect to repair the damage to the extent of Landlord's insurance obligation set forth in Article 11 and to the extent of insurance proceeds received (or would have received had Landlord maintained the insurance required of it under this Lease) or may cancel this Lease by notice of cancellation within ninety (90) days after such event (whereupon this Lease shall terminate and Tenant shall vacate and surrender the Premises to Landlord). Tenant's liability for Rent, subject to the provisions regarding abatement of Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance contained above, shall continue until the date of termination of this Lease.

    **12.3** **TENANT'S RIGHT TO TERMINATE.** This Lease sets forth the terms and conditions upon which this Lease may be terminated in the event of any damage or destruction. Accordingly, except for Tenant's termination rights specifically set forth in this Article, Tenant hereby waives any right to terminate this Lease by reason of damage or casualty loss pursuant to any present or future laws or case decisions to the same effect. If Landlord fails to commence its required restoration of the Premises within one hundred eighty (180) days after the casualty and such delay is not caused by Tenant (or any Tenant Parties) or any Unavoidable Delays described in Section 25.6, then Tenant shall have the right to terminate this Lease by notice to Landlord given prior to Landlord's commencement of construction. In addition, Tenant shall have the right to terminate this Lease by giving written notice to Landlord of exercise thereof within thirty (30) days after the date the Premises is damaged or destroyed if:

    (a) No part of the Premises remains tenantable after damage or destruction thereof from any cause and Landlord's restoration obligation is reasonably estimated by Landlord to take longer than three hundred sixty-five (365) days to complete; or

    (b) The damage or destruction occurs within the last three hundred sixty-five (365) days of the Term.

    **12.4** **REPAIR AND RENT RECOMMENCEMENT.** In the event Landlord elects to repair the damage as provided herein, any abatement of Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall end the earlier of (i) thirty (30) days after notice by Landlord to Tenant that Landlord has completed its required restoration, or (ii) the date Tenant reopens the damaged Premises for business. Unless this Lease is terminated by Landlord or Tenant as provided above and following the completion of Landlord's required restoration, Tenant shall promptly restore the items Tenant is required to insure as set forth in Article 11 to a condition equal to that existing prior to such destruction or casualty.

## ARTICLE 13. MAINTENANCE

    **13.1** **LANDLORD'S DUTY TO MAINTAIN.** Landlord will, as part of the Common Area Costs, maintain (and repair and replace as required) the roof, exterior walls, structural columns and structural floor or floors of the Landlord's Building in good condition (but specifically excluding outer floor and floor coverings in the Premises; non-structural, demising walls in the Premises; the doors, windows and glass at the Premises; and any alterations, additions or changes performed by or on behalf of Tenant [whether structural or non-structural], all of which shall be Tenant's responsibility as set forth in Section 13.2 below). Notwithstanding the foregoing provisions of this Section, Landlord shall not in any way be liable to Tenant on account of its failure to make repairs unless Tenant shall have given Landlord written notice of the necessity for such repairs and has afforded Landlord a reasonable opportunity to effect the same after such notice. If any maintenance, repair or replacement required to be performed by Landlord hereunder is caused by the negligence or willful act or omission of Tenant or any Tenant Parties, then Tenant shall promptly reimburse Landlord for the costs incurred in effectuating the same upon Landlord's demand therefor and as Additional Rent hereunder. Without limiting the foregoing, Tenant waives the right to make repairs at Landlord's expense and/or any related termination right under any law, statute or ordinance now or hereafter in effect.

    **13.2** **TENANT'S DUTY TO MAINTAIN.** Tenant will, at its own cost and expense, maintain the Premises (except that part Landlord has agreed to maintain as set forth in Section 13.1 above) in good and tenantable condition consistent with a first class shopping center and otherwise in compliance with all applicable federal, state and local laws, rules, regulations, orders and guidelines now or hereafter in force, and make all repairs to the Premises and every part thereof as needed. Tenant's obligations under this Section shall include, but not be limited to, modifying, repairing, replacing, installing and maintaining, as

16

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

applicable, the following: items as are required by any governmental agency having jurisdiction thereof (whether the same is ordinary or extraordinary, foreseen or unforeseen); interior walls and glass; the interior portions of exterior walls; ceilings; utility meters exclusively serving the Premises (including those outside the Premises if they exclusively serve the Premises); pipes and conduits within the Premises exclusively serving the Premises; all pipes and conduits outside the Premises exclusively serving the Premises between the Premises and the service meter; all fixtures; heating, ventilating and air conditioning ("HVAC") system exclusively serving the Premises (including all components thereof whether located inside or outside the Premises); sprinkler equipment and other equipment within the Premises exclusively serving the Premises; the storefront and all exterior glass; all of Tenant's signs (both interior and exterior); locks and closing devices; all window sashes, casements or frames, doors and door frames; and any alterations, additions or changes performed by or on behalf of Tenant (whether structural or non-structural); provided that Tenant shall make no adjustment, alteration or repair of any part of any sprinkler or sprinkler alarm system in or serving the Premises without Landlord's prior approval and Landlord may require Tenant to use Landlord's vendor for such adjustment, alteration or repair.

Tenant shall contract with a service company approved by Landlord for the preventive maintenance of the HVAC system exclusively serving the Premises (including all components thereof whether located inside or outside the Premises) and a copy of the service contract (which contract shall be subject to Landlord's approval) shall be furnished by Tenant to Landlord within ten (10) days after Tenant's opening for business, and a copy of any subsequent contract shall be furnished by Tenant to Landlord within ten (10) days after the same becomes effective. Such service contract must provide for at least four (4) visits, inspections and services each year and the regular changing of filters. All broken glass, both exterior and interior, shall be promptly replaced by Tenant with glass of the same kind, size and quality. At Tenant's expense, Tenant shall be responsible for providing all janitorial, cleaning and pest control services within the Premises. All such services shall be provided in accordance with standards customarily maintained for similar first class shopping centers. Tenant shall permit no waste, mold growth, damage or injury to the Premises and Tenant shall initiate and carry out a program of regular maintenance and repair of the Premises, including the painting or refinishing of all areas of the interior and the storefront, so as to impede, to the extent possible, deterioration by ordinary wear and tear and to keep the same in attractive condition. In furtherance of the foregoing, at any time after Tenant's exercise of an option to extend (if any) the Term of this Lease, upon Landlord's written request, Tenant shall, at its sole cost and expense, within thirty (30) days following Landlord's request, refurbish all or any portion of the interior of the Premises as specified by Landlord to substantially the same or better condition as existed when Tenant opened for business to the public. Tenant will not overload the electrical wiring serving the Premises and will install, at its expense, with Landlord's written approval, any additional electrical wiring required in connection with Tenant's apparatus. Landlord shall be under no obligation to make any repairs, replacements, reconstruction, alterations, or improvements to or upon the Premises or the mechanical equipment exclusively serving the Premises except as expressly provided for herein.

In order to satisfy certain of Tenant's obligations under this Section, Landlord may from time to time elect to require Tenant to participate in a program or programs (such as, without limitation, an HVAC system preventive maintenance program) pursuant to which Landlord (a) manages, directs and coordinates certain maintenance, repair and replacement services through contractors selected by Landlord for the convenience of participating tenants and at a cost generally competitive in the vicinity of the Shopping Center, and (b) bills each participating tenant for the cost of such services rendered to it as Additional Rent under its lease. Landlord may elect to require participation in any program, or to discontinue any program, by providing Tenant with at least thirty (30) days prior written notice. If Landlord elects to discontinue any program as provided above, then Tenant shall remain responsible for the cost of services already rendered to it under such program as Additional Rent hereunder, and shall thereafter directly arrange for the applicable services in order to satisfy its obligations under this Section.

   13.3   LANDLORD'S RIGHT OF ENTRY AND USE. Upon at least twenty-four (24) hours prior verbal or written notice to Tenant (except in an emergency in which event no notice shall be required), Landlord and/or its agents, representatives, and contractors shall have the right to enter into or upon any part of the Premises at any reasonable time (except in an emergency in which event entry may be at any time) to inspect the condition, occupancy or use thereof, to comply with any regulatory or governmental order, and to maintain, make repairs and/or perform other work or improvements to the Premises and/or the Shopping Center or any part or component thereof including without limitation any spaces adjacent to or adjoining the Premises. Upon at least twenty-four (24) hours prior verbal or written notice to Tenant, Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to purchasers, mortgagees or insurers of all or a portion of the Shopping Center or, during the last year of the Term, to prospective tenants of the Premises. During the last one hundred eighty (180) days of the Term, Landlord may erect a suitable sign on the Premises stating the Premises is available for lease. In connection with any such entry described above, Landlord shall endeavor to minimize disruption to Tenant's use of the Premises.

   13.4   CONFLICTS. If there is a conflict between the provisions of this Article 13 and Article 12, the provisions of Article 12 shall govern.

<div align="center">

### ARTICLE 14. UTILITIES

</div>

In addition to Tenant's obligations under Section 2.5 of this Lease and commencing on the date of Landlord's delivery of the Premises to Tenant and continuing throughout the Term, Tenant shall pay for all

<div align="center">17</div>

INITIAL HERE
Landlord
Tenant   

costs related to the provision of all utilities and utility related services to, and used in connection with, the Premises such as, without limitation and as applicable, water, sewer, electricity, gas, telephone and data service, and trash and recycling collection and removal (collectively referred to herein as "utilities") including any deposits, connection or hookup fees and other costs, charges and fees related to such provision of utilities such as, without limitation, any meter reading fees, as and when such costs become due and payable. Certain utilities to the Premises shall be metered and the cost of such metering shall be allocated, all pursuant to Exhibit "C" and/or Exhibit "C-2" attached hereto, as applicable. Landlord shall not be liable for any interruption or failure whatsoever in utilities, nor shall any such failure or interruption constitute an actual or constructive eviction of Tenant from the Premises, result in or give rise to any abatement in or offset against any Rent reserved hereunder, or entitle Tenant to any compensation or damages from Landlord. If Tenant fails to transfer any utility service exclusively serving the Premises to its name effective as of the date of delivery of the Premises to Tenant, and such failure continues for more than five (5) days after the date of delivery of possession, Landlord may, at Landlord's option, turn off such utility service to the Premises which in no way shall constitute an actual or constructive eviction of Tenant from the Premises and/or bill Tenant, as Additional Rent hereunder, the cost of utilities consumed from the date of delivery of possession of the Premises and an additional $50.00 per day until such time as such utility service is transferred.

Landlord may, at its discretion, manage and direct the provision of certain utilities by doing one or any combination of the following, provided that the cost thereof to Tenant is generally competitive in the vicinity of the Shopping Center: (i) Landlord may designate certain service provider(s) to provide certain utilities with respect to the Premises and require Tenant, at Tenant's expense, to contract directly with such service provider(s), (ii) Landlord may engage or contract directly with certain service provider(s) to provide certain utilities with respect to the Premises (i.e., without requiring Tenant to contract directly with such service provider(s)), and/or (iii) Landlord may directly provide certain utilities to the Shopping Center or portions thereof. With respect to (i) above, Tenant will furnish to Landlord a copy of such contract(s) prior to opening for business at the Premises (and a copy of each renewal of such contract(s) prior to the expiration of the existing contract(s)). Tenant shall pay the cost of utilities to (a) such service provider(s) with respect to (i) above, and (b) Landlord with respect to (ii) and (iii) above. Tenant's failure to timely pay the cost of utilities, whether pursuant to (a) or (b), shall be deemed an Event of Default under this Lease. Depending, as applicable, on the terms and conditions of the applicable contract(s) with respect to (i) above or at Landlord's discretion with respect to (ii) and (iii) above, Tenant shall pay the cost of utilities based on one or any combination of the following: (1) Tenant's Proportionate Share as part of Common Area Costs or otherwise, (2) an equitable proration in relation to Tenant's specific use of the Premises including consideration of any excessive usage by Tenant (e.g., a restaurant's share of water and trash costs would equitably be higher than a bank's share of water and trash costs), or (3) the separate meter or submeter reading for the Premises, if applicable. Without limiting consideration of any excessive usage by Tenant described in (2) above, if at any time it is determined that Tenant's usage of the existing trash and recycling collection and removal system (including the use of dumpsters and bins) is excessive, then Tenant shall pay to such service provider(s) or to Landlord, as applicable, all costs incurred with respect to such excessive usage including, without limitation, the cost to provide additional dumpsters or bins or increase trash or recycling removal trips to satisfy Tenant's trash and recycling collection and removal needs.

If any governmental authority currently or hereafter imposes any building energy reporting requirements (such as, without limitation, with respect to energy and water usage, greenhouse gas emissions or Energy Star® ratings) with respect to the Shopping Center or any portion thereof (such laws including similar legislation and/or codes, as amended or supplemented from time to time, are collectively referred to herein as the "Program"), then Tenant agrees to reasonably cooperate with Landlord to ensure compliance with the Program including, without limitation, Tenant providing information to facilitate compliance (such as information regarding utility providers and accounts for the Premises). Tenant agrees to provide such information to Landlord, its designated agents or the applicable governmental agency or utility providers promptly following request and authorizes the delivery of any information required under such energy reporting requirements to Landlord, its designated agents, or the applicable governmental agency or utility providers, and the disclosure of such information, as required under the Program. Landlord's right of entry set forth in this Lease shall extend to any entry onto the Premises to comply with the Program, subject to any terms and conditions relating to notice and the like set forth in such right of entry provision. Landlord may include the reasonable cost of compliance with the Program (such as, without limitation, installation of meters, retaining of consultants and filing of necessary documents) in Common Area Costs.

### ARTICLE 15. LIENS

Landlord's property shall not be subject to liens for work done or materials used on the Premises made at the request of, or on order of or to discharge an obligation of, Tenant. This Article shall be construed so as to prohibit, in accordance with the provisions of the laws of the state in which the Premises is located, the interest of Landlord in the Premises or any part thereof from being subject to any lien for any improvements made by Tenant or any third party on Tenant's behalf (except Landlord) to the Premises. If any lien or notice of lien on account of an alleged debt of Tenant or any notice of lien by a party engaged by Tenant or Tenant's contractor or materialmen to work on the Premises shall be filed against the Shopping Center or any part thereof, Tenant, within ten (10) days after notice of the filing thereof, will cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If Tenant shall fail to cause such lien or notice of lien to be discharged and released of record within the period aforesaid, then, in addition to any other right or remedy, Landlord may discharge the same either by

18

INITIAL HERE
Landlord
Tenant

paying the amounts claimed to be due or by procuring the discharge of such lien by deposit or by bonding procedures. Any amount so paid by Landlord and all costs and expenses, including reasonable attorneys' fees and court costs, incurred by Landlord in connection therewith, including interest at the Default Rate, shall constitute Additional Rent and shall be paid by Tenant to Landlord on demand, or be deducted from Tenant Allowance monies owed to Tenant by Landlord, if any.

## ARTICLE 16. SIGNAGE

Tenant shall at its own expense erect a sign on the exterior sign band of the Premises, which sign shall: (i) conform to the general material, size and appearance of other tenants' signs at the Shopping Center, (ii) be in strict conformity with any guidelines or sign criteria adopted by Landlord with respect to the Shopping Center, including, without limitation, the sign criteria set forth in Exhibit "C-1" attached hereto and made a part hereof, (iii) be in accordance with all applicable laws, (iv) be installed by a contractor or other party which meets with Landlord's prior reasonable approval, and (v) be otherwise subject to Landlord's prior written approval. Tenant shall install its permanent signage on the exterior of the Premises on or before the Commencement Date. Landlord will not be liable to Tenant or any Tenant's contractor for city requirements pertaining to signage. If at any time during the Term, Landlord determines to replace the sign above the exterior of the Premises in connection with a general renovation of the Shopping Center or otherwise, then Tenant shall pay (or reimburse to Landlord, as the case may be) the cost of replacing such sign.

Tenant shall also have the right to place a double-sided sign panel ("Tenant's Sign") on the Shopping Center pylon sign located on Chimney Rock Road at the main entrance to the Shopping Center (the "Pylon") pursuant to the following terms and conditions:

(a)     Tenant shall contract with Tenant's sign company for the design, in accordance with the sign criteria set forth in Exhibit "C-1" attached hereto and made a part hereof, and installation of Tenant's Sign to be installed on the Pylon in a location to be designated by Landlord. Prior to the manufacture and installation of Tenant's Sign, shop drawings prepared at Tenant's expense shall be delivered to Landlord for Landlord's prior written approval. In addition to any signage fee specifically set forth below, all costs (including, without limitation, those related to design, installation, relocation and/or removal, maintenance, repair and electricity) of Tenant's Sign shall be borne solely by Tenant.

(b)     Commencing on the installation of Tenant's Sign on the Pylon (but not earlier than the Commencement Date), Tenant shall pay Landlord Three Hundred Dollars ($300.00) per month for the right to have Tenant's Sign on the Pylon, due and payable on the first day of each month, which amount shall be (i) prorated for any partial month, (ii) subject to annual increases set by Landlord in its sole discretion, and (iii) subject to applicable sales tax (if any). Said amount shall also be and become Additional Rent. If Tenant fails to install Tenant's Sign on the Pylon within one hundred twenty (120) days of the full execution of this Lease, then Landlord may elect, in Landlord's sole discretion, to terminate Tenant's right to place Tenant's Sign on the Pylon by providing Tenant with written notice of such termination.

(c)     Tenant's indemnification and insurance obligations set forth in Article 11 of this Lease shall be applicable to any and all claims and demands whether for injuries to persons or loss of life, or damage to property, occurring in connection with Tenant's Sign.

(d)     After the end of the first full Lease Year, either Landlord or Tenant may terminate Tenant's right to place Tenant's Sign on the Pylon upon giving the non-terminating party thirty (30) days prior written notice.

## ARTICLE 17. ASSIGNMENT AND SUBLETTING

**17.1     RESTRICTIONS ON TRANSFER.** Tenant will not assign this Lease, sublet all or any part of the Premises or enter into any license or concession agreements (collectively or individually, a "Transfer") without the prior written consent of Landlord, which Landlord may withhold in its sole and absolute discretion. In no event may Tenant encumber or hypothecate this Lease or its leasehold interest hereunder, and any attempt to do so shall be void and confer no rights upon any third person and shall be a violation of this Section. The consent by Landlord to any Transfer shall not constitute a waiver of the necessity for such consent to any subsequent Transfer. Any attempted Transfer without Landlord's prior written consent shall be void and confer no rights upon any third person and shall be a violation of this Section. Any Transfer of this Lease from Tenant by liquidation or otherwise by operation of law, including, but not limited to, an assignment for the benefit of creditors, shall be a violation of this Section.

In the event that Tenant proposes any Transfer, Tenant shall notify Landlord in writing by certified mail, return receipt requested, at least sixty (60) days before the date on which the Transfer is to be effective, and, included with such notice, furnish Landlord with: (a) the name of the entity receiving such Transfer (the "Transferee"); (b) a detailed description of the business of the Transferee; (c) audited financial statements of the Transferee; (d) all written agreements governing the Transfer; (e) if the Transferee is an individual, a true and correct copy of the Transferee's driver's license; (f) any information reasonably requested by Landlord with respect to the Transfer or the Transferee; and (g) a fee of Two Thousand Five Hundred Dollars ($2,500.00) to compensate Landlord for legal fees, costs of administration, and other expenses to be incurred in connection with the review and processing of such documentation (whether or not such Transfer is consummated) ("Transfer Fee"). Landlord shall respond to Tenant's request for Landlord's

19

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

approval or disapproval of the Transfer within thirty (30) days after Landlord receives the request and documents and information required above. Landlord reserves the right to reasonably increase the amount of the Transfer Fee if Tenant requests an expedited response time from Landlord or if Tenant requests Landlord's review of any attempted Transfer already consummated by Tenant but made without Landlord's prior written consent in violation hereof.

Landlord shall have the right, as a reasonable condition of Landlord's consent to a proposed Transfer, to require (i) the Transferee provide Landlord with an additional security deposit (in addition to any security deposits, advance rent or other sums or security then being held by Landlord) in such amount as is determined by Landlord in its discretion, (ii) any shareholder, member, partner, owner or other principal of the Transferee and their respective spouses enter into a guaranty agreement on Landlord's standard form (in addition to any existing guaranty agreement(s) related to this Lease, which shall remain in full force and effect), and/or (iii) Minimum Annual Rent be increased to the current market rate (plus periodic adjustments).

Without limiting Landlord's right to withhold its consent to a Transfer for the conditions set forth above or on any reasonable grounds, it is agreed that Landlord will not be acting unreasonably in refusing to consent to a Transfer if Tenant is in default in the performance of any of its obligations under this Lease or if, in Landlord's opinion, (i) the business operation of the proposed Transferee is not equal to, or greater than, the class, quality or standard of operation (including, without limitation, number of locations) of Tenant's business; (ii) such Transferee may adversely affect (A) the business of the other tenants or occupants (such as, without limitation, any duplication of uses including without limitation those contained in letters of intent or lease contracts which Landlord is actively negotiating with prospective tenants and of which Landlord can provide reasonable documentary evidence), (B) the tenant mix in the Shopping Center (including without limitation those contained in letters of intent or lease contracts which Landlord is actively negotiating with prospective tenants and of which Landlord can provide reasonable documentary evidence), or (C) Landlord's ability to obtain any Percentage Rent required by this Lease; (iii) the tangible net worth (exclusive of goodwill, primary residence and retirement accounts, as applicable) and financial capabilities of such Transferee is less than that of Tenant and any Guarantor(s) as of the date of this Lease or at the time of the Transfer, whichever is greater, in constant dollars; (iv) the proposed Transfer involves a change of use of the Premises from that specified herein or would otherwise breach any covenant of Landlord respecting radius, location, use or exclusivity in any other lease in the Shopping Center or any Shopping Center agreements; or (v) the proposed Transfer involves an increased risk of the presence, use, release or discharge of Hazardous Substances. In addition, Landlord's consent will not be deemed unreasonably withheld should Landlord deny consent to a Transfer within the period commencing on the Commencement Date and ending the last day of the eighteenth full calendar month thereafter or if consenting to a Transfer would result in more than two (2) occupants in the Premises. Notwithstanding any contrary provision of this Lease, if Tenant or any proposed Transferee claims that Landlord has unreasonably withheld or delayed its consent to a proposed Transfer or otherwise has breached its obligations under this Section 17.1, Tenant's and such Transferee's only remedy shall be to seek a declaratory judgment and/or injunctive relief, and Tenant, on behalf of itself and, to the extent permitted by law, such proposed Transferee, waives all other remedies against Landlord, including, without limitation, the right to seek monetary damages or to terminate this Lease.

Within thirty (30) days of Landlord's receipt of any Transfer request and any additional information requested by Landlord concerning the proposed Transferee's financial responsibility, Landlord will notify Tenant of its election to do one of the following: (1) consent to the proposed Transfer subject to such reasonable conditions as Landlord may impose in providing such consent; (2) refuse such consent; or (3) terminate this Lease as to all or such portion of the Premises which is proposed to be sublet or assigned and recapture all or such portion of the Premises for reletting by Landlord. The voluntary or other surrender of this Lease by Tenant or a mutual cancellation hereof shall not work as a merger but shall, at the option of Landlord, either terminate all or any existing subleases or subtenancies or operate as an assignment to Landlord of such subleases or subtenancies. Any Transferee approved by Landlord shall expressly assume in writing the obligations of Tenant hereunder.

As used in this Lease, the term "constant dollars" shall mean the present value of the dollars to which such phrase refers. An adjustment shall occur on January 1 of each year following the date of this Lease. Constant dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during which this Lease is dated; the "Current Index Number" shall be the level of the Index for the month of September of the year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average published by the United States Department of Commerce (base year 1982-84=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then Landlord shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

      **17.2   NO RELEASE.** No Transfer will release Tenant and/or Guarantor, if any, of Tenant's obligations under this Lease or alter the primary liability of Tenant to pay the Rent and to perform all other obligations to be performed by Tenant hereunder. In the event of default by any Transferee of Tenant or any successor Tenant in the performance of any of the terms hereof, Landlord may proceed directly against

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

Tenant and/or Guarantor, if any, without the necessity of exhausting remedies against such Transferee or successor.

**17.3   CHANGE OF OWNERSHIP.** If Tenant or any Guarantor is a corporation, limited liability company, partnership or other business entity, then (i) a transfer, assignment or hypothecation of any stock or interest in such corporation, limited liability company, partnership or business entity by any stockholder, partner or member so as to result in a change in the control thereof by the person, persons or entities owning a majority interest therein as of the date of this Lease, or (ii) a change in the person, persons or entities who directly or indirectly possess the power to direct or cause the direction of the management or policies of Tenant or any Guarantor, whether through the ownership of voting securities or interests, by contract or otherwise, shall be deemed to be a Transfer of this Lease. Subsection (i) of this provision shall not be applicable to Tenant or to any Guarantor if it is a corporation whose voting stock is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded in any recognized over-the-counter market.

**17.4   EXCESS CONSIDERATION.** In the event that Landlord consents to a sublease and the rental due and payable by the sublessee (or a combination of the rent payable under such sublease plus any bonus or other consideration therefore or incident thereto) exceeds the Rent payable under this Lease, or if with respect to an assignment, permitted license or other transfer by Tenant in accordance with this Article, the consideration payable to Tenant by the assignee, licensee or other transferee exceeds the Rent payable under this Lease, then Tenant shall be bound and obligated to pay Landlord seventy-five percent (75%) of all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee as the case may be.  Finally, in the event of any assignment or subletting, it is understood and agreed that all rentals equal to Tenant's Rent obligation under this Lease plus any excess consideration to which Landlord is entitled shall be received by Tenant in trust for Landlord, to be forwarded immediately to Landlord (to be applied as a credit and offset to Tenant's Rent obligations with the exception of any excess consideration described above which Landlord may retain).

<u>ARTICLE 18. DEFAULTS BY TENANT</u>

18.1   EVENTS OF DEFAULT.

The following shall each be deemed to be an event of default (each of which is sometimes referred to as an "Event of Default") in this Lease:

(a)      Any part of the Rent required to be paid by Tenant under this Lease shall at any time be unpaid following its due date without the requirement of any notice.

(b)      Except for events enumerated in the other subsections below of this Section 18.1, Tenant fails in the observance or performance of any of its other covenants, agreements or conditions provided for in this Lease, and said failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant (unless such failure cannot reasonably be cured within ten (10) days and Tenant shall have commenced to cure said failure within said ten (10) days and continues diligently to pursue the curing of the same, which cure shall occur no later than sixty (60) days from the date of such notice from Landlord).

(c)      Tenant fails, after the date on which it is required by this Lease to open the Premises for business with the public, to be open for business as required by this Lease, or vacates or abandons the Premises.

(d)      The estate created in Tenant or any Guarantor hereof is taken in execution or by other process of law, or all or a substantial part of the assets of Tenant or any Guarantor hereof is placed in the hands of a liquidator, receiver or trustee (and such receivership or trusteeship or liquidation continues for a period of thirty (30) days), or Tenant or any such Guarantor makes an assignment for the benefit of creditors, or admits in writing that it cannot meet its obligations as such obligations become due, or is adjudicated a bankrupt, or Tenant or any such Guarantor institutes any proceedings under any federal or state insolvency or bankruptcy law, or under any other act relating to the subject of bankruptcy wherein Tenant or any such Guarantor seeks to be adjudicated as bankrupt, or to be discharged of its debts, or to effect a plan of liquidation, composition or reorganization, or should any involuntary proceedings be filed against Tenant or any such Guarantor under any such insolvency or bankruptcy law and such proceeding not be removed within ninety (90) days thereafter.  If any insolvency proceedings, such as those referred to in this Section 18.1(d), are instituted against Tenant, the Premises shall not become an asset in any such proceedings.

18.2   LANDLORD'S REMEDIES.

If any Event of Default occurs, Landlord may treat the occurrence of such event as a breach of this Lease and, in addition to any and all other rights or remedies of Landlord in this Lease or by law in equity provided, Landlord shall have the option and right without further notice or demand to Tenant or any other person to:

(a)      Declare the Term ended and to enter the Premises and take possession thereof and remove all persons therefrom, and Tenant shall have no further claim thereon or thereunder.

21

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

(b)    Bring suit for the collection of Rent as it accrues pursuant to the terms of this Lease and damages including consequential damages without canceling this Lease, and with or without entering into possession of the Premises.

(c)    Retake possession of the Premises from Tenant by summary proceedings or otherwise, either with or without terminating this Lease, and to sue Tenant for an amount equal to the remaining Rent to become due during the Term (or any extension period then in effect) discounted to its present value at a discount rate equal to the U.S. Treasury Bill or Note rate with the closest maturity to the remaining Term as selected by Landlord. Landlord's damages shall include the actual or estimated costs of reletting and alteration, leasing commissions and other costs of Landlord in connection therewith. Alternatively, Landlord may, after such retaking of possession, relet the Premises or any portion thereof. Tenant shall pay to Landlord all monthly deficits in Rent after any such re-entry in monthly installments as the amounts of such deficits from time to time are ascertained. Such deficiency shall be calculated and paid monthly; Tenant shall have no right to any excess. Tenant shall also pay to Landlord any costs and expenses, including, but not limited to, brokerage commissions and reasonable attorneys' fees, incurred by Landlord in such reletting or in making such alterations and repairs not covered by the rental received from such reletting. Should Landlord enter or take possession of the Premises as aforesaid, Landlord shall have the right, but not the obligation, to remove all or any part of the personal property located therein and may place the same in storage at a public warehouse at the expense and risk of the owner or owners thereof.

18.3    COSTS AND ATTORNEYS' FEES. In the event that any action, suit or other proceeding is initiated concerning or arising out of this Lease, the prevailing party shall recover all of such party's costs including, without limitation, reasonable attorneys' fees incurred in each and every action, suit or other proceeding (including any alternative dispute resolution proceedings), including any and all appeals or petitions therefrom from the non-prevailing party. In addition to the foregoing, Tenant shall pay all costs incurred by Landlord (including, without limitation, reasonable attorneys' fees) in connection with: (i) any petition for relief under the Bankruptcy Code filed by or against Tenant and any related proceeding, (ii) any assignment of this Lease to any assignee of Tenant pursuant to the Bankruptcy Code, and/or (iii) any event of default by Tenant whether or not any action, suit or other proceeding is initiated. As used herein, "reasonable attorneys' fees" shall mean the full and actual costs of any legal services actually rendered in connection with the matters involved, calculated on the basis of the usual fee charged by the attorney performing such services.

18.4    TENANT'S PROPERTY TO REMAIN. Subject to Landlord's agreement to subordinate its Landlord's lien as provided later in this Lease, if there is an Event of Default, all of Tenant's furniture, fixtures, equipment, improvements, additions, alterations, and other personal property shall, at the election of Landlord, remain on the Premises and, in that event and continuing during the length of said default, Landlord shall have the right to take exclusive possession of same and to use same, without cost, until all defaults are cured or, at its option, at any time during the Term to require Tenant to forthwith remove same.

18.5    TENANT'S WAIVER. Tenant hereby expressly waives, for itself and all persons claiming by, through, or under it, any right of redemption or for the restoration of the operation of this Lease under any present or future law, including without limitation any such right which Tenant would otherwise have in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Premises as herein provided. If an Event of Default occurs, Tenant hereby waives its rights to receive any notice of default, as well as any period of and right to cure said default, as may be required by state or local law, and Tenant's rights in that regard shall be solely as provided in this Lease.

## ARTICLE 19. LIMITATION OF LANDLORD'S LIABILITY

19.1    LANDLORD'S DEFAULT. Except as otherwise provided in this Lease, Landlord shall be in default under this Lease if Landlord fails to perform any of its obligations hereunder and said failure continues for a period of thirty (30) days after written notice thereof from Tenant to Landlord (unless such failure cannot reasonably be cured within thirty (30) days and Landlord shall have commenced to cure said failure within said thirty (30) days and continues diligently to pursue the curing of the same). If Landlord defaults under this Lease and if, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied against the right, title and interest of Landlord in the Shopping Center including, but not limited to, the rents, proceeds and profits derived therefrom as the same may then be constituted and encumbered, and Landlord shall not be liable for any deficiency. In no event shall Tenant have the right to levy execution against any property of Landlord other than its right, title and interest in the Shopping Center including, but not limited to, the rents, proceeds and profits derived therefrom. Upon any such uncured default by Landlord, Tenant may exercise any of its rights provided at law or in equity; provided, however: (a) Tenant shall have no right to offset or abate rent in the event of any default by Landlord under this Lease, except to the extent offset rights are specifically provided to Tenant in this Lease; (b) Tenant shall have no right to terminate this Lease; and (c) Tenant's rights and remedies hereunder shall be limited to the extent (i) Tenant has expressly waived in this Lease any of such rights or remedies and/or (ii) this Lease otherwise expressly limits Tenant's rights or remedies. Notwithstanding anything contained in this Lease to the contrary, the obligations of Landlord under this Lease (including any actual or alleged breach or default by Landlord) do not constitute personal obligations of the individual partners, directors, officers, members or shareholders of Landlord or Landlord's partners, and Tenant shall not seek recourse against the individual partners, directors, officers, members or shareholders of Landlord or against Landlord's partners or any other persons or entities having any interest in Landlord, or any of their personal assets for satisfaction of any liability with respect to this Lease. Notwithstanding anything

22

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant          

contained in this Lease to the contrary, in no event shall Landlord or any Landlord Parties ever be liable pursuant to this Lease for lost profits or consequential, speculative or punitive damages.

**19.2    TRANSFER OF LANDLORD'S INTEREST.** In the event of the sale or other transfer of Landlord's interest in the Premises (except in the case of a sale-leaseback financing transaction in which Landlord is the lessee), Landlord shall transfer and assign to such purchaser or transferee the obligations of Landlord under this Lease (including the Security Deposit, if any) whereupon Landlord shall be deemed released from all liability and obligations hereunder arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such sale or transfer.  Provided such purchaser or transferee assumes (or is deemed to have assumed) the obligations of Landlord under this Lease as described above, Tenant agrees to attorn to any such purchaser or transferee without further act by Landlord or such purchaser or transferee.

<u>ARTICLE 20. SUBORDINATION AND ATTORNMENT</u>

**20.1    SUBORDINATION OF LEASE AND TENANT'S ATTORNMENT.** This Lease is subject and subordinate to the lien of all mortgages, deeds of trust, security instruments, ground leases, easement agreements and any covenants, conditions and restrictions (collectively, "Superior Interests") now or hereafter covering all or any part of the Shopping Center, and to all amendments, modifications, consolidations, renewals, replacements and extensions thereof.  Tenant also agrees that, if any mortgagee elects to have this Lease prior to the lien of its mortgage and signifies such election in the instrument creating its lien, or by separate recorded instrument, this Lease shall be prior in dignity to such mortgage. In the event of any proceedings brought for the enforcement of any instrument of any Superior Interest holder (including but not limited to a mortgage or lease), Tenant shall, upon demand by the Superior Interest holder, attorn to and recognize such Superior Interest holder as Landlord under this Lease.  Tenant hereby waives its rights under any current or future law which gives or purports to give Tenant any right to terminate or otherwise adversely affect this Lease and the obligations of Tenant hereunder in the event of any such foreclosure proceeding or sale.

**20.2    INSTRUMENTS TO CARRY OUT INTENT.** Tenant agrees that, in order to confirm the provisions of this Article, but in no way limiting the self-operative effect of said provisions, Tenant shall execute and deliver whatever instruments may be required for such purposes within ten (10) days following Landlord's written request.  Should Tenant fail to sign and return any such instruments within said ten (10) day period, Tenant shall be in default hereunder without the benefit of any additional notice or cure periods specified in this Lease.

<u>ARTICLE 21. ESTOPPEL CERTIFICATES</u>

Within ten (10) days after request therefor from Landlord, Tenant agrees to execute and deliver to Landlord, or to such other addressee or addressees as Landlord may designate (and any such addressee may rely thereon), a statement in writing certifying (if true) that this Lease is in full force and effect and unmodified or describing any modifications; that Tenant has accepted the Premises; that Landlord has performed all of its obligations under this Lease arising prior to the date of the certificate; that there are no defenses or offsets against the enforcement of this Lease or stating with particularity those claimed by Tenant; stating the date to which Rent has been paid; and making such other true representations as may be reasonably requested by Landlord.  Should Tenant fail to execute and deliver any such statement within said ten (10) day period, Tenant shall be in default hereunder without the benefit of any additional notice or cure periods specified in this Lease.

<u>ARTICLE 22. QUIET ENJOYMENT</u>

Upon payment of the Rent herein provided for and the observance and performance of all of the agreements, covenants, terms and conditions to be observed and performed by Tenant and subject to the terms and conditions of this Lease, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term without hindrance or interruption by Landlord.

<u>ARTICLE 23. SURRENDER AND HOLDING OVER</u>

**23.1    DELIVERY AFTER TERM.** Upon the expiration or earlier termination of the Term, Tenant shall (i) deliver up and surrender to Landlord possession of the Premises broom clean, free of debris, in good order, condition and state of repair (except as may be Landlord's obligation under this Lease and ordinary wear and tear), (ii) subject to any Landlord lien rights under this Lease or at law, remove all of Tenant's movable furniture, trade fixtures or other personal property including interior and exterior signage, and repair any damage caused by such removal, and (iii) deliver the keys (and any combinations, as applicable) to the Premises to the office of Landlord in the Shopping Center or to Landlord at the address to which notices to Landlord are to be sent.  For purposes of this Section, the term "trade fixtures" shall not include any permanently affixed items or equipment (such as without limitation plumbing fixtures, HVAC equipment, kitchen hoods and walk-in coolers), carpeting, floor coverings, attached shelving/cabinetry, lighting fixtures (other than freestanding lamps), wall coverings, or similar Tenant improvements which shall remain on the Premises at the expiration or earlier termination of this Lease unless otherwise requested by Landlord in writing.  If not sooner terminated as herein provided, this Lease shall terminate at the end of the Term as provided for in Article 3 without the necessity of notice from either Landlord or Tenant to terminate same, Tenant hereby waiving notice to vacate the Premises and agreeing that Landlord shall be

23

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Premises from a tenant holding over.

    **23.2    EFFECT OF HOLDING OVER; RENT.** If Tenant or any party claiming under Tenant remains in possession of the Premises, or any part thereof, after any termination or expiration of this Lease, no tenancy or interest in the Premises shall result therefrom, but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction and removal, and Tenant shall upon demand pay to Landlord, as liquidated damages, a sum equal to all Percentage Rent, if any, and Additional Rent provided for in this Lease during any period which Tenant shall hold the Premises after the Term has expired, plus an amount computed at the rate of double the Minimum Annual Rent payable for the month immediately preceding expiration of the Term.  Notwithstanding anything to the contrary set forth in this Lease, if Tenant remains in possession of the Premises, or any part thereof, after any termination or expiration of this Lease, (i) extension or renewal rights, first offer and first refusal rights, expansion rights and exclusive use rights benefitting Tenant set forth in this Lease, if any, shall automatically terminate without the requirement of any notice, and (ii) Tenant shall automatically forfeit without the requirement of any notice all rights to the Security Deposit, if any.  In addition, Tenant shall indemnify, protect, defend (by counsel approved in writing by Landlord and, as applicable, Landlord's insurance carrier) and hold Landlord harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including reasonable attorneys' fees and court costs) resulting from such failure to surrender, including, without limitation, any claim made by any succeeding tenant based thereon.  The foregoing indemnity shall survive the expiration or earlier termination of this Lease.  The foregoing provisions of this Section 23.2 are in addition to, and do not affect, Landlord's right of re-entry or any other rights of Landlord hereunder or otherwise provided by law or equity.

<h3 style="text-align:center">ARTICLE 24. CONDEMNATION</h3>

    **24.1    ALL OF PREMISES TAKEN.** If the whole of the Premises shall be taken either permanently or temporarily by any right of eminent domain or conveyance in lieu thereof (each being hereinafter referred to as "condemnation"), this Lease shall terminate as of the day possession shall be taken by the condemning authority.

    **24.2    LESS THAN ALL OF PREMISES TAKEN.** If twenty percent (20%) or more of the GLA in the Premises is taken by condemnation or if (regardless of the percentage of the GLA in the Premises which is taken) the remainder of the Premises is divided in two (2) or more units, then in either event Landlord or Tenant shall have the right to terminate this Lease upon written notice to the other delivered no later than the day possession shall be taken by such condemning authority whereupon this Lease shall terminate as of the day possession shall be taken by such condemning authority.  Tenant shall pay Rent and perform all of its other obligations under this Lease up to that date.  If this Lease is not so terminated, the GLA of the Premises shall be accordingly adjusted as of the date of the taking, Rent shall be accordingly adjusted and any pre-paid Rent shall be proportionably credited or debited to Tenant.  Thereafter, the Rent shall be based on the square footage of GLA in the Premises.  Landlord agrees, at Landlord's cost and expense, as soon as reasonably possible, to restore the Premises on the land remaining to a complete unit of like quality and character as existed prior to such appropriation or taking, provided that Landlord shall not be required to expend more on such restoration than the condemnation award received by Landlord (less all expenses, costs, legal fees and court costs incurred by Landlord in connection with such award).

    **24.3    SHOPPING CENTER TAKEN.**

    (a)    If any part of the Shopping Center (including any easement appurtenant to Landlord's interest therein) is taken by condemnation so as to render, in Landlord's judgment, the remainder unsuitable for use as a retail shopping center, Landlord shall have the right to terminate this Lease upon notice in writing to Tenant.  If Landlord so terminates this Lease, such termination shall be effective as of the day possession is taken by the condemning authority, and Tenant shall pay Rent and perform all of its obligations under this Lease up to that date with a proportionate refund by Landlord of any Rent as may have been paid in advance for a period subsequent to such possession.

    (b)    If title to (i) twenty percent (20%) or more of the GLA of the Landlord's Building or (ii) twenty percent (20%) or more of the parking required to be maintained in the Shopping Center is so taken, and if Landlord within one (1) year after such taking has not substituted an equivalent number of parking spaces in a location reasonably accessible to the Shopping Center, then either party may terminate this Lease by written notice to the other given within thirty (30) days after the taking or after the expiration of such one (1) year period, as the case may be.

    **24.4    OWNERSHIP OF AWARD.** All damages for any condemnation of all or any part of the Shopping Center, including, but not limited to, all damages as compensation for diminution in value of the leasehold, reversion and fee, shall belong to Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title and interest to any such award.  Although all damages in the event of any condemnation are to belong to Landlord, Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss which Tenant might incur in removing Tenant's merchandise, furniture, fixtures, leasehold improvements and equipment provided the same does not reduce Landlord's award.

<p style="text-align:center">24</p>

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant 

**24.5    CONFLICTS.** If there is a conflict between the provisions of this Article 24 and Article 13, the provisions of Article 24 shall govern.

**24.6    WAIVER OF TERMINATION RIGHT.** This Lease sets forth the terms and conditions upon which this Lease may be terminated in the event of any taking. Accordingly, except for Tenant's termination rights specifically set forth in this Article, Tenant hereby waives any right to terminate this Lease by reason of any taking pursuant to any present or future laws or case decisions to the same effect.

<div align="center">

**ARTICLE 25, <u>MISCELLANEOUS</u>**

</div>

**25.1    INTERPRETATION.**

(a)    The captions appearing in this Lease are inserted only as a matter of convenience and in no way amplify, define, limit, construe or describe the scope or intent of such sections of this Lease.  The neuter, feminine or masculine pronoun when used herein shall each include each of the other genders and the use of the singular shall include the plural.  The deletion of any printed, typed or other portion of this Lease shall not evidence an intention to contradict such deleted portion.  Such deleted portion shall be deemed not to have been inserted in this Lease.

(b)    The printed provisions of this Lease were drawn together by Tenant and Landlord so that this Lease shall not be construed for or against Landlord or Tenant, but this Lease shall be interpreted in accordance with the general tenor of the language in an effort to reach the intended result.

(c)    Notwithstanding any other provision of this Lease, if the state in which the Premises is located recognizes a distinction between an estate for years and a "usufruct," it is the intention of the parties for this instrument to create a usufruct and not an estate for years.

(d)    The provisions of this Lease with respect to any obligation of Tenant to pay any sum owing in order to perform any act or satisfy its monetary obligations hereunder after the expiration or earlier termination of this Lease shall survive the expiration or earlier termination of this Lease.

**25.2    RELATIONSHIP OF PARTIES.** Nothing herein contained shall be construed as creating any relationship between the parties other than the relationship of Landlord and Tenant, or cause either party to be responsible in any way for the acts, debts or obligations of the other.

**25.3    NOTICES.**

(a)    Any notice, demand, request, approval, consent or other instrument which may be or is required to be given under this Lease shall be in writing and shall be delivered personally or sent by either United States certified mail, return receipt requested, postage prepaid, or overnight delivery courier (unless otherwise specifically set forth in this Lease) and shall be addressed to the party to be notified at the address of such party set forth in Section 1.1(t), or at Landlord's option to the Premises or finally, to such other address as such party may from time to time designate by notice to the other in accordance with this Section.  Notices shall be effective upon delivery unless delivery is refused or cannot be made, in which event notice shall be effective at the time of refusal.

(b)    No notice required to be given to Landlord shall be effective for any purpose unless and until a true copy thereof is given to each mortgagee of Landlord's estate, provided Tenant has previously been given written notice of the name and address of such mortgagee.

(c)    Notices required hereunder may be given by an attorney acting on behalf of Landlord or Tenant.

**25.4    SUCCESSORS.** This Lease shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns, and shall inure to the benefit of Tenant and only such assigns of Tenant to whom the assignment by Tenant has been made in accordance with the provisions of this Lease.

**25.5    BROKER'S COMMISSION.** Landlord has entered into an agreement with the real estate broker specified in Section 1.1(n) of this Lease as representing Landlord ("Landlord's Broker"), and Landlord shall pay any commissions or fees that are payable to Landlord's Broker with respect to this Lease in accordance with the provisions of a separate commission contract.  Landlord shall have no further or separate obligation for payment of commissions or fees to any other real estate broker, finder or intermediary.  Tenant represents that it has not had any dealings with any real estate broker, finder or intermediary with respect to this Lease, other than Landlord's Broker and the broker specified in Section 1.1(n) of this Lease as representing Tenant ("Tenant's Broker").  Any commissions or fees payable to Tenant's Broker with respect to this Lease shall be paid exclusively by Landlord's Broker.  Each party represents and warrants to the other, that, to its knowledge, no other broker, agent or finder (a) negotiated or was instrumental in negotiating or consummating this Lease on its behalf, or/and (b) is or might be entitled to a commission or compensation in connection with this Lease.  Any broker, agent or finder of Tenant whom Tenant has failed to disclose herein shall be paid by Tenant.

**25.6    UNAVOIDABLE DELAYS.** In the event that either party shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles,

<div align="center">25</div>

INITIAL HERE
Landlord _____
Tenant _____

inability to procure labor or materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, fire or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease (collectively, "Unavoidable Delays" and each an "Unavoidable Delay"), then performance of such act shall be excused for the period of an Unavoidable Delay and the period for the performance of any such act shall be extended for a period equivalent to the period of an Unavoidable Delay. The party rendered unable to fulfill any obligation by reason of an Unavoidable Delay shall take all commercially reasonable action necessary to remove such inability with all due speed and diligence. The nonperforming party will be prompt and diligent in attempting to remove the cause of its failure to perform, and nothing herein shall be construed as permitting that party to continue to fail to perform after said cause has been removed. The provisions of this Section shall not operate to excuse Tenant from prompt payment of Rent or any other payments required by the terms of this Lease and shall not extend the Term. Delays or failures to perform resulting from lack of funds shall not be deemed delays beyond the reasonable control of a party.

25.7   **ENTIRE AGREEMENT; PARTIAL INVALIDITY.** Landlord and Tenant acknowledge there are no oral agreements between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof. Landlord and Tenant further acknowledge that they are not relying upon any statement or representation made by the other not included in this Lease, and that they are relying upon their own investigations, analysis and judgment in entering into this Lease. This Lease, including the Exhibits and any addenda attached hereto, sets forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and the Shopping Center. No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced in writing, signed and mutually delivered by both Landlord and Tenant. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

25.8   **APPLICABLE LAW; VENUE.** The laws of the state in which the Premises is located shall govern the validity, performance and enforcement of this Lease. Each of Landlord and Tenant hereby irrevocably and unconditionally: (i) consents to submit to the exclusive jurisdiction of the state and federal courts of the state in which the Premises is located for any proceeding arising in connection with this Lease and each such party agrees not to commence any such proceeding except in such courts, and (ii) waives any objection to the laying of venue of any such proceeding in the state and federal courts of the state in which the Premises is located.

25.9   **WAIVER.** Failure of either party to insist upon the strict performance of any provision of this Lease or to exercise any option or enforce any rules and regulations shall not be construed as a waiver in the future of any such provision, rule or option.

25.10   **ACCORD AND SATISFACTION.** No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any such check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided for in this Lease or available at law or in equity.

25.11   **LANDLORD'S SELF-HELP.** In addition to Landlord's rights of self-help set forth elsewhere in this Lease or available at law or in equity, if Tenant at any time fails to perform any of its obligations under this Lease in a manner reasonably satisfactory to Landlord, Landlord shall have the right, but not the obligation, upon giving Tenant at least ten (10) days' prior written notice of its election to do so (except in the event of an emergency when no prior notice shall be required), to perform such obligations on behalf of and for the account of Tenant and to take all such action necessary to perform such obligations without liability to Tenant for any loss or damage which may result to Tenant's stock or business by reason of such repairs. In such event, Landlord's costs and expenses incurred therein shall be paid for by Tenant as Additional Rent, forthwith upon demand therefor, with interest thereon from the date Landlord performs such work at the Default Rate. The performance by Landlord of any such obligation shall not constitute a release or waiver of Tenant therefrom.

25.12   **RECORDING.** Tenant agrees that it will not record this Lease, or a short memorandum hereof.

25.13   **JOINT AND SEVERAL LIABILITY.** If two or more individuals, corporations, partnerships or other business entities (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each of them shall be joint and several. In like manner, if Tenant named in this Lease shall be a partnership or other business entity, the members of which are, by virtue of statute or general law, subject to personal liability, the liability of each such member shall be joint and several.

25.14   **EXECUTION OF LEASE.** The submission of this Lease for examination does not constitute a reservation of or option for the Premises or any other space within the Shopping Center and shall vest no

26

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant          _____

right in either party. This Lease shall become effective as a binding lease only upon execution and legal delivery thereof by the parties, together with the execution and delivery to Landlord of the Guaranty by Guarantor(s), if any, named in Section 1.1 and the delivery by Tenant to Landlord of any documents and monies (if any) required to be delivered by Tenant to Landlord upon Tenant's execution and delivery of this Lease to Landlord. This Lease may be executed in more than one counterpart, and each such counterpart shall be deemed to be an original document.

**25.15  WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS LEASE, OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS LEASE, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

**25.16  TIME OF THE ESSENCE.** Time is of the essence of each and every obligation under this Lease.

**25.17  TENANT'S AUTHORITY.** If Tenant executes this Lease as a corporation, limited liability company, partnership or other business entity, then Tenant and the persons and/or entities executing this Lease on behalf of Tenant covenant, represent and warrant that as of the date of this Lease and continuing throughout the Term: (a) Tenant is duly organized, authorized, validly existing and qualified to do business in the state in which the Premises is located; (b) such persons and/or entities executing this Lease are duly authorized to execute and deliver this Lease on Tenant's behalf in accordance with Tenant's duly adopted organizational documents; and (c) this Lease is binding upon Tenant in accordance with its terms. Concurrently with Tenant's execution and delivery of this Lease to Landlord and/or at any time during the Term within ten (10) days of Landlord's request, Tenant shall provide to Landlord a copy of any documents reasonably requested by Landlord evidencing such qualification, organization, existence and authorization.

**25.18  ANTI-TERRORISM AND MONEY LAUNDERING REPRESENTATION AND INDEMNIFICATION.** Tenant certifies that: (i) neither it nor its officers, directors or controlling owners are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("SDN"); (ii) neither it nor its officers, directors or controlling owners are engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation; and (iii) neither it nor its officers, directors or controlling owners are in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing certification. Should Tenant, during the Term, be designated an SDN, Landlord may, at its sole option, terminate this Lease.

## ARTICLE 26. INTENTIONALLY OMITTED

## ARTICLE 27. RADIUS RESTRICTION

Tenant (or any person, corporation, limited liability company, partnership or other business entity who or that controls, is controlled by, or is under common control with Tenant) shall not directly or indirectly (either individually or as a partner or stockholder or otherwise) own, operate or become financially interested in any business similar to or competing with the business for which Tenant is authorized to use the Premises as provided in Section 1.1 within a radius of five (5) miles from the outside boundary of the Shopping Center as presently constituted. If Tenant violates the foregoing, then Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including without limitation, Minimum Annual Rent) and as Additional Rent hereunder, an additional amount equal to one (1) day of Minimum Annual Rent at the then applicable rate as stated in Section 1.1(g) hereof for each day until such time as Tenant cures such violation. The parties hereby agree that such amount represents a fair and reasonable estimate of the cost which Landlord will incur by reason of such violation. Notwithstanding the foregoing, the specific rights and remedies set forth in (i) and (ii) above shall not deprive Landlord of any other rights and remedies available to it under this Lease, at law or in equity as a result of Tenant's violation of its obligations described herein. This Article shall not apply to any such business or businesses owned by Tenant and open and in operation within said radius prior to the date of this Lease.

27

INITIAL HERE
Landlord
Tenant 

## ARTICLE 28. EXCLUSIVE

Provided Tenant is in possession of the Premises and operating for Tenant's Use therein and no event of Default has occurred and is continuing, Landlord will not lease in the future to any tenant in the Landlord's Building for the purpose of conducting within the Landlord's Building as its primary business the operation of an urgent care medical facility.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Landlord's Building without imposing any restriction on the use of such space for the operation of (1): any general medical care practice, any internal medicine practice and any general family practices; or (2) physical therapy, dentistry, orthodontic services, optometry, chiropractic services, audiology, mental therapy, psychiatry, plastic surgery, dermatology, pathology or anesthesiology.

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease or any replacement of such existing tenant (including any assignee, sublessee or other transferee thereof) for substantially the same permitted use, whether such replacement tenant shall occupy the same or different premises. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Landlord's Building may sell one or more of the exclusive item(s) described above as an incidental part of its business (for purposes hereof, "incidental part" means twenty percent (20%) or less of such tenant's sales), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant.  This exclusive shall automatically terminate without the requirement of any notice and be of no further force or effect (i) should Tenant assign its interest in and to this Lease, (ii) if the use of the Premises is changed and, as a result of such change, the exclusive item(s) described above are no longer the primary business of Tenant at the Premises, (iii) if Tenant ceases operations from the Premises, whether or not such cessation of operations is permitted by this Lease, or (iv) upon the occurrence of any Event of Default by Tenant under this Lease.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Landlord's Building without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially leasing more than 10,000 square feet of GLA (including any assignees, sublessees or other transferees thereof) or to any tenant or occupant of any outparcel (including any assignees, sublessees or other transferees thereof) located in or adjacent to the Shopping Center, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

Notwithstanding anything to the contrary in this Article, if Tenant's exclusive shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant"), then Landlord shall not be deemed to have violated Tenant's exclusive and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant. If at any time or time to time Landlord fails, within one hundred eighty (180) days after receipt of written notice from Tenant to cure any violation of the terms of this Article 28 or fails to enjoin or restrain a Rogue Tenant from engaging in Tenant's exclusive, then commencing on such one hundred eighty first (181st) day after Landlord's receipt of such notice, as Tenant's sole and exclusive remedy for such violation, fifty percent (50%) of Minimum Rent shall abate (not as a penalty but as liquidated damages) one day for each day after such one hundred eighty first (181st) day until such breach is cured.  If the violation of the Tenant's exclusive is not cured twelve (12) months following the first (1st) payment of reduced Minimum Rent, Tenant shall have the right, at any time within thirty (30) days following the expiration of such twelve (12) month period and while such violation continues, but not thereafter, to elect to terminate this Lease upon written notice to Landlord.  If Tenant so elects, then this Lease and the Term shall end thirty (30) days following the date of Tenant's notice, all as if such early termination date were the natural expiration date of the Term (and without further recourse to or remedy against Landlord on account of such violation), except that if said violation shall be cured within said thirty (30) day period, then Tenant's rights and election to so terminate shall be null and void.  In the event Tenant fails to timely exercise its right to terminate this Lease pursuant to this Article 28, then Tenant's termination right for such violation shall be deemed to be deemed waived and Tenant shall re-commence paying the full Minimum Rent due hereunder retroactive to the expiration of such twelve (12) month period.

## ARTICLE 29. LIMIT ON COMMON AREA COSTS

During the first (1st) full calendar year of the initial Term (and any portion of a calendar year of such initial Term prior to the commencement of such first (1st) full calendar year), as applicable, Tenant's responsibility for Common Area Costs shall be for Tenant's Proportionate Share of the actual Common Area Costs. Notwithstanding the provisions of Article 8 of this Lease, commencing with the second (2nd) full calendar year of the Term, Landlord agrees that Tenant's Proportionate Share of Controllable Common Area Costs shall not be increased by more than six percent (6%) for any one (1) calendar year in excess of the amount payable by Tenant for Controllable Common Area Costs in the immediately preceding calendar year, on a cumulative basis.  The amount of the difference in any one (1) calendar year between the actual percentage increase in Controllable Common Area Costs and the six percent (6%) limit (when the increase is less than the six percent (6%) limit) may be accumulated by Landlord and carried forward to future years and used

28

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

by Landlord to increase the six percent (6%) limit so long as the increase in such year when added to increases in all preceding prior years shall not exceed an annual average increase of six percent (6%). During the first (1st) full calendar year of any extended Term (and any portion of a calendar year of such extended Term prior to the commencement of such first (1st) full calendar year), as applicable, Tenant's responsibility for Common Area Costs shall be for Tenant's Proportionate Share of the actual Common Area Costs. Thereafter, during each calendar year of the extended Term, the foregoing six percent (6%) cap on Controllable Common Area Costs shall apply.

"Controllable Common Area Costs" are all of those Common Area Costs described in Section 8.5 except for the costs of security; utilities; trash and recycling collection and removal; snow and ice removal; and any services provided by governmental authorities or agencies. The cap on Controllable Common Area Costs set forth above shall in no event be construed to cap Taxes or Insurance.

<u>ARTICLE 30. OPTION TO EXTEND</u>

Tenant shall have the option, exercisable by written notice to Landlord, by certified mail, return receipt requested, given not later than three hundred sixty (360) days prior to the expiration of the then current Term and not earlier than four hundred fifty (450) days prior to the expiration of the then current Term to extend the Term for two (2) additional terms of sixty (60) full calendar months each, each on the same terms and conditions as provided in this Lease, except that:

(a)     Landlord shall have no obligation to make any improvements to the Premises.

(b)     Minimum Rent for the first extended Term shall be as follows (plus applicable sales tax, if any):

| Months | Minimum Rent (Per Sq. ft. of the Premises per annum) | Minimum Rent (Monthly) | Minimum Rent (Annual) |
|---|---|---|---|
| 1 - 12 | $72.97 | $16,539.87 | $198,478.40 |
| 13 - 24 | $74.79 | $16,952.40 | $203,428.80 |
| 25 - 36 | $76.66 | $17,376.27 | $208,515.20 |
| 37 - 48 | $78.58 | $17,811.47 | $213,737.60 |
| 49 - 60 | $80.55 | $18,258.00 | $219,096.00 |

(c)     Minimum Rent for the second extended Term shall be as follows (plus applicable sales tax, if any):

| Months | Minimum Rent (Per Sq. ft. of the Premises per annum) | Minimum Rent (Monthly) | Minimum Rent (Annual) |
|---|---|---|---|
| 1 - 12 | $82.56 | $18,713.60 | $224,563.20 |
| 13 - 24 | $84.62 | $19,180.53 | $230,166.40 |
| 25 - 36 | $86.74 | $19,661.07 | $235,932.80 |
| 37 - 48 | $88.91 | $20,152.93 | $241,835.20 |
| 49 - 60 | $91.13 | $20,656.13 | $247,873.60 |

(d)     There shall be no option to further extend the Term.

Upon Landlord's written request, Tenant shall promptly execute and deliver to Landlord documentation confirming the commencement date, expiration date and applicable Minimum Annual Rent of any extended Term properly exercised by Tenant in accordance with the terms and conditions set forth above; provided, however, execution and delivery of such documentation shall in no event delay, or be required for the effectiveness of, any such dates.

Notwithstanding the foregoing, any option to extend the Term shall be deemed null and void, without the requirement of any notice and at Landlord's sole discretion, if one or more of the following has occurred:

1.     Tenant has been late in the payment of Minimum Rent on three (3) or more occasions within any Lease Year. For this purpose, a payment shall be deemed to be late if it is received by Landlord after the seventh day of the month in which such Minimum Rent is due, regardless of whether or not such late payment also constitutes an event of default by Tenant under this Lease.

2.     Intentionally omitted.

3.     Tenant is in default in the performance of any of its obligations under this Lease at the time Tenant exercises the option to extend or at the commencement of the extended Term.

4.     Tenant has failed to give written notice by certified mail, return receipt requested, to Landlord three hundred sixty (360) days prior to the expiration of the then current Term or has given notice earlier than four hundred fifty (450) days prior to the expiration of the then current Term.

5.     Tenant has assigned its interest in and to this Lease.

29

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

## ARTICLE 31. TENANT ALLOWANCE

**31.1    DEFINITION OF TENANT ALLOWANCE.** Landlord agrees to reimburse Tenant an amount not to exceed the amount stated in Section 1.1(u) of this Lease as a tenant finish allowance for "Permanent Improvements to the Premises" as hereinafter defined (the "Tenant Allowance").

**31.2    CONDITIONS TO RELEASE OF TENANT ALLOWANCE.** Landlord shall pay the Tenant Allowance to Tenant within thirty (30) days after all of the following conditions have been met:

(a)    If Tenant has engaged a general contractor in connection with Tenant's Work, then Tenant has furnished to Landlord a copy of the final construction contract (including a reasonably detailed final scope of services and a reasonably detailed final cost breakdown) for Tenant's Work and Landlord has inspected the Premises to confirm that the work set forth in such final construction contract has indeed been completed, or if Tenant has not engaged a general contractor in connection with Tenant's Work, then Tenant has furnished to Landlord a reasonably detailed final cost breakdown for Tenant's Work and Landlord has inspected the Premises to confirm that the work set forth in such final cost breakdown has indeed been completed.  Landlord's inspection right set forth herein is intended solely for Landlord to confirm that Tenant's Work has been completed and Landlord provides no representations or warranties to Tenant, express or implied, with respect to Tenant's Work.  Landlord shall perform its inspection after the completion of Tenant's Work and within ten (10) days of the date Tenant provides to Landlord both (i) a written request for inspection including a copy of the final construction contract (including final scope of services and final cost breakdown) or the final cost breakdown, as applicable, as set forth above, and (ii) a certificate of occupancy from the governmental authority having jurisdiction (or an equivalent if the governmental authority having jurisdiction does not issue certificates of occupancy), as set forth in item (c) below.

(b)    Tenant has furnished to Landlord original, final affidavits and original, final lien releases from Tenant's general contractor, if any, all subcontractors and all material suppliers for all labor and materials performed or supplied as part of Tenant's Work (whether or not the Tenant Allowance is applicable thereto).  Such affidavits and lien releases shall (i) be on Landlord's form if so requested by Landlord, (ii) specify on their face the work performed by and the total amount paid to the party providing such affidavit and/or lien release, (iii) be satisfactory to Landlord in establishing payment in full for all labor and materials which may form a predicate for a claim of lien against the Premises or any other portion of the Shopping Center, and (iv) otherwise be in form and substance acceptable to Landlord.

(c)    A certificate of occupancy from the governmental authority having jurisdiction (or an equivalent if the governmental authority having jurisdiction does not issue certificates of occupancy) has been delivered to Landlord.

(d)    Tenant is open for business to the public in the entire Premises and has paid to Landlord (i) Rent for the first month and second month of the Term, and (ii) the Security Deposit, if any.

(e)    Landlord has received and approved a copy of the HVAC system preventive maintenance agreement if required by Section 13.2 of this Lease.

(f)    Landlord has received a certificate of insurance as required by Section 11.4 of this Lease.

(g)    Landlord has received evidence that Tenant has transferred any utilities exclusively serving the Premises to its name and paid its utility deposits and local government impact fees.

(h)    Landlord has received a copy of Tenant's "as built" drawings confirming compliance with the Americans with Disabilities Act.

(i)    Landlord has received a Form W-9, Request for Taxpayer Identification Number and Certification, executed by Tenant.

(j)    Tenant is not in default under this Lease.

(k)    Tenant has installed its permanent signage on the exterior of the Premises.

(l)    Tenant has provided to Landlord a written request for payment of the Tenant Allowance, which written request shall specifically address Tenant's satisfaction of (i) the other conditions set forth above and include any documentation required by the other conditions set forth above, and (ii) any other conditions for payment of the Tenant Allowance expressly set forth elsewhere in this Lease (including, without limitation, Exhibit "C") and include any documentation required by such conditions (the "Tenant Allowance Request").

**31.3    DEFINITION OF PERMANENT IMPROVEMENTS TO THE PREMISES.**

(a)    "Permanent Improvements to the Premises" specifically include without limitation labor and materials for the following areas of Tenant's Work (to the extent the same are included in the scope of Tenant's Work): demolition or removal of any existing items or improvements from the Premises; cleaning and/or trash removal; temporary utilities to the Premises during construction; portable restrooms; asbestos inspection; permit fees; plumbing (including fixtures and restrooms); electrical; lighting; floor slab; floor

30

INITIAL HERE
Landlord
Tenant                     

coverings (including without limitation custom flooring); walls; wall coverings (including without limitation paint); ceilings (including without limitation ceiling tile replacement); doors; utility meters; permanently affixed cabinetry and permanently affixed restaurant equipment such as kitchen hoods and walk-in coolers; permanently affixed signage; HVAC equipment installation or replacement; fire system (i.e., sprinkler system) installation or replacement; fire system upgrades; firewalls; locks/glasswork; plans and specifications for Tenant's Work; grease traps and affixed vents/ventilation equipment (such as without limitation venting on the roof); ADA ramps; and any specific repairs to existing permanent improvements (such as repairs to the floor slab or any existing plumbing, electrical, HVAC or fire systems including any inspection fees associated with such repairs). Any Permanent Improvements to the Premises shall remain in the Premises upon the expiration or earlier termination of this Lease unless otherwise requested by Landlord in writing.

(b)     "Permanent Improvements to the Premises" specifically exclude without limitation labor and materials for the following areas of Tenant's Work (to the extent the same are included in the scope of Tenant's Work): removable furniture, fixtures and equipment (e.g., removable shelving, computer equipment such as point of sale equipment and other computer equipment such as monitors, and removable restaurant equipment such as ovens and stoves); inventory; moving or relocation; any type of utility deposits; gift certificates; televisions or television equipment; telecommunications lines, telephones or telephone equipment; satellite dishes or satellite dish equipment; office supplies; mileage; food and/or entertainment; uniforms; security system; and Tenant's temporary, non-permanently affixed signage (such as temporary window signs and banners).

(c)     If a particular area of Tenant's Work is not specifically included or excluded from Permanent Improvements to the Premises as set forth above, then Landlord shall determine whether the same should be included or excluded from Permanent Improvements to the Premises.

(d)     As provided above, Tenant acknowledges and agrees that the Tenant Allowance is intended to reimburse Tenant for Permanent Improvements to the Premises as defined above and that in no event will the amount of the Tenant Allowance exceed Tenant's actual cost of Permanent Improvements to the Premises as evidenced by the lien releases required above and as determined in accordance with this Article.

31.4     **OUTSIDE DATE FOR TENANT ALLOWANCE REQUEST**. If Tenant does not provide the Tenant Allowance Request to Landlord within one hundred eighty (180) days of the Commencement Date of this Lease, then Tenant shall be deemed to have waived, without the requirement of any notice, any right to the Tenant Allowance and Landlord's reimbursement obligation under this Article shall be deemed null and void and of no further force or effect.

### ARTICLE 32. LANDLORD'S LIEN

TO SECURE THE PAYMENT OF ALL RENTAL AND OTHER SUMS OF MONEY DUE OR TO BECOME DUE HEREUNDER AND THE FAITHFUL PERFORMANCE OF THIS LEASE BY TENANT, TENANT HEREBY GRANTS TO LANDLORD AN EXPRESS FIRST AND PRIOR CONTRACTUAL LIEN AND SECURITY INTEREST ON ALL PROPERTY (INCLUDING, BUT NOT LIMITED TO, FURNITURE, FIXTURES, EQUIPMENT, INVENTORY, CHATTELS AND MERCHANDISE AND ALL ACCESSORIES THERETO AND ALL PROCEEDS THEREOF) WHICH MAY BE PLACED ON THE PREMISES, AND ALSO UPON ALL PROCEEDS OF ANY INSURANCE WHICH MAY ACCRUE TO TENANT BY REASON OF DESTRUCTION OF OR DAMAGE TO ANY SUCH PROPERTY. SUCH PROPERTY SHALL NOT BE REMOVED FROM THE PREMISES WITHOUT THE WRITTEN CONSENT OF LANDLORD UNTIL ALL ARREARAGES IN RENTAL AND OTHER SUMS OF MONEY THEN DUE TO LANDLORD HEREUNDER SHALL FIRST HAVE BEEN PAID. ALL EXEMPTION LAWS ARE HEREBY WAIVED IN FAVOR OF SAID LIEN AND SECURITY INTEREST. THIS LIEN AND SECURITY INTEREST IS GIVEN IN ADDITION TO LANDLORD'S STATUTORY LIEN AND SHALL BE CUMULATIVE THERETO. UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT, THIS LIEN MAY BE FORECLOSED WITH OR WITHOUT COURT PROCEEDINGS, BY PUBLIC OR PRIVATE SALE, PROVIDED LANDLORD GIVES TENANT AT LEAST TEN (10) DAYS NOTICE OF THE TIME AND PLACE OF SAID SALE, AND LANDLORD SHALL HAVE THE RIGHT TO BECOME THE PURCHASER UPON BEING THE HIGHEST BIDDER AT SUCH SALE. LANDLORD SHALL HAVE THE RIGHT TO RECORD A UNIFORM COMMERCIAL CODE FINANCING STATEMENT PERFECTING ITS SECURITY INTEREST.

### ARTICLE 33. SUBORDINATION OF LANDLORD'S LIEN

Landlord agrees to subordinate its Landlord's lien to the lien, operation and effect of any security interest encumbering all or part of Tenant's personal property, trade fixtures or inventory on the Premises granted by Tenant to an institutional lender who is extending a loan or other financial accommodations to Tenant when all or substantially all of the proceeds therefrom will be used by Tenant in connection with Tenant's improvements to and occupancy of the Premises pursuant to this Lease. Landlord's agreement to subordinate its Landlord's lien as provided above shall be subject to (i) the terms and conditions of the Landlord Waiver Agreement attached hereto as Exhibit "I" (the "Landlord Waiver Agreement"), and (ii) execution of the Landlord Waiver Agreement by Landlord, Tenant and its lender and the payment by Tenant to Landlord of any review and processing fee described therein. Tenant's insurance and indemnification obligations set forth in this Lease shall apply to its lender's access to the Premises pursuant to the Landlord Waiver Agreement and other matters related thereto.

31

INITIAL HERE
Landlord
Tenant     

## ARTICLE 34. TENANT'S FINANCIAL STATEMENTS

Upon ten (10) days prior written request from Landlord (which Landlord may make at any time during the Term but no more often than two (2) times in any calendar year), Tenant shall deliver to Landlord (a) a current financial statement of Tenant and any Guarantor of this Lease (if any), and (b) financial statements of Tenant and any such Guarantor for the two (2) years prior to the current financial statement year. Such statements shall be prepared in accordance with generally accepted accounting principles and certified as true in all material respects by Tenant (if Tenant is an individual) or by an authorized officer of Tenant (if Tenant is a corporation or limited liability company) or a general partner of Tenant (if Tenant is a partnership). Landlord shall be permitted to divulge the contents of any of the statements provided for herein to third parties only if such disclosure is made in connection with any financing arrangements or assignments or other transfers of Landlord's interest in the Premises or in connection with any administrative or judicial proceedings in which Landlord is involved.

## ARTICLE 35. MEDICAL WASTE AND OTHER BIOHAZARDS

In connection with any medical waste or other biohazards generated or maintained on the Premises by Tenant, Tenant will, at Tenant's expense, contract directly with a licensed service provider who specializes in the proper removal, treatment and disposal of medical waste and other biohazards, and furnish to Landlord a copy of such contract prior to opening for business at the Premises (and a copy of each renewal of such contract prior to the expiration of the existing contract). Pursuant to such contract, (a) Tenant shall be billed directly by such service provider, and (b) Tenant shall pay directly to such service provider all charges attributable to the Premises. Tenant's failure to timely pay such charges pursuant to such contract shall be deemed an Event of Default under this Lease. All biohazardous waste shall be stored in the Premises and shall be properly removed from the Premises by such licensed service provider and thereafter properly treated and disposed of off-site. In no event shall such biohazardous waste be placed in any common trash or recycling areas in the Shopping Center. Tenant's indemnification obligations set forth in Article 9 and Article 11 of this Lease shall apply to Tenant's obligations under this Article.

## ARTICLE 36. SATELLITE DISH EQUIPMENT

Tenant may install satellite dish equipment on the roof of the building in which the Premises is located on the terms and conditions set forth in Exhibit "H" attached to this Lease.

## ARTICLE 37. SECURITY DEPOSIT

**37.1   SECURITY.** As security for the faithful performance by Tenant of all of the terms and conditions of this Lease on Tenant's part to be performed, Tenant shall concurrently with Tenant's execution and delivery of this Lease to Landlord, deposit with Landlord the Security Deposit required by Section 1.1(m). The Security Deposit shall be held by Landlord as security for the full and faithful performance by Tenant of all of the terms, covenants and conditions of this Lease to be performed by Tenant during the Term. The Security Deposit is not, and may not be construed by Tenant to constitute Rent for the last month or any portion thereof. If Tenant defaults with respect to any of its obligations under this Lease, Landlord may (but shall not be required to) use, apply or retain all or any part of the Security Deposit for the payment of any Rent or any other sum in default, or for the payment of any other amount, loss or damage which Landlord may spend, incur or suffer by reason of Tenant's default. If any portion of the Security Deposit is so used or applied, Tenant shall, within ten (10) days after demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the Security Deposit or any balance thereof shall be returned to Tenant within thirty (30) days following the expiration of the Term, provided that Landlord may retain the Security Deposit until such time as any amount due from Tenant under this Lease has been determined and paid in full.

**37.2   TRANSFER OF DEPOSIT.** In the event of a sale of the Landlord's Building or lease of the Landlord's Building or the land on which it stands, subject to this Lease, Landlord shall transfer the Security Deposit to the purchaser or lessee. Upon any such transfer, Landlord shall be released from all liability for the return of the Security Deposit, and Tenant shall look solely to the new landlord for the return of the Security Deposit. This provision shall apply to every transfer or assignment made of the Security Deposit to a new landlord. The Security Deposit deposited under this Lease shall not be mortgaged, assigned or encumbered by Tenant without the written consent of Landlord.

## ARTICLE 38. PROPERTY SPECIFIC PROVISIONS

**38.1   UNDERLYING GROUND LEASE.** Tenant acknowledges and agrees that Tenant's leasehold interest under this Lease is a sublease subject and subordinate in all respects to that certain Ground Lease dated September 9, 2016, by and between Chimney Rock Crossing East, LLC, as landlord and ground lessor (including its successors and assigns, "Ground Lessor") and Landlord, as tenant and ground lessee (as the same may be further amended, modified, assigned or evidenced from time to time, the "Ground Lease"), the terms of which are incorporated herein by reference. Tenant covenants and agrees to comply with the provisions of the Ground Lease applicable to the Premises and to tenants or occupants of the Shopping Center. Tenant further acknowledges and agrees that in the event Landlord, whether pursuant to any rights it may have as ground lessee under the Ground Lease or otherwise, acquires

32

INITIAL HERE
Landlord
Tenant   

fee title to Shopping Center, then Landlord may elect, in its sole discretion, to either: (i) maintain separate interests in the Ground Lease notwithstanding Landlord will then be both Ground Lessor and ground lessee thereunder, in which event the Ground Lease shall remain in full force and effect, and this Lease shall remain in full force and effect as a sublease subject and subordinate to the Ground Lease; or (ii) merge Landlord's interests in the Ground Lease as Ground Lessor and ground lessee thereunder and eliminate the Ground Lease, in which event this Lease shall remain in full force and effect as a direct lease rather than a sublease. Tenant shall execute and deliver whatever instruments may be required in order to confirm the provisions hereof in accordance with Section 20.2 of this Lease.

**38.2    USE RESTRICTIONS FROM UNDERLYING GROUND LEASE.** Without limiting Section 38.1 above, Tenant acknowledges and agrees that the Ground Lease contains the following use restrictions: Pursuant to Section 4 of the Ground Lease, the premises subject to the Ground Lease, which includes the Premises, may not be used for (i) the sale of construction materials ("Construction Materials") to include by way of example but not limitation, the production, manufacture or processing of recyclables, asphalt, concrete, stone, aggregates, but the foregoing restriction shall not apply to any retail tenant that sells Construction Materials as part of its business, including, without limitation, home improvement stores, hardware stores, tile stores, nurseries and wholesale club stores, or (ii) residential purposes (but a hotel, motel or similar use is not restricted).  Tenant shall use the Premises only in accordance with the terms and conditions of this Lease, including without limitation Section 1.1(j) hereof, and in no event shall such use violate the foregoing use restrictions.

**38.3    ACTIVE QUARRY.** Tenant acknowledges that the Premises is located in close proximity to an active quarry located on Block 701, Lot 6 (the "Quarry").  In addition to mining stone and producing various aggregate products within the Quarry, concrete and asphalt is also manufactured and aggregate recycling is performed. The Quarry and these heavy industrial uses as may be expanded from time to time (including, but not limited to, mining, concrete plant, asphalt plant, and aggregate recycling) are ongoing and permitted to operate twenty-four (24) hours a day, seven (7) days a week.  Tenant specifically acknowledges the close proximity of the Premises to the Quarry, the heavy industrial uses associated with the Quarry, and that said heavy industrial uses can result in noise, dust, vibration and heavy truck traffic emanating from the Quarry (provided that such truck traffic shall not enter into the Premises).  Tenant waives any claim for any interruption of or interference with its use and enjoyment of the Premises resulting from operation of the Quarry.  Tenant agrees to include this provision in all subleases and assignments.

[SIGNATURES ON NEXT PAGE]

33

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

LANDLORD:

**BRIDGEWATER REGENCY, LLC,**
a Delaware limited liability company

By: Regency Centers, L.P.,
    a Delaware limited partnership
    Its: Managing Member

    By: Regency Centers Corporation,
        a Florida corporation
        Its: General Partner

    By: _____

    John Hricko
    Print Name

    Its: Market Officer
    Position/Title

Witness
Print Name

Witness
Print Name

TENANT:

**ROMES URGENT CARE SERVICES, LLC,**
a Pennsylvania limited liability company

Witness
Shakira Hernandez MA
Print Name

Witness
CATHY Peters
Print Name

By: _____
    Jean-Paul Rowe   MD
    Print Name

Its: Owner
    Position/Title

Attest: _____
    Jean-Paul Rowe  MD
    Print Name

Its: Owner
    Position/Title

Tax ID # 27-0418806

34

INITIAL HERE
Landlord _____
Tenant _____

<u>Execution Instructions</u>

**New Jersey Corporate:** This Lease must be executed for Tenant, if a corporation, by the president or vice president and attested by the secretary or assistant secretary, unless the bylaws or a resolution of the Board of Directors shall otherwise provide, in which event, a certified copy of the bylaws or resolution, as the case may be, must be furnished. Also, the corporate seal of Tenant, if Tenant has such a seal, must be affixed.

**New Jersey Individual:** This Lease must be executed by each individual whose name appears under the signature lines. Their execution must be witnessed by two (2) disinterested persons who must sign as witnesses in the space provided.

35

<u>INITIAL HERE</u>
Landlord
Tenant  

EXHIBIT A

LEGAL DESCRIPTION OF SHOPPING CENTER

# CONTROL LAYOUTS, INC.
Land Surveyors
271 Cleveland Avenue
Highland Park, NJ 08904
732/846-9100 Telephone
732/937-5793 Facsimile

Legal Description
Our File No. 902-14
February 5, 2015
Block 730 Lot 1.01
Bridgewater, New Jersey

BEGINNING at a point of intersection of the existing Northerly Right of Way line of New Jersey State Highway U.S. Route 22 Westbound (formerly known as New Jersey State Highway Route 29) (variable width) with the centerline of Middle Brook; thence running

1) Along the aforesaid existing Northerly Right of Way line of New Jersey State Highway U.S. Route 22 Westbound, on a curve to the right, having a radius of 5902.00 feet and an arc length of 762.08 feet with a chord bearing of North 89 degrees 14 minutes 09 seconds West and chord distance of 761.55 feet to a point; thence

2) On a curve to the right, having a radius of 485.00 feet and an arc length of 36.18 feet with a chord bearing of North 64 degrees 20 minutes 21 seconds West and chord distance of 36.16 feet to a point; thence

3) On a curve to the right, having a radius of 235.00 feet and an arc length of 108.53 feet with a chord bearing of North 48 degrees 58 minutes 18 seconds West and chord distance of 107.57 feet to a point; thence

4) North 35 degrees 44 minutes 28 seconds West, a distance of 273.33 feet to a point; thence

5) On a curve to the left, having a radius of 245.00 feet and an arc length of 181.49 feet with a chord bearing of North 56 degrees 57 minutes 47 seconds West and chord distance of 177.37 feet to a point; thence

6) North 78 degrees 11 minutes 06 seconds West, a distance of 95.59 feet to a point; thence

7) On a curve to the right, having a radius of 71.50 feet and an arc length of 74.05 feet with a chord bearing of North 46 degrees 07 minutes 14 seconds West and chord distance of 70.78 to a point on the Easterly Right of Way line of Chimney Rock Road (35.00 feet wide); thence

8) Along the aforesaid Easterly Right of Way line of Chimney Rock Road, North 11 degrees 51 minutes 20 seconds East, a distance of 224.14 feet to a point; thence

9) North 27 degrees 34 minutes 42 seconds East, a distance of 184.22 feet to a point; thence

10) On a curve to the right, having a radius of 500.00 feet and an arc length of 201.27 feet with a chord bearing of North 39 degrees 06 minutes 37 seconds East and chord distance of 199.92 feet to a point; thence

Page 1 of 3

INITIAL HERE
Landlord
Tenant

# CONTROL LAYOUTS, INC.

**Land Surveyors**
271 Cleveland Avenue
Highland Park, NJ 08904
732/846-9100 Telephone
732/937-5793 Facsimile

11) North 50 degrees 38 minutes 52 seconds East, a distance of 105.36 feet to a point; thence

12) On a curve to the left, having a radius of 1500.00 feet and an arc length of 237.71 feet with a chord bearing of North 46 degrees 06 minutes 08 seconds East and chord distance of 237.47 feet to a point; thence

13) North 41 degrees 33 minutes 45 seconds East, a distance of 118.63 feet to a point; thence

14) On a curve to the left, having a radius of 777.00 feet and an arc length of 33.39 feet with a chord bearing of North 38 degrees 43 minutes 22 seconds East and chord distance of 33.37 feet to a point; thence

15) North 49 degrees 07 minutes 01 second East, a distance of 231.46 feet to a point on the Southerly Right of Way line of Thompson Avenue (variable width); thence

16) Along the aforesaid Southerly Right of Way line of Thompson Avenue, South 51 degrees 18 minutes 25 seconds East, a distance of 47.07 feet to a point on or near the centerline of the aforesaid Middle Brook; thence

17) Along the aforesaid centerline of Middle Brook, South 03 degrees 39 minutes 37 seconds West, a distance of 298.35 feet to a point; thence

18) Continuing along the aforesaid centerline of Middle Brook, South 00 degrees 41 minutes 52 seconds West, a distance of 234.04 feet to a point; thence

19) Continuing along the aforesaid centerline of Middle Brook, South 07 degrees 02 minutes 15 seconds East, a distance of 131.11 feet to a point; thence

20) Still along the aforesaid centerline of Middle Brook, South 17 degrees 29 minutes 16 seconds East, a distance of 81.28 feet to a point; thence

21) Continuing along the aforesaid centerline of Middle Brook, South 35 degrees 11 minutes 03 seconds East, a distance of 77.29 feet to a point; thence

22) Continuing along the aforesaid centerline of Middle Brook, South 41 degrees 05 minutes 17 seconds East, a distance of 133.33 feet to a point; thence

23) Still along the aforesaid centerline of Middle Brook, South 33 degrees 42 minutes 27 seconds East, a distance of 553.96 feet to a point; thence

24) Continuing along the aforesaid centerline of Middle Brook, South 21 degrees 08 minutes 20 seconds East, a distance of 134.90 feet to a point on the aforesaid existing Northerly Right of Way line of New Jersey State Highway U.S. Route 22 Westbound, said point being the point and place of BEGINNING.

Page 2 of 3

---

INITIAL HERE
Landlord
Tenant 

# CONTROL LAYOUTS, INC.

**Land Surveyors**

271 Cleveland Avenue
Highland Park, NJ 08904
732/846-9100 Telephone
732/937-5793 Facsimile

BEING known and designated as Lot 1.01 in Block 730 as shown on the Official Tax Map of the Township of Bridgewater, Somerset County, New Jersey.

The above description being drawn in accordance with a survey prepared by Control Layouts, Inc., dated December 2014 and revised February 5, 2015 and May 1, 2015.

GREGG A. GAFFNEY
NEW JERSEY PROFESSIONAL LAND SURVEYOR
LICENSE NO. GS43304

Page 3 of 3

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

## EXHIBIT B

### PART 1 - SITE PLAN OF THE SHOPPING CENTER
### (DESIGNATING THE "LANDLORD'S BUILDING")

*The site plan is presented solely for the purpose of identifying the approximate location and size of the improvements in the Shopping Center. Subject to the terms and conditions of this Lease, building sizes, dimensions, access and parking area, existing tenant locations and identities are subject to change without notice and at Landlord's discretion. Unit numbers as indicated are not necessarily the actual suite numbers and are intended for use as a reference only. Without limiting any other specific designations set forth on the site plan as of the date of this Lease, those buildings depicted below which are either designated with the letters "NAP" (i.e., not a part) or are not shaded shall not be considered a part of Landlord's Building.*



☒ AVAILABLE  ☐ LEASED

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant


**EXHIBIT B**

**PART 2 - LEASING PLAN
(DESIGNATING THE "PREMISES")**

*The site plan is presented solely for the purpose of identifying the approximate location and size of the improvements in the Shopping Center. Subject to the terms and conditions of this Lease, building sizes, dimensions, access and parking area, existing tenant locations and identities are subject to change without notice and at Landlord's discretion. Unit numbers as indicated are not necessarily the actual suite numbers and are intended for use as a reference only. Without limiting any other specific designations set forth on the site plan as of the date of this Lease, those buildings depicted below which are either designated with the letters "NAP" (i.e., not a part) or are not shaded shall not be considered a part of Landlord's Building.*

Premises:  A140



REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant   

EXHIBIT C

TENANT'S WORK

A.   **Procedure for the Preparation and Approval of Working Drawings and Specifications.**

Tenant shall, within thirty (30) days after the date of this Lease, deliver to Landlord for its review and approval two (2) sets of drawings and specifications for Tenant's proposed improvements to the Premises (the "**Tenant's Plans**").   One set will be returned to Tenant and one set will be retained by Landlord. Landlord may at its election require electronic drawings and specifications (both .PDF format or similar, and .DWG format or similar).   Such drawings shall consist of at least a site plan (if sitework changes to utilities, paving, landscaping, mechanical, electrical, or plumbing systems etc. are proposed), a floor plan, and exterior building elevations (if any modifications are proposed to the storefront or exterior walls) done at a reasonable scale, which will convey detail and intent, as well as an indication of color selection and graphics.   Storefront elevations shall include specification of materials and color scheme.   The following conditions, as applicable, are to be clearly detailed on the drawings:

- New roof penetrations, including plumbing penetrations for vent stacks, or any modifications to the roof system
- New equipment (satellite dishes, HVAC, etc.) installed on the roof
- Underground utility changes and pavement demolition/replacement
- Modifications to exterior walls to include new doors, windows, finishes, etc.
- Anything to be mounted on the exterior walls
- Changes to electrical, water, or gas service
- Changes to the concrete floor slab
- Grease trap location

Landlord's review of the drawings and specifications shall be for its sole purpose and shall not imply or obligate Landlord to review the same for quality, design, code compliance or other like matters. Accordingly, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the same.   If Landlord does not, within fourteen (14) days after receipt of Tenant's preliminary plans, indicate its disapproval, the same shall be deemed approved. However, Landlord shall not be responsible for items noted or inferred to be furnished and installed by Landlord unless item is specifically noted in paragraph B or Exhibit "C-2".

If Tenant fails to submit its plans and specifications within the 10-day period provided above, then Landlord may, at its option, in addition to all other remedies available for Tenant's default, have the sole right to cancel this Lease.   Indulgences granted to Tenant shall not be construed to be a waiver of the provisions of this paragraph.   Time is of the essence.

Tenant shall have access to change locks upon Landlord's receipt of two (2) sets of plans, contractor's insurance and Landlord's delivery of space.   Tenant will pay costs of lock change and must make appointment with Landlord.

B.   **Landlord's Work.**

LANDLORD HAS NO OBLIGATION TO PERFORM ANY WORK WITHIN THE PREMISES OR THE SHOPPING CENTER UNLESS STATED IN EXHIBIT "C-2".   IF NO EXHIBIT "C-2" IS ATTACHED, TENANT AGREES TO ACCEPT THE PREMISES IN ITS CONDITION "AS IS" AND SHALL BE OBLIGATED TO PERFORM SUCH WORK AS IS NECESSARY TO RENDER THE PREMISES USEFUL FOR THE PURPOSES LEASED.

C.   **Tenant's Work.**

All work not specifically described as Landlord's obligation in Exhibit "C-2" shall be the obligation of Tenant and shall be performed in accordance with approved plans and specifications at the sole cost of Tenant. The following work shall be at the sole expense of Tenant and shall be subject to the approval of Landlord, unless otherwise expressly provided herein:

1.   Furniture and Fixtures - all furniture, furnishings, trade fixtures and related parts, all of which shall be new, and placed in a position consistent with that of a first-class retail shopping center (e.g., not abutting storefront glass, etc.), unless otherwise approved by Landlord.

2.   Fixture and Equipment Connections - electrical and mechanical connection of all merchandising, lighting, floor and wall fixtures or equipment and related parts, including kitchen and food service equipment and other equipment peculiar to Tenant's occupancy.

3.   Outdoor seating plan if this Lease and local ordinance specifically allow an outdoor seating area.

4.   Approved Fire Protection Devices – sprinkler system, approved fire extinguishers or fire protection devices in size, type and quantity throughout the Premises as required by code and standards of governing insurance rating boards.

5.   All Signs and Graphics - the design, installation and location of all signs, exit signs and emergency lighting.   Landlord must approve all signs prior to any installation.   Tenant shall install its

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant   ____

permanent signage on the exterior of the Premises on or before the Commencement Date. Signage will be solely Tenant's responsibility. Landlord will not be responsible for compliance with city ordinances or liable for Tenant's contractor actions.

6.     Ceilings - all ceilings, including lighting coves and other special effects. Ceiling to include insulation no less than R 19 installed no lower than the storefront glass. Requests for sheetrock ceilings must be approved by Landlord. Sheetrock ceilings will be allowed when installing a thirty inch (30") opening access panel within Tenant space.

7.     Show Window Backgrounds - all show window backgrounds, show windows, show window floors, show window ceilings and show window lighting installations.

8.     Walls and Wall Finishes - all interior partition walls within the Premises and all finishes on walls, including placing the finishes and installing the insulation on and within the partitions erected by Landlord.

9.     Doors - all doors and hardware within the Premises.

10.    Floor Coverings - all floor coverings and floor finishes.

11.    Interior Final Finishes - all interior painting, papering, paneling and decoration.

12.    Plumbing - all plumbing, including connections to utility systems.

13.    Electrical and Telephone Systems and Equipment - furnishing and installation of all interior distribution panels, lighting panels, power panels, conduits, outlet boxes, switches, outlets, wiring, lighting fixtures and lamping; furnishing and installation of conduit and outlets as required for Tenant's telephone service.

14.    Sound proofing - Tenant will be responsible for sound proofing the Premises per Landlord specifications. During the construction of Tenant's Work, Tenant must request in writing that Landlord provide Tenant with Landlord's sound proofing specifications for the Premises and Tenant's use thereof. If Tenant fails to provide such request, then Landlord may elect to require Tenant to promptly install sound proofing per Landlord specifications at any time following the completion of Tenant's Work.

15.    Rear Door - Tenant will be responsible for costs of installing a rear door unless a rear door already exists.

16.    Exterior conduits for utility lines and boxes must be painted to match fascia of building.

17.    ADA - All costs related to construction of any ADA compliance improvements including, without limitation, additional accessibility ramps as may be required by applicable law, will be paid by Tenant.

D.     **General.**

1.     Landlord, Tenant or utility company shall have the right, subject to Landlord's approval, to run utility lines, pipes, roof drainage pipes, conduit, wire or duct work, where necessary, through attic space, column space or other parts of the Premises, and to maintain same in a manner which does not interfere unnecessarily with Tenant's use thereof.

2.     Tenant shall prepare all its plans and perform all its work to comply with all governing statutes, ordinances, regulations, codes and insurance rating boards; take out all necessary permits and obtain certificates of occupancy for the work performed by Tenant - all subject to Landlord's approval. Tenant shall further pay all utility deposits and government impact fees.

3.     The concrete floor will be designed to a support a uniformly distributed load. Should Tenant desire a heavier loading, Tenant agrees to pay the cost of engineering and the cost of providing such heavier loading capacity.

4.     All work done on the Premises by Tenant must be performed by licensed contractors approved by Landlord. Tenant or Tenant's contractor shall be required to provide a construction security deposit to Landlord during the construction of Tenant's Work, which deposit may be applied to repair damage to the Shopping Center arising from Tenant's Work or the acts, omissions, negligence or willful misconduct of Tenant's contractors, subcontractors, material suppliers or agents at the Shopping Center. Tenant's contractors shall be required to waive all lien rights against Landlord's interest in the Shopping Center.

5.     Meters - All meters required for utility services and utility deposits shall be furnished and installed at Tenant's expense.

INITIAL HERE
Landlord
Tenant

EXHIBIT C-1

SIGN CRITERIA

# CHIMNEY ROCK CROSSING EAST

N.J.S.H. ROUTE 22 & CHIMNEY ROCK ROAD
BRIDGEWATER TOWNSHIP
SOMERSET COUNTY, NEW JERSEY

A DEVELOPMENT OF:

BRIDGEWATER REGENCY LLC



APPROVED BY

CHARLES P. DIETZ
ARCHITECT REGISTRATION
NO. - 13813

DATE __09/27/17__  SIGNED

# SIGNAGE DESIGN GUIDELINES

ISSUED FOR SITE PLAN UPDATES
AUGUST 08, 2017
rev SEPTEMBER 28, 2017



THE
DIETZ
PARTNERSHIP
90 East Halsey Road, Suite 201 · Parsippany, New Jersey 07054 · (973) 884 - 7400
A R C H I T E C T S

TABLE OF CONTENTS
East Parcel
Project #14-108

Revised 09-27-2017

A)   SITE PLAN

B)   RETAIL SIGNAGE SPECIFICATIONS – LESS THAN 5,000 S.F.

C)   RETAIL SIGNAGE SPECIFICATIONS – 5,000 S.F. LESS THAN 20,000 S.F.

D)   ANCHOR SIGNAGE SPECIFICATIONS – GREATER THAN 20,000 S.F

E-1)  RESTAURANT SIGN BAND NORTH, SOUTH & WEST ELEVATIONS- RETAIL 'A1', 'A2', 'A3' & 'A4' & 'A5'

E-2)  RETAIL SIGN BAND NORTH & WEST ELEVATIONS- RETAIL 'B'

E-3)  RETAIL SIGN BAND WEST ELEVATION- RETAIL 'C1' & 'C2'

E-4)  RETAIL SIGN BAND WEST ELEVATION- RETAIL 'D'

E-5)  ANCHOR SIGN BAND WEST ELEVATIONS- RETAIL 'E'

E-5A)  ANCHOR SIGN BAND NORTH ELEVATIONS- RETAIL 'E'

E-6)  ANCHOR SIGN BAND SOUTH & WEST ELEVATIONS- RETAIL 'F'

E-7, E-7A)  RESTAURANT SIGN BAND SOUTH, WEST & EAST ELEVATIONS- RESTAURANT 'G1', 'G2' & 'G3'

E-8, E-8A)  RESTAURANT SIGN BAND NORTH, WEST & EAST ELEVATIONS RESTAURANT 'H1', 'H2' & 'H3'

E-9)  FREESTANDING SIGNS (A & B) - EAST PARCEL

E-9A) SITE RETAINING WALL SIGN

E-10)  SIGNAGE DETAILS- BACKER PANEL MOUNT (APPROVED), DIRECT MOUNT (APPROVED), RACEWAY (NOT APPROVED)

EXHIBITS - SIGNAGE PHOTO EXAMPLES OF BACKER PANEL AND DIRECT MOUNT LETTERS (APPROVED)

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

## RETAIL SIGNAGE SPECIFICATIONS

### LOCATION
### FRONT OF RETAIL
### (LESS THAN 5,000 S.F.)

#### TYPE OF SIGN

Individually backlighted channel letters with Plexiglas front and trim caps, **direct mounted or mounted on metal backer panel. Blade signs projected from façade as permitted by ordinance.**

#### SIZE OF SIGN

Maximum letter size is 24". Minimum letter size is 18". **First letter is permitted to maximum letter size of 30". Blade signs maximum size is 2.5 SF as permitted by ordinance.**

Front Signs: One "sign band" sign per tenant, per façade except if the building fronts on two or more public roads, then one wall sign may be affixed to each wall fronting a public road *provided the additional walls do not front a residential zone*. Signs shall not project from the wall more than fifteen-(15") inches, and shall be located in the locations shown on the attached elevations. The total display area of a façade sign shall not exceed 5% of the area of the face of the wall upon which such sign or signs are attached. In no case, may the area of a sign exceed 100 S.F.

Signable Area: That portion of a building fronting on a public roadway, or public parking facility, free of any projection, relief, cornice, column, change of building material, window or door opening shall not extend above the roofline of the parapet and along the entire length of the building which fronts the public street or public parking facility.

Measurement Technique: Measure to the highest point of the sign, to the lowest point of the sign and to the outmost sides of the sign. Assume a rectangle, and then calculate.

#### PLACEMENT AND INSTALLATION

Signs to be located within the area shown on the attached elevations. Buildings included but not limited to are Bldg. A1, Bldg. A2, Bldg. A3, Bldg. A4, **Bldg. A5, Retail G1, Retail G2, Retail G3, Retail H1, Retail H2, Retail H3.** Refer to the attached Building Elevations. **Final signage locations to be subject to local zoning authority having jurisdiction.**

Final electrical hook-up to be performed by a licensed electrician, and shall be in complete conformance with all local, state and national codes.

Shop drawings for the sign shall be submitted to the landlord and architect for final approval.

#### STYLE, COLORS AND MATERIALS

Typefaces are subject to landlord approval.
Fronts shall be Plexiglas face with matching trim caps and returns.
*NOTE: Regional and nationally recognized logos, trademarks, fonts and colors shall be permitted provided they meet the above referenced standards and local municipal ordinances.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

RETAIL SIGNAGE SPECIFICATIONS

LOCATION
FRONT OF RETAIL
5,000 S.F. TO LESS THAN 20,000 S.F.

TYPE OF SIGN

Individually backlighted aluminum channel letters with Plexiglas fronts and trim caps, direct mounted or mounted on metal backer panel. Blade signs projected from façade as permitted by ordinance.

SIZE OF SIGN

Maximum letter size is 36". Minimum letter size 24". First letter is permitted to maximum letter size of 42". Blade signs maximum size is 2.5 SF as permitted by ordinance.

Front Signs: One "sign band" sign per tenant, per façade except if the building fronts on two or more public roads, then one wall sign may be affixed to each wall fronting a public road *provided the additional walls do not front a residential zone*. Signs shall not project from the wall more than fifteen- (15") inches, and shall be located in the locations shown on the attached elevations. The total display area of a façade sign shall not exceed 5% of the area of the face of the wall upon which such sign or signs are attached. In no case, may the area of a sign exceed 100 S.F.

Signable Area: That portion of a building fronting on a public roadway, or public parking facility, free of any projection, relief, cornice, column, change of building material, window or door shall not extend above the roofline of the parapet and along the entire length of the building which fronts the public street or public parking facility.

Measurement Technique: Measure to the highest point of the sign, to the lowest point of the sign and to the outmost sides of the sign. Assume a rectangle, then calculate.

PLACEMENT AND INSTALLATION

Signs to be located within the area shown on the attached elevations. Buildings included but not limited to are Bldg. B, Bldg. C1, Bldg. C2, and Bldg. D. Refer to the attached Building Elevations. Final signage locations to be subject to local zoning authority having jurisdiction.

Final electrical hookup to be performed by licensed electrician, and shall be in complete conformance with all local, state and national codes and ordinances.

Shop drawings for the sign shall be submitted to the landlord and architect for final approval.

STYLE, COLORS, AND MATERIALS

Typefaces are subject to landlord approval.
Fronts shall be Plexiglas face with matching trim caps and return.
*NOTE: Regional and nationally recognized logos, trademarks, fonts and colors shall be permitted provided they meet the above referenced standards and local municipal ordinances.

REGENCY
CENTERS



INITIAL HERE
Landlord
Tenant

### ANCHOR SIGNAGE SPECIFICATIONS

#### LOCATION
#### ANCHORS
#### GREATER THAN 20,000 S.F.

#### TYPE OF SIGN

Individually backlighted aluminum channel letters with Plexiglas fronts and trim caps, **direct mounted or mounted on metal backer panel. Blade signs projected from façade as permitted by ordinance.**

#### SIZE OF SIGN

Maximum letter size is 48", Minimum letter size 36". **Blade signs maximum size is 2.5 SF as permitted by ordinance.**

Front Signs: One "sign band" sign per tenant, per façade except if the building fronts on two or more public roads, then one wall sign may be affixed to each wall fronting a public road *provided the additional walls do not front a residential zone.* Signs shall not project from the wall more than fifteen-(15") inches, and shall be located in the locations shown on the attached elevations. The total display area of a façade sign shall not exceed 5% of the area of the face of the wall upon which such sign or signs are attached. The maximum width of any wall sign shall not exceed 75% of the width wall upon which the sign is attached. In no case, may the area of a sign exceed 100 S.F.

Signable Area: That portion of a building fronting on a public roadway, or public parking facility, free of any projection, relief, cornice, column, change of building material, window or door opening shall not extend above the roofline of the parapet and along the entire length of the building which fronts the public street or public parking facility.

Measurement Technique: Measure to the highest point of the sign, to the lowest point of the sign and to the outmost sides of the sign. Assume a rectangle, then calculate.

#### PLACEMENT AND INSTALLATION

Signs to be located within the area shown on the attached elevations. Buildings included but not limited to are Bldg. E, & Bldg. F. Refer to the attached Building Elevations. **Final signage locations to be subject to local zoning authority having jurisdiction.**

Final electrical hookup to be performed by licensed electrician, and shall be in complete conformance with all local, state and national codes and ordinances.

Shop drawings for the sign shall be submitted to the landlord and architect for final approval.

#### STYLE, COLORS, AND MATERIALS

Typefaces are subject to landlord approval.
Neon to be 6500 white.
Fronts shall be Plexiglas face with matching trim caps and returns.

*NOTE: Regional and nationally recognized logos, trademarks, fonts and colors shall be permitted provided they meet the above referenced standards and local municipal ordinances.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

## Chimney Rock Crossing East, LLC

| Building # @ Hearing | Building # Current Plan | Bldg. S.F. @ Hearing | Bldg. S.F. Current Plan | Bldg. Façade Area @ Hearing | Bldg. Façade Area Current Plan | Façade Sign Area Approved @ Hearing | Façade Sign Area Current Plan |
|---|---|---|---|---|---|---|---|
| 'A' | | 9,600 S.F. | 9,600 S.F. | | | | |
| | 'A-1' | 2,400 S.F. | 2,000 S.F. | 900 S.F. | 565 S.F. | 45 S.F. | 36 S.F. |
| | A-1 SIDE | | | | 1,720 S.F. | | 36 S.F. |
| | 'A-2' | 2,400 S.F. | 1,600 S.F. | 760 S.F. | 515 S.F. | 38 S.F. | 35 S.F. |
| | 'A-3' | 2,400 S.F. | 1,600 S.F. | 760 S.F. | 415 S.F. | 38 S.F. | 36 S.F. |
| | 'A-4' | 2,400 S.F. | 1,600 S.F. | 900 S.F. | 415 S.F. | 45 S.F. | 36 S.F. |
| | 'A-5' | N/A | 2,800 S.F. | | 800 S.F. | | 36 S.F. |
| | A-5 SIDE | | | | 1,720 S.F. | | 36 S.F. |
| | A REAR | | | | | | 0 S.F. |
| 'B' | | | | | | | |
| | 'B' | 6,000 S.F. | 6,000 S.F. | 1,416 S.F. | 1,416 S.F. | 70.8 S.F. | 96 S.F. |
| | B SIDE | | | | 2,654 S.F. | | 48 S.F. |
| 'C' | | 21,500 S.F. | 23,563 S.F | 5,324 S.F. | 5,296 S.F. | | |
| | 'C-1' | | | | | 72.3 S.F. | |
| | 'C-2' | | | | | 59.85 S.F. | |
| | 'C-3' | | | | | 330 S.F. | |
| | 'C-4' | | | | | 65.6 S.F. | |
| | 'C-1' | 5,750 S.F. | 7,813 S.F. | | 1,901 S.F. | | 72 S.F. |
| | 'C-2' | 15,750 S.F. | 15,750 S.F. | | 3,395 S.F. | | 233.3 S.F. |
| 'D' | | | | | | | |
| | 'D' | 10,000 S.F. | 10,000 S.F. | 2,112 S.F | 2,112 S.F. | 105.6 S.F. | 93.3 S.F. |
| 'E' | | | | | | | |
| | 'E' | 34,090 S.F. | 34,090 S.F. | 5,336 S.F. | 5,336 S.F. | 186 S.F | 186 S.F. |
| | 'E SIDE' | | | | | | 50 S.F. |
| 'F' | | | | | | | |
| | 'F' | 35,975 S.F. | 35,975 S.F. | 5,274 S.F. | 5,274 S.F. | 131.8 S.F. | 170 S.F. |
| | 'F SIDE' | | | | | | 65.2 S.F. |
| 'G' | | | | | | | |
| | 'G' | 6,042 S.F. | 7,548 S.F. | N/A | N/A | N/A | N/A |
| | 'G-1' | N/A | 2,553 S.F. | | 722 S.F. | | 36 S.F. |
| | G-1 SIDE | | | | 1,772 S.F. | | 36 S.F. |
| | 'G-2' | N/A | 2,262 S.F. | | 588 S.F. | | 36 S.F. |
| | 'G-3' | N/A | 2,652 S.F. | | 913 S.F. | | 36 S.F. |
| | G-3 SIDE | | | | 1,565 S.F. | | 0 S.F. |
| | G REAR | | | | 2,202 S.F. | | 108 S.F. |
| 'H' | | 7,680 S.F. | 7,680 S.F. | | | | |
| | 'H-1' | 2,720 S.F. | 2,720 S.F. | 865 S.F. | 865 S.F. | 85.76 S.F. | 42.88 S.F. |
| | 'H-2' | 2,400 S.F. | 2,400 S.F. | 730 S.F. | 730 S.F. | 36.5 S.F. | 36.5 S.F. |
| | 'H-3' | 2,560 S.F. | 2,560 S.F. | 816 S.F. | 816 S.F. | 71.45 S.F. | 29.0 S.F. |
| | H-1 SIDE | | | | | | 0 S.F. |
| | H-3 SIDE | | | | | | 29.0 S.F. |
| | H REAR | | | | 2,411 S.F. | | 108.38 S.F. |

K:\2014\14-108\AutoCAD\Schematic Design\Sign Package Submission\2017-10-04 RESOLUTION FINAL
PACKAGE- EAST\Table of Stores Updated - East.docx

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant 





REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant





REGENCY
CENTERS



TOTAL GROSS ADVERTISING AREA OF ALL SIGNS, OTHER THAN FREESTANDING SIGNS, ON ANY ONE PROPERTY SHALL NOT BE GREATER THAN 3% OF THE AREA OF THE BUILDING FACE FRONTING ON THE STREET. THE MAXIMUM AREA OF ALL SIGNS, EXCEPT FREESTANDING SIGNS, SHALL NOT EXCEED 100 SQUARE FEET. SIGNS ATTACHED TO A PRINCIPAL STRUCTURE SHALL NOT EXTEND ABOVE THE ROOFLINE OF THE PARAPET.

INDIVIDUAL CHANNEL LETTERS
3'-0"H MAX. X 16'-0"L (48.0 S.F.)

INDIVIDUAL CHANNEL LETTERS
3'-0"H MAX. X 16'-0"L PER SIGN (TOTAL 48 S.F. X 2 SIGNS = 96.0 S.F.)
SIGNS MAY BE COMBINED IF SINGLE TENANT

TENANT

TENANT        TENANT

01 RETAIL B: NORTH ELEVATION
SCALE 1/8" = 1'-0"

01 RETAIL B: WEST ELEVATION
SCALE 1/8" = 1'-0"

BLADE SIGNS AS PERMITTED PER TENANT
2.5 S.F. - DIMENSIONS VARY - 8' A.F.F.
TYPICAL

* NOTE: FRONT WALL SIGN WAS ORIGINALLY APPROVED FOR
70.0 SF (5% OF AREA OF BUILDING FACE)
PROPOSING ADDED SIDE WALL SIGN FOR TOTAL OF 144 SF
(10.1% OF AREA OF BUILDING FACE)
FRONT WALL SIGN = 96 SF (6.7% OF AREA OF BUILDING FACE
SIDE WALL SIGN = 48 SF (3.3% OF BUILDING FACE)

E-2

* VARIANCE : TOTAL SQUARE FOOTAGE EXCEEDS 100 SF
PROPOSED (3) SIGNS IN LIEU OF (1)

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY   OPRA I.D. - 2017-09-27

THE
DIETZ
PARTNERSHIP

INITIAL HERE
Landlord
Tenant



REGENCY CENTERS

TOTAL GROSS ADVERTISING AREA OF ALL SIGNS, OTHER THAN FREESTANDING SIGNS, ON ANY ONE PROPERTY SHALL NOT BE GREATER THAN 5% OF THE AREA OF THE BUILDING FACE FRONTING ON THE STREET. THE MAXIMUM AREA OF ALL SIGNS, EXCEPT FREESTANDING SIGNS, SHALL NOT EXCEED 100 SQUARE FEET. SIGNS ATTACHED TO A PRINCIPAL STRUCTURE SHALL NOT EXTEND ABOVE THE ROOFLINE OF THE PARAPET.

01 RETAIL C1 & C2: WEST ELEVATION

* NOTE: FRONT WALL SIGNS FOR C1-C4 WERE ORIGINALLY APPROVED AS 527.75 SF (10% OF AREA OF BUILDING FACE).
PROPOSED WALL SIGNS FOR C1 AND C2 ARE 305.3 SF (5.7% OF AREA OF BUILDING FACE)
PROPOSED FOR C1 IS 72 SF (1.8% OF AREA OF BUILDING FACE)
PROPOSED FOR C2 IS 233.3 SF (6.8% OF AREA OF BUILDING FACE)

NOTE: STACKED LETTER SIGNS ARE ACCEPTABLE. TENANT LOGO SIGNS MAY BE INCORPORATED INTO APPROVED SIGNS.

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY

NOTE: THERE ARE TENANT SIGNS THAT ARE MOUNTED MORE THAN 3'-0" ABOVE ROOF LINE

* VARIANCE : C2 SIGN MOUNTED MORE THAN 3'-0" ABOVE ROOF LINE
* VARIANCE : SQUARE FOOTAGE FOR C2 EXCEEDS 100 S.F.

E-3

THE DIETZ PARTNERSHIP

INITIAL HERE
Landlord
Tenant



REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant



TOTAL GROSS ADVERTISING AREA OF ALL SIGNS, OTHER THAN FREESTANDING SIGNS, ON ANY ONE PROPERTY SHALL NOT BE GREATER THAN 5% OF THE AREA OF THE BUILDING FACE FRONTING ON THE STREET. THE MAXIMUM AREA OF ALL SIGNS, EXCEPT FREESTANDING SIGNS, SHALL NOT EXCEED 100 SQUARE FEET. SIGNS ATTACHED TO A PRINCIPAL STRUCTURE SHALL NOT EXTEND ABOVE THE ROOFLINE OF THE PARAPET.

INDIVIDUAL CHANNEL LETTERS
6'-0"H X 15'-6 5/8"L (93.3 S.F.)

01 RETAIL D: WEST ELEVATION
SCALE: 1/8" = 1'-0"

BLADE SIGN AS PERMITTED
2.5 S.F.- DIMENSIONS VARY-
8' A.F.F.

* NOTE: FRONT WALL SIGN WAS ORIGINALLY APPROVED FOR
105.6 S.F (5% OF AREA OF BUILDING FACE)
PROPOSED FRONT WALL SIGN TO BE 93.3 S.F. (4.5% OF AREA)

NOTE: THERE ARE TENANT SIGNS THAT ARE
MOUNTED MORE THAN 3'-0" ABOVE ROOF LINE

E—4

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY   UPDATED: 2017-09-21

THE
DIETZ
PARTNERSHIP

REGENCY
CENTERS



TOTAL GROSS ADVERTISING AREA OF ALL SIGNS, OTHER THAN FREESTANDING SIGNS, ON ANY
ONE PROPERTY SHALL NOT BE GREATER THAN 5% OF THE AREA OF THE BUILDING FACE
FRONTING ON THE STREET. THE MAXIMUM AREA OF ALL SIGNS, EXCEPT FREESTANDING SIGNS,
SHALL NOT EXCEED 100 SQUARE FEET. SIGNS ATTACHED TO A PRINCIPAL STRUCTURE SHALL
NOT EXTEND ABOVE THE ROOFLINE OF THE PARAPET.

CABINET SIGN AS PART
OF OVERALL SIGN AREA

INDIVIDUAL CHANNEL
LETTERS ON RACEWAY
-6'-0"H X 31'-0"L (199.0 S F.)*

OFF 5TH

**01  RETAIL E:  WEST ELEVATION** *
SCALE 1/8" = 1'-0"

* NOTE: FRONT WALL SIGN WAS ORIGINALLY APPROVED FOR
186 SF (5.5% OF AREA OF BUILDING FACE)
FRONT WALL WALL SIGN REMAINS THE SAME.

NOTE: THERE ARE TENANT SIGNS THAT ARE
MOUNTED MORE THAN 1'-0" ABOVE ROOF LINE

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY     UPDATED - 2017-05-25

THE
DIETZ
PARTNERSHIP

E—5            * VARIANCE : SQUARE FOOTAGE EXCEEDS 100 S F.

INITIAL HERE
Landlord
Tenant



01  RETAIL E: NORTH ELEVATION *

CHIMNEY ROCK CROSSING - EAST

E-5A

* VARIANCE : (2) FACADE SIGNS PROPOSED IN LIEU OF (1)

REGENCY
CENTERS



01 RETAIL F: WEST ELEVATION

02 RETAIL F: SOUTH ELEVATION

INDIVIDUAL CHANNEL LETTERS
8'-6"H X 20'-0"L (170 S.F.)

INDIVIDUAL CHANNEL LETTERS
5'-1"H X 12'-5"L (65.2 S.F.)

CHIMNEY ROCK CROSSING - EAST

THE
DIETZ
PARTNERSHIP

E-6

INITIAL HERE
Landlord
Tenant





REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant



TOTAL GROSS ADVERTISING AREA OF ALL SIGNS, OTHER THAN FREESTANDING SIGNS, ON ANY ONE PROPERTY SHALL NOT BE GREATER THAN 5% OF THE AREA OF THE BUILDING FACE FRONTING ON THE STREET. THE MAXIMUM AREA OF ALL SIGNS, EXCEPT FREESTANDING SIGNS, SHALL NOT EXCEED 100 SQUARE FEET. SIGNS ATTACHED TO A PRINCIPAL STRUCTURE SHALL NOT EXTEND ABOVE THE ROOFLINE OF THE PARAPET.

INDIVIDUAL CHANNEL LETTERS
2'-8"H X 13'-0"L (36 S.F.) - PER ALL (3) TENANTS*

TENANT    TENANT    TENANT

01 RETAIL G: EAST ELEVATION

* NOTE: WALL SIGNS ORIGINALLY NOT PROPOSED
PROPOSED FRONT WALL SIGNS FOR TOTAL OF 108 SF
(3% OF AREA OF BUILDING FACE)
PROPOSED SIDE WALL SIGN FOR TOTAL OF 36 SF
(1.6% OF AREA OF BUILDING FACE)
PROPOSED REAR WALL SIGNS FOR TOTAL OF 108 SF
(3% OF AREA OF BUILDING FACE)

NOTE: THERE ARE TENANT SIGNS THAT ARE
MOUNTED MORE THAN 3'-0" ABOVE ROOF LINE

E—7A                 * VARIANCE: PROPOSED (3) SIGNS IN LIEU OF (1)

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY    UPDATED: 2-03-07

THE DIETZ PARTNERSHIP

REGENCY
CENTERS



01 BLDG H: WEST ELEVATION

03 BLDG H: NORTH ELEVATION

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY

THE DIETZ PARTNERSHIP

E-8

INITIAL HERE
Landlord
Tenant





TOTAL GROSS ADVERTISING AREA OF ALL SIGNS, OTHER THAN FREESTANDING SIGNS, ON ANY ONE PROPERTY SHALL NOT BE GREATER THAN 5% OF THE AREA OF THE BUILDING FACE FRONTING ON THE STREET. THE MAXIMUM AREA OF ALL SIGNS, EXCEPT FREESTANDING SIGNS, SHALL NOT EXCEED 100 SQUARE FEET. SIGNS ATTACHED TO A PRINCIPAL STRUCTURE SHALL NOT EXTEND ABOVE THE ROOFLINE OF THE PARAPET.

INDIVIDUAL CHANNEL LETTERS ON BACKER PANEL 2'-4"H X 13'-0"L (29.0 S.F.)

INDIVIDUAL CHANNEL LETTERS ON BACKER PANEL 2'-0"H MAX. X 18'-3"L (36.5 S.F.)

INDIVIDUAL CHANNEL LETTERS ON BACKER PANEL 5'-7 3/4"H X 7'-6 1/8"L (42.88 S.F.)

01 BLDG H: EAST ELEVATION
SCALE 3/32" = 1'-0"

* NOTE: REAR WALL SIGNS ORIGINALLY NOT PROPOSED

PROPOSING REAR WALL SIGNS FOR TOTAL OF 108.38 SF
(4.5% OF AREA OF BUILDING FACE)

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY   UPDATED: 2017-09-27

E—8A

* VARIANCE: FOR (3) +
(3) FACADE SIGNS IN LIEU OF (1)
* VARIANCE: FOR (1) & (2) +
(2) FACADE SIGNS IN LIEU OF (1).

THE
DIETZ
PARTNERSHIP

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant



E-9

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant



ONE FREESTANDING SIGN SHALL BE PERMITTED ON ANY SINGLE PROPERTY.
THE TOTAL ADVERTISING AREA SHALL NOT EXCEED 5% OF BUILDING FACE FRONTING ON THE
STREET BUT IN NO EVENT GREATER THAN 100SF

THE PLANNING BOARD MAY PERMIT A TOTAL SIGN AREA OF UP TO 150SF IF, IN THE PLANNING
BOARDS JUDGEMENT, SUCH ADDITIONAL AREA SHALL ASSIST IN ACHIEVING THE GOALS AND
OBJECTIVES OF THIS SUBSECTION. ONLY ONE FREESTANDING SIGN SHALL BE PERMITTED ON
ANY SINGLE PROPERTY REGARDLESS OF THE NUMBER OF ESTABLISHMENTS ON THE
PROPERTY, EXCEPT THAT THE PLANNING BOARD MAY AUTHORIZE AN ADDITIONAL
FREESTANDING SIGN IF THE PROPERTY HAS ACCESS FROM MORE THAN ONE PUBLIC STREET.

Regency Centers.

01 EAST RETAINING WALL: 310 S.F. *VARIANCE
NOT TO SCALE

CHIMNEY ROCK CROSSING - EAST
BRIDGEWATER, NEW JERSEY

E—9A

* VARIANCE : 01 FREESTANDING SIGNS PROPOSED IN LIEU
OF (1) AND SQUARE FOOTAGE EXCEEDS 100 S.F.

THE
DIETZ
PARTNERSHIP



REGENCY CENTERS

INITIAL HERE
Landlord
Tenant




REGENCY
CENTERS


INITIAL HERE
Landlord
Tenant




REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant 



REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant 



REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant





## EXHIBIT C-2

## LANDLORD'S WORK

LANDLORD SHALL NOT BE REQUIRED TO PERFORM ANY WORK.

TENANT AGREES TO ACCEPT THE PREMISES IN ITS "AS IS" CONDITION.

The Premises shall be delivered to Tenant with the following:

1.  HVAC existing one (1) unit 10 tons.

2.  Electric panel is 400 AMPS.

3.  Gas service stubbed to Premises.

4.  Sprinkler heads turned up existing in Premises.

REGENCY
CENTERS

INITIAL HERE
Guarantor
Guarantor

EXHIBIT D

ABSOLUTE UNCONDITIONAL GUARANTY AGREEMENT

THIS ABSOLUTE UNCONDITIONAL GUARANTY AGREEMENT (this "Guaranty") is made this _____ day of _____, 20___ by JEAN PAUL ROMES, MD, an individual, and LISA A. ROMES, an individual, jointly and severally (herein collectively called "Guarantor") in favor of BRIDGEWATER REGENCY, LLC, a Delaware limited liability company (herein called "Landlord").

R E C I T A L S:

Romes Urgent Care Services, LLC, a Pennsylvania limited liability company, d/b/a MedFirst Urgent Care (herein called "Tenant") and Landlord are party to that certain Shopping Center Lease dated _____, 20___ (the "Agreement").

In order to induce Landlord to enter into the Agreement, Guarantor agreed to execute and deliver to Landlord this Guaranty.

Guarantor acknowledges that Landlord would not have entered into the Agreement without the execution and delivery by Guarantor of this Guaranty.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby agrees in favor of Landlord (and Landlord's successors and assigns) as follows:

1.      Guarantor absolutely, unconditionally and irrevocably guarantees the prompt and complete payment and performance when due, whether by acceleration or otherwise, of all obligations, liabilities and covenants, whether now in existence or hereafter arising, of Tenant to Landlord, and arising under the Agreement, including without limitation all amounts due to Landlord as rent or otherwise under the Agreement (the "Obligations"). Guarantor hereby agrees to pay and/or perform punctually, upon written demand by Landlord, each such Obligation which is not paid or performed as and when due and payable by Tenant, in like manner as such amount is due from Tenant. For purposes hereof, the Obligations shall be performed and/or due and payable when due and payable under the terms of the Agreement notwithstanding the fact that the collection or enforcement thereof as against Tenant may be stayed or enjoined under Title 11 of the United States Code or similar applicable law. This Guaranty is one of payment and not of collection. Notwithstanding the foregoing, provided that no monetary Event of Default by Tenant has occurred under the Agreement, commencing as of the first day of the forty-ninth (49th) month after the Commencement Date, Guarantor's liability hereunder, from the date Landlord has lawful possession of the Premises, shall be limited to one (1) month's installment of Minimum Rent and Additional Rent due under the Agreement, at the rate payable at the time of the Event of Default, multiplied by twelve (12); provided, however, the foregoing is a limitation of damages with respect to Tenant's failure to pay Minimum Rent or Additional Rent, and Guarantor shall remain liable for (i) all damages and amounts payable to Landlord which accrued prior to Tenant's surrender of the Premises, (ii) all other damages which arise out of or result from any other Event of Default under the Lease, (iii) all utility charges current and past due for Tenant's utility usage and (iv) all attorney's fees incurred by Landlord in connection with the enforcement of this Guaranty.

2.      Guarantor's obligations under this Guaranty are absolute and unconditional and shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or the Agreement, or by any other circumstance relating to the Obligations or the Agreement which might otherwise constitute a legal or equitable discharge of or defense of a guarantor or surety. Guarantor hereby irrevocably waives any and all suretyship defenses, defenses that could be asserted by Tenant (except payment) and all other defenses that would otherwise be available to Guarantor. All payments by Guarantor pursuant to this Guaranty shall be made without setoff. Landlord shall not be obligated to file any claim relating to the Obligations in the event that Tenant becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of Landlord so to file shall not affect Guarantor's obligations under this Guaranty. Guarantor irrevocably waives any right to require Landlord to pursue any other remedy in Landlord's power whatsoever, whether against Tenant or any other obligor principally or secondarily obligated with respect to the Obligations. Guarantor irrevocably waives any defense arising by reason of any disability, bankruptcy, reorganization or similar proceeding involving Tenant. In the event that any payment in respect of any Obligations is rescinded or must otherwise be returned for any reason whatsoever, Guarantor shall remain liable under this Guaranty in respect of such Obligations as if such payment had not been made.

3.      Guarantor agrees that Landlord may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of Guarantor, extend the time of payment of, or performance of, or renew, any of the Obligations, and may also make any agreement with Tenant or with any other party to or person liable on any of the Obligations, or interested therein, for the extension, renewal, payment, compromise, waiver, discharge or release thereof, in whole or in part, or for any amendment or modification of the terms thereof or of the Agreement or any other agreement between Landlord and Tenant or any such other party or person, without in any way impairing, releasing or affecting the liabilities of Guarantor under this Guaranty.

REGENCY
CENTERS

INITIAL HERE
Guarantor
Guarantor   

4.      Guarantor will not exercise any rights which it may acquire by way of subrogation until all of the Obligations to Landlord shall have been indefeasibly paid in full, or performed in its entirety.  Any amount paid to Guarantor in violation of the preceding sentence shall be held in trust for the benefit of Landlord and shall forthwith be paid to Landlord to be credited and applied to the Obligations, whether matured or unmatured.  Guarantor hereby subordinates any and all liabilities and indebtedness to Guarantor to the prior indefeasible payment in full of the Obligations.

5.      This Guaranty shall remain in full force and effect and be binding upon Guarantor, its successors and assigns until all of the Obligations have been satisfied in full and the Agreement shall have been terminated or fully performed.  This Guaranty may not be modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Landlord and Guarantor.  This is a continuing Guaranty relating to all Obligations, including any arising during any holdover term or arising under transactions renewing or extending the term of the Agreement, changing the terms of any Obligations, or creating new or additional Obligations after prior Obligations have in whole or in part been satisfied, regardless of any lapse of time.  If any of the present or future Obligations are guaranteed by persons, partnerships, corporations or other entities in addition to Guarantor, the death, release or discharge, in whole or in part, or the bankruptcy, liquidation or dissolution of one or more of them shall not discharge or affect the liabilities of Guarantor under this Guaranty.  The obligations of Guarantor hereunder shall be additional to, and not in substitution for, any security or other guarantee or indemnity at any time existing in respect of Tenant's obligations, liabilities and covenants under the Agreement.

6.      No failure on the part of Landlord to exercise, and no delay in exercising, any right, remedy or power under this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise by Landlord of any right, remedy or power under this Guaranty preclude any other or future exercise of any right, remedy or power under this Guaranty. Each and every right, remedy and power granted to Landlord under this Guaranty or allowed it by law or by the Agreement or any other agreement shall be cumulative and not exclusive of any other, and may be exercised by Landlord from time to time.

7.      Guarantor hereby waives notice of acceptance of this Guaranty and notice of any obligation or liability to which it may apply, and waives presentment, demand for payment, protest, notice of dishonor or non-payment of any such obligation or liability, suit or the taking of other action by Landlord against, and all other notices whatsoever to, Tenant, Guarantor or others.

8.      Landlord may at any time and from time to time without notice to or consent of Guarantor and without impairing or releasing the obligations of Guarantor hereunder: (a) take or fail to take any action of any kind in respect of any security for any obligation, covenant or liability of Tenant to Landlord, (b) exercise or refrain from exercising any rights against Tenant or others, (c) compromise or subordinate any obligation or liability of Tenant to Landlord including any security therefor, (d) consent to the assignment by Tenant of its interest in the Agreement, or (e) consent to any other matter or thing under or relating to the Agreement. Guarantor agrees to reimburse Landlord for the costs and reasonable attorneys' fees incurred by reason of Landlord having to enforce this Guaranty.

9.      Guarantor represents and warrants to Landlord that (a) the Agreement has been duly authorized, executed and delivered by Tenant and is a legal, valid and binding instrument enforceable against Tenant in accordance with its terms, and (b) this Guaranty has been duly authorized, executed and delivered by Guarantor and is a legal, valid and binding instrument enforceable against Guarantor in accordance with its terms.

10.      Guarantor may not assign its rights nor delegate its obligations under this Guaranty, in whole or in part, without prior written consent of Landlord, and any purported assignment or delegation absent such consent is void. This Guaranty shall remain in full force and effect notwithstanding (a) any assignment or transfer by Tenant of its interest in the Agreement (in which case this Guaranty shall apply, from and after such assignment or transfer, to all of the obligations, liabilities and covenants of the assignee or transferee under the Agreement), or (b) any assignment or transfer by Landlord of its interest in the Agreement (in which case Guarantor's obligations under this Guaranty shall inure to the benefit of Landlord's assignee or transferee), in each case irrespective of whether Guarantor has notice of or consents to any such assignment or transfer.

11.      GUARANTOR HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR THE SUBJECT MATTER HEREOF OR THEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THE AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION HAS BEEN FULLY DISCUSSED AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.  GUARANTOR FURTHER WARRANTS AND REPRESENTS THAT GUARANTOR HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT GUARANTOR KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

12.      THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW JERSEY WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW. GUARANTOR AND LANDLORD JOINTLY AND SEVERALLY AGREE TO THE EXCLUSIVE JURISDICTION OF COURTS LOCATED IN THE STATE OF NEW JERSEY, UNITED STATES OF AMERICA, OVER ANY DISPUTES ARISING OUT OF OR RELATING TO THIS GUARANTY.

REGENCY
CENTERS

INITIAL HERE
Guarantor
Guarantor

[remainder of page intentionally left blank]

REGENCY
CENTERS

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the day and year first above written.

_Shakira Hernandez MA_
Witness
_Shakira Hernandez MA_
Print Name

_Cathy Peters_
Witness
_CATHY Peters_
Print Name

_Jean Paul Romes_
JEAN PAUL ROMES, MD
Print Full Legal Name

5125 Glenbrook Road
Address (other than the address of the Premises)

Stroudsburg, PA 18360

_Shakira Hernandez MA_
Witness
_Shakira Hernandez MA_
Print Name

_Cathy Peters_
Witness
_CATHY Peters_
Print Name

_Lisa A Romes_
LISA A. ROMES
Print Full Legal Name

5125 Glenbrook Road
Address (other than the address of the Premises)

Stroudsburg, PA 18360

Guarantor acknowledges its address and will notify Landlord of any changes thereto.

REGENCY
CENTERS

INITIAL HERE
Guarantor
Guarantor 

### EXHIBIT E

### REQUIREMENTS AND RESTRICTIONS

Tenant:

1.      will not, without Landlord's consent, conduct or permit to be conducted any auction, fire, bankruptcy or going-out-of-business sales, or similar type sale, in connection with the Premises; provided, however, that this provision shall not restrict the absolute freedom of Tenant to determine its own selling prices nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales;

2.      will not use or permit the use of any apparatus for sound reproduction or transmission or of any musical instrument in such manner that the sounds so reproduced, transmitted or produced shall be audible beyond the interior of the Premises; will not utilize an advertising medium within the Shopping Center which can be seen, heard or experienced outside the Premises, including, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, radio or television; will not display, paint or place, or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devices on any vehicle parked in the parking area of the Shopping Center; will not distribute, or cause to be distributed, in the Shopping Center any handbills or other advertising devices; and will not conduct or permit any activities that might constitute a nuisance or an annoyance to the public, other occupants of the Shopping Center or to Landlord, or that will injure the reputation of the Shopping Center;

3.      will keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the confines of the Premises; will not cause or permit strong, unusual, offensive or objectionable noise, odors, fumes, dust or vapors to emanate or be dispelled from the Premises; will not burn trash or store or permit accumulations of any trash, garbage, rubbish or other refuse outside of the Premises except in compactors or other receptacles approved by Landlord; will not permit smoking, vaping or other forms of inhalation of tobacco, tobacco alternatives or other substances that produce smoke or vapor within the Premises and shall comply and observe all rules, promulgated by Landlord from time to time, relating to the designation of smoking and non-smoking areas in, around or throughout the Shopping Center;

4.      will not load or permit the loading or unloading of merchandise, supplies or other property, nor ship, nor receive, outside the area and entrance designated therefor by Landlord from time to time; will not permit the parking or standing, outside of said area, of trucks, trailers or other vehicles or equipment engaged in such loading or unloading in a manner to interfere with the use of any Common Areas or any pedestrian or vehicular use and good shopping center practice; will use its best efforts to complete or cause to be completed all deliveries, loading, unloading and services to the Premises prior to 10:00 a.m. each day;

5.      will not paint or decorate any part of the exterior of the Premises, or change the architectural treatment thereof, or install any visible protective devices such as burglar bars or security shutter (excluding storm shutters as otherwise set forth in this Lease) or window tinting, without first obtaining Landlord's written approval; and will remove promptly upon order of Landlord any paint, decoration or protective device which has been applied to or installed upon the exterior of the Premises without Landlord's prior approval, or take such other action with reference thereto as Landlord may direct;

6.      will keep the inside and outside of all glass in the doors and windows of the Premises clean; will not place or maintain any merchandise, vending machines or other articles in the vestibule or entry of the Premises, on the footwalks adjacent thereto or elsewhere on the exterior thereof; will maintain the Premises at its own expense in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests; and will keep refuse in proper containers on the interior of the Premises until removed from the Premises;

7.      except as otherwise specifically set forth in this Lease, will not place, permit or maintain on the exterior walls or roof of the Premises or other locations in or adjacent to the Shopping Center any sign, advertising matter, decoration, lettering, insignia, emblems, trademark or descriptive material (herein called "Signs") and will not permit any Signs to remain or be placed on any window or door of the Premises or otherwise place items in the Premises that are readily visible from the exterior thereof (e.g., any type of window covering, window scrim or furniture) unless the same have been approved in writing by Landlord; and will maintain any and all Signs and items as may be approved in good condition and repair at all times, Landlord reserving the right to do so at Tenant's expense if Tenant fails to do so after five (5) days' notice from Landlord;

8.      will maintain a first-class display in the display windows in the Premises and keep the same electrically lighted and any and all electric signs lighted during all other periods that a majority of tenants are open for business in the Shopping Center (or if Tenant is open longer hours than the majority of tenants in the Shopping Center, during all hours Tenant is open and operating);

9.      will operate and maintain mechanical, electrical and plumbing items serving the Premises and which are Tenant's responsibility under this Lease in a first-class manner to prevent mold growth; and

10.     except for any rights specifically granted to Tenant in this Lease, will not use the sidewalks adjacent to the Premises, or any other space outside of the Premises, for the sale or display of any merchandise or for other business, occupation or undertaking.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

EXHIBIT H

## SATELLITE DISH EQUIPMENT TERMS AND CONDITIONS

1.      Landlord hereby grants Tenant, at Tenant's sole cost and expense, the right to install, maintain and operate a mast mounted satellite dish or antenna (and related equipment including cables from the exterior of the building in which the Premises is located to equipment inside the Premises) (the "Satellite Dish Equipment"). Tenant's rights herein shall run concurrent with the Term (it being understood and agreed that in no event shall Tenant's rights herein extend beyond the Term, as the same may be earlier terminated or extended as provided in this Lease).

2.      Prior to any installation of the Satellite Dish Equipment, Tenant shall submit to Landlord for review the plans and specifications for the Satellite Dish Equipment. Landlord shall review such plans and specifications within fifteen (15) days of submission thereof to Landlord. Landlord's approval of such plans and specifications will not be unreasonably withheld, delayed or conditioned. Tenant and Landlord will mutually agree upon the location of the Satellite Dish Equipment. Tenant will be responsible to ensure that the installation, maintenance, removal and operation of the Satellite Dish Equipment (i) complies with all legal requirements, and (ii) will not interfere with or adversely affect the operation of any other tenant, including any electrical or mechanical equipment thereof, located within the Shopping Center. Tenant shall screen the Satellite Dish Equipment from view, if required by Landlord. All other provisions of this Lease, including without limitation, Tenant's maintenance, insurance and indemnification obligations will apply to the Satellite Dish Equipment. Tenant shall consult with a structural engineer of Landlord's choice and/or Landlord's roofing contractor to ensure that neither the integrity of the roof of the Premises, nor Landlord's roof warranty, shall be negatively affected by the placement and installation of the Satellite Dish Equipment. Any and all roof penetrations must be done by Landlord's roofing contractor. Any structural and/or roof damage caused by installation, maintenance, removal and/or operation of the Satellite Dish Equipment shall be repaired at Tenant's sole cost and expense. Furthermore, if after the Satellite Dish Equipment is installed, Landlord, using reasonable business judgment, believes that the aesthetic quality of the Shopping Center is negatively affected, Tenant shall, within twenty (20) days from receipt of Landlord's notice requiring installation of screening (or additional screening, as applicable) or relocation of the Satellite Dish Equipment, install screening (or additional screening, as applicable) around the Satellite Dish Equipment or remove and reinstall the Satellite Dish Equipment to a more beneficial location reasonably determined by Landlord, all at Tenant's sole cost and expense. In addition, Landlord may, from time to time, install additional equipment on the roof, perform roof repairs or re-roof the building on which the Satellite Dish Equipment is located. If Landlord determines that it is necessary that Tenant relocate the Satellite Dish Equipment in order to accommodate same, then Landlord shall have the right to cause Tenant to relocate the Satellite Dish Equipment to another mutually agreed upon location on or about the Shopping Center, at any time, and upon no less than seventy-two (72) hours prior verbal or written notice to Tenant (except in an emergency in which event no notice shall be required), all at Tenant's sole cost and expense.

3.      Upon prior written notice to Landlord and accompanied by a representative of Landlord if Landlord so desires, Landlord will permit Tenant reasonable access to the roof and/or building, as needed, to install, maintain, and/or remove equipment for the Satellite Dish Equipment. Tenant may pass through common areas of the building in which the Premises is located for such purposes, and Tenant will exercise every reasonable effort to minimize any disruption of activity otherwise occurring in and about such common areas.

4.      Tenant, at its own expense, may locate the Satellite Dish Equipment at or relocate the Satellite Dish Equipment to some other location on or about the Shopping Center for purposes of adequate reception, as required by law or otherwise; subject, however, to Landlord's prior written approval of such location. In such event, Tenant will submit a description of the alternative location for Landlord's approval. If Landlord approves such alternative location, then Landlord will provide Tenant with reasonable access to such alternate location pursuant to the terms and conditions of this Exhibit "H".

5.      Tenant may replace any of the Satellite Dish Equipment with similar equipment in size and aesthetics, without prior written consent of Landlord; provided, however, that Tenant will advise Landlord of any change in equipment located outside of or attached to the Premises. Any new or replacement equipment will be subject to the terms and conditions of this Exhibit "H".

6.      Tenant will ensure that the Satellite Dish Equipment, and each part of it, will be installed in accordance with all local building rules of construction and codes. Tenant will immediately remove and hereby agrees to indemnify, defend and hold harmless Landlord in connection with any mechanics liens upon the Premises or the Shopping Center which result from work associated with installation of the Satellite Dish Equipment. Tenant will, at Tenant's sole cost and expense, obtain all FCC and other licenses or approvals required to install and operate the Satellite Dish Equipment.

7.      If equipment which interferes with the Satellite Dish Equipment or impedes access to the Satellite Dish Equipment is installed by a party other than Tenant, then Landlord will exercise reasonable efforts to identify and obtain a location reasonably satisfactory to Tenant to which the Satellite Dish Equipment may be relocated.

8.      The Satellite Dish Equipment is and shall remain the property of Tenant. Landlord and Tenant agree that the Satellite Dish Equipment is not, and installation of the Satellite Dish Equipment shall not cause the Satellite Dish Equipment to become, a fixture pursuant to this Lease or by operation of law.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

9.     Subject to the provisions of this Lease, Tenant will indemnify, defend and hold Landlord harmless from and against any claims, liabilities, judgments, costs, or expenses (including reasonable attorneys' fees) assessed against Landlord arising out of or related to the Satellite Dish Equipment, property damage or personal injury caused by or related to the activities of Tenant or any Tenant Parties in installing, removing or servicing the Satellite Dish Equipment.  Tenant shall promptly and properly repair any roof leaks or other damage or injury to the roof, caused by the installation, use, maintenance or removal of the Satellite Dish Equipment by using Landlord's contractors. Notwithstanding the foregoing, Tenant will not be liable to Landlord for any claims, liabilities, judgments, costs, or expenses to the extent that they are caused by negligent acts or omissions of Landlord, its agents, contractors or employees.

10.     If Tenant fails to install the Satellite Dish Equipment within thirty (30) days of the Commencement Date, then Landlord may elect, in Landlord's sole discretion, to terminate Tenant's right to install the Satellite Dish Equipment by providing Tenant with written notice of such termination.

EXHIBIT I

LANDLORD WAIVER AGREEMENT

THIS LANDLORD WAIVER AGREEMENT (this "Agreement"), dated this ____ day of
_____, 20___, is made by and between _____, a _____
("Landlord"), whose address for notices hereunder is: c/o Regency Centers,
_____, Attention: Property Management,
with a copy to: c/o Regency Centers, One Independent Drive, Suite 114, Jacksonville, FL 32202, Attention:
Legal Department, and _____, a _____ ("Lender"), whose address for
notices hereunder is _____
Attention:_____.

RECITALS

WHEREAS, Landlord is the current landlord and _____, a
_____, d/b/a _____ ("Tenant") is the current tenant under that certain lease
agreement dated _____, 20___ (as at any time modified, amended or assigned) (the "Lease")
covering certain premises (unit/space #_____, approximately _____ square feet) (the
"Premises") located in the City of _____, State of _____ in the shopping center
commonly known as _____;

WHEREAS, Lender will be extending a loan or other financial accommodations to Tenant (the
"Loan"), and all or substantially all of the proceeds from the Loan will be used by Tenant in connection with
Tenant's improvements to and occupancy of the Premises pursuant to the Lease;

WHEREAS, as a condition to extending the Loan to Tenant, Lender has required that Tenant grant
to Lender a security interest in the Collateral (as defined in the paragraph entitled "Collateral" below); and

WHEREAS, Landlord and Lender desire to enter into this Agreement to evidence the rights and
obligations of the parties with respect to the Collateral, all as more specifically set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, Landlord and Lender hereby agree as follows:

1.    Recitals.  The recitals set forth above are true and correct and incorporated herein by
reference.

2.    Collateral.  For purposes of this Agreement, the "Collateral" means certain furniture,
removable fixtures, equipment and inventory of Tenant located or to be located on or at the Premises,
together with any substitutions or replacements thereof, all as more particularly described on Exhibit "A"
attached hereto; provided, however, notwithstanding anything to the contrary set forth on Exhibit "A", the
Collateral shall not include (a) building fixtures such as, without limitation, electrical systems and lighting
fixtures, plumbing and restroom fixtures, flooring, HVAC systems and related building equipment (however,
the foregoing shall not prevent Landlord from electing, in Landlord's sole discretion pursuant to any such
right under the Lease, to require Tenant to remove certain building fixtures installed by Tenant such as,
without limitation, walk-in coolers or vaults), (b) any items paid for by any prior tenant or occupant of the
Premises, Landlord or any entity related to Landlord, or for which Landlord reimbursed Tenant pursuant to
a tenant allowance or the like pursuant to the Lease, or (c) Tenant's leasehold interest pursuant to the
Lease, any security deposit or letter of credit benefitting Landlord related to the Lease, or any items that
would otherwise constitute income of Tenant such as bank accounts, cash, sums collected from accounts
receivables including any subtenant rent, chattel paper, debt instruments and the like.  Landlord hereby
disclaims any responsibility for risk of loss of the Collateral due to casualty, theft or otherwise.

3.    Subordination of Landlord's Lien.  Subject to the terms and conditions of this Agreement
and to the extent of Lender's valid and perfected security interest in the Collateral, Landlord hereby
consents to Lender's security interest in the Collateral, and agrees that until Lender's rights under this
Agreement terminate in accordance with the paragraph entitled "Term of this Agreement; Remaining
Collateral" below and as between Landlord and Lender, Landlord will not assert against any of the Collateral
any statutory, common law or contractual lien held by Landlord with respect to the Collateral, all of which
Landlord hereby subordinates in favor of Lender but does not waive.  Landlord does not waive, relinquish
or subordinate any liens, rights or remedies that Landlord may now have, or shall ever enjoy, as a judgment
creditor.

4.    Landlord's Notice to Lender of Default; Lender's Opportunity to Cure.  In the event of a
default by Tenant under the Lease, Landlord agrees to not terminate the Lease without giving Lender a
copy of the written default notice issued to Tenant and the right (but not the obligation) to cure such default
within the time period provided by the Lease ("Landlord's Default Notice").  Notwithstanding anything to the
contrary contained herein, Landlord shall not be liable to Lender under this Agreement, at law or in equity
for Landlord's unintentional failure to provide Lender with Landlord's Default Notice, it being understood
and agreed that Lender's recourse shall be against Tenant and not Landlord.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant                    ___

5.    Lender's Right of Entry during the Lease Term. During the term of the Lease, Lender may enter the Premises, during such hours reasonably designated by Landlord, to inspect or remove any of the Collateral therefrom, without Lender's payment of any rent or fee to Landlord.

6.    Lender's Right of Entry after Early Termination.

(a)    Landlord's Notice to Lender of Early Termination. If (i) the term of the Lease is terminated prior to the natural expiration thereof due to Tenant's default or Tenant's relinquishment of possession of the Premises to Landlord ("Early Termination"), and (ii) the Collateral or any portion thereof remains on the Premises following Early Termination, then Landlord shall provide Lender with written notice of Early Termination ("Landlord's Notice"). Notwithstanding anything to the contrary contained herein, Landlord shall not be liable to Lender under this Agreement, at law or in equity for Landlord's unintentional failure to provide Lender with Landlord's Notice, it being understood and agreed that Lender's recourse shall be against Tenant and not Landlord. In addition, Landlord's failure to provide Lender with Landlord's Notice shall not in any manner affect the validity of such Early Termination as to Tenant.

(b)    Removal Period after Early Termination. In the event of Early Termination, Lender may enter the Premises, during such hours reasonably designated by Landlord, to inspect or remove any of the Collateral therefrom for a period commencing on the earlier of (i) the effective date of delivery of Landlord's Notice, or (ii) the date Lender obtains actual knowledge of Early Termination, and expiring fifteen (15) days thereafter (the "Removal Period"). Lender shall pay to Landlord, in a lump sum and upon Landlord's demand therefor, a fee for Lender's right of entry and right to store the Collateral in the Premises for the entire duration of the Removal Period regardless of the actual duration of Lender's occupancy, which fee shall be based on the minimum rent and additional rent due under the Lease immediately prior to termination thereof but prorated on a per diem basis determined on a thirty (30) day month (the "Storage Fee"). Lender shall not be deemed to have assumed or be liable for any unperformed or unpaid obligations of Tenant under the Lease. Lender's right to enter the Premises to inspect or remove the Collateral as provided herein shall not extend beyond the Removal Period. If Lender or any party claiming under Lender remains in possession of the Premises, or any part thereof, beyond the Removal Period, all such parties shall be subject to immediate eviction and removal, and Lender shall upon demand pay to Landlord, as liquidated damages, a sum equal to double the per diem Storage Fee for each day of such possession beyond the Removal Period. The Storage Fee shall in no event reduce or diminish Tenant's liability for, or the amount of, the holdover rent Tenant is required to pay Landlord under the Lease. During the Removal Period, Landlord may enter the Premises to show the Premises to, or to prepare the Premises for, prospective tenants or occupants provided that Landlord shall not unreasonably interfere with Lender's inspection and removal of the Collateral.

7.    Prior to Lender's Entry; Landlord's Right to Accompany; No Liability to Tenant. Prior to Lender entering the Premises either during the term of the Lease or during the Removal Period after Early Termination, Lender shall (a) provide Landlord with prior written notice of the date Lender will enter the Premises to inspect or remove any of the Collateral therefrom, (b) certify to Landlord that Lender has the legal right to take possession of the Collateral, and (c) provide to Landlord a certificate of Lender's commercial general liability insurance, in form and substance reasonably acceptable to Landlord, naming Landlord as an additional insured thereunder. Landlord reserves the right for its property manager and/or other representative(s) to accompany Lender while on the Premises. Landlord shall not have any duty to inquire as to the validity of Lender's right, title or interest in the Collateral and Lender's right to take possession of the same, or as to the authority of any person who purports to act on behalf of Lender. Lender's entry upon the Premises will not be deemed an eviction or a disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord liable to Tenant for damages or abatement of rent or relieve Tenant from the responsibility of performing any of Tenant's obligations under the Lease, and Tenant shall have no right or claim against Landlord for or by reason of any such entry or inspection or removal of the Collateral by or on behalf of Lender.

8.    Lender's Conduct. Lender shall (a) not interfere with the operations of other tenants or occupants in exercising its rights hereunder or conduct any going out of business sale, liquidation sale or the like from the Premises, (b) repair any damage caused by Lender's or its agents', contractors' or employees' inspection and/or removal of the Collateral, (c) restore the Premises to the condition immediately prior to such inspection and/or removal, and (d) indemnify, defend and hold Landlord harmless from any and all losses, costs (including, without limitation, reasonable attorneys' fees and costs), claims, actions or suits arising from Lender's or its agents', contractors' or employees' acts or omissions in exercising Lender's rights and performing Lender's obligations under this Agreement including, without limitation, those arising from Lender's failure to surrender possession of the Premises at the expiration of the Removal Period, any mechanics liens or claims by Tenant. Lender's obligations hereunder shall survive the termination of Lender's rights under this Agreement in accordance with the paragraph entitled "Term of this Agreement; Remaining Collateral" below.

9.    Term of this Agreement; Remaining Collateral. Lender's rights under this Agreement shall automatically terminate upon the earliest to occur of the following: (a) natural expiration of the term of the Lease by the passage of time, (b) expiration of the Removal Period following Early Termination, (c) repayment of the Loan by Tenant and/or termination of Lender's security interest in the Collateral, or (d) Lender's delivery of written notice to Landlord electing to terminate this Agreement. Lender shall deliver written notice to Landlord upon the repayment of the Loan and/or termination of Lender's security interest in the Collateral, provided that Landlord's receipt of such notice shall not affect the effectiveness of the automatic termination as set forth in subsection (c) above. Upon such termination of Lender's rights under this Agreement but subject to laws of the state in which the Premises is located, (i) any Collateral remaining

INITIAL HERE
Landlord
Tenant

on or at the Premises (the "Remaining Collateral") shall be deemed abandoned property, (ii) Lender shall be deemed to have released and quit claimed to Landlord all right, title and interest of Lender in and to the Remaining Collateral, (iii) Landlord may exercise any and all rights and remedies it may have with respect to the Remaining Collateral pursuant to the Lease, at law or in equity (including, without limitation, the disposal thereof) without any obligation or liability to Lender, and (iv) Lender shall file and record termination agreements with each filing officer of every county and state in which Lender has filed and recorded a uniform commercial code financing statement encumbering any of the Collateral sufficient to terminate of record such financing statements (such obligation shall survive the termination of Lender's rights under this Agreement).

      10.    <u>Miscellaneous</u>.

      (a)    <u>Notices</u>. Any notice, demand, request, approval, consent or other instrument which may be or is required to be given under this Agreement shall be in writing and shall be delivered personally or sent by either United States certified mail, return receipt requested, postage prepaid, or overnight delivery courier and shall be addressed to the party to be notified at the address of such party set forth in the introductory clause of this Agreement above, or to such other address as such party may from time to time designate by notice to the other in accordance with this subparagraph. Notices shall be effective upon delivery unless delivery is refused or cannot be made, in which event notice shall be effective at the time of refusal.

      (b)    <u>Governing Law</u>. This Agreement shall be governed by the laws of the state in which the Premises is located.

      (c)    <u>No Recording; Modifications</u>. This Agreement shall not be recorded. No alteration, amendment, change or addition to this Agreement shall be binding upon Landlord or Lender unless reduced in writing, signed and mutually delivered by both Landlord and Lender.

      (d)    <u>Severability</u>. If any term, covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Agreement shall be valid and enforced to the fullest extent permitted by law.

      (e)    <u>Prevailing Party</u>. In the event that any action, suit or other proceeding is initiated concerning or arising out of this Agreement, the prevailing party shall recover all of such party's costs and reasonable attorneys' fees incurred in each and every action, suit or other proceeding (including any alternative dispute resolution proceedings), including any and all appeals or petitions therefrom from the non-prevailing party.

      (f)    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SUBPARAGRAPH HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

      (g)    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon Landlord and Lender and their respective successors and assigns.

      (h)    <u>Joinder and Consent of Tenant</u>. The joinder and consent of Tenant is attached hereto and made a part hereof.

      (i)    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed agreement even though all signatories do not appear on the same document.

[remainder of page intentionally left blank]

REGENCY
CENTERS

<u>INITIAL HERE</u>
Landlord
Tenant

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement on the date first above written.

LANDLORD:

a _____

By: _____

_____
Witness

_____
Print Name                              Print Name

Its: _____
_____         Position/Title
Witness

_____
Print Name

LENDER:

a _____

By: _____

_____
Witness

_____
Print Name                              Print Name

Its: _____
_____         Position/Title
Witness

_____
Print Name

[JOINDER AND CONSENT OF TENANT ON NEXT PAGE]

*cont sign per Lever*

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant _____

### JOINDER AND CONSENT OF TENANT
### TO LANDLORD WAIVER AGREEMENT

Tenant joins in the execution of this Agreement to evidence Tenant's acknowledgement and consent to the granting of the rights to Lender on the terms and conditions set forth in this Agreement, and to the exercise by Lender of such rights hereunder without any liability to Landlord whatsoever. In addition, Tenant hereby acknowledges and agrees that this Agreement does not in any manner release Tenant from or otherwise diminish Tenant's obligations to Landlord under the Lease.

Simultaneously with Tenant's execution hereof, Tenant shall pay to Landlord a fee of Two Thousand Five Hundred Dollars ($2,500.00) to compensate Landlord for legal fees, costs of administration and other expenses to be incurred in connection with the review and processing of this Agreement.

This Joinder and Consent shall be binding upon Tenant and its respective successors and assigns.

TENANT:

_____
Witness

_____
Print Name

_____
Witness

_____
Print Name

_____ and _____ ("Guarantor") executed that certain Absolute Unconditional Guaranty Agreement dated _____ (the "Existing Guaranty") guaranteeing the performance of the obligations of the Lease as more specifically provided therein. Guarantor joins in the execution hereof to evidence Guarantor's continuing obligations with regard to the Lease and the Existing Guaranty.

GUARANTOR:

_____
Witness

_____
Print Name

_____
Witness

_____
Print Name

GUARANTOR:

_____
Witness

_____
Print Name

_____
Witness

_____
Print Name

*Don't sign pr - Lettere*

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

EXHIBIT A

COLLATERAL

REGENCY
CENTERS

## EXHIBIT J

### EXISTING EXCLUSIVE USES AND RESTRICTIVE COVENANTS

*This exhibit contains redacted language from exclusive use agreements applicable to the Premises and is being provided to Tenant for information purposes only. This Lease shall remain subject to all exclusives uses and restrictions that apply to the Premises that were in effect prior to the date hereof, pursuant to the terms of this Lease. Capitalized terms used in this exhibit shall have the meanings given to such terms in the applicable exclusive use agreement below, rather than the meanings given to such terms in this Lease. References to articles, sections, paragraphs, exhibits, attachments and addenda (such as, without limitation, references to site plans) shall mean the articles, sections, paragraphs, exhibits, attachments and addenda referenced in the applicable exclusive use agreement, rather than the articles, sections, paragraphs, exhibits, attachments and addenda referenced in and/or attached to this Lease.*

### NORDSTROM RACK

4.     OPENING, USE AND OPERATING COVENANT.

C.     Permitted Uses. Neither the Shopping Center, nor any part thereof, shall be used, and no building or other improvement in the Shopping Center shall be constructed, maintained or used for any purpose other than the following: retail, office, and service establishments of the type common to a first-class shopping center, including, by way of example but without limitation, financial institutions, brokerage offices, restaurants, theaters, and travel and other agencies; provided that so long as Tenant is operating as a retail outlet store upon the Premises, office uses and service establishments (excluding theaters and restaurants) shall not exceed twenty percent (20%) of the Floor Area of the Shopping Center. All businesses conducted within the Shopping Center (including the Premises) shall be conducted in a lawful manner.

E.     Prohibitions. No use or operation will be made, conducted or permitted on or with respect to all or any part of the Shopping Center, by either Landlord (or its tenants) or Tenant (or its assignees, sublessees, licensees, concessionaries or other occupants of the Premises), which use or operation is obnoxious to or out of harmony with the development or operation of a first-class shopping center, including, but not limited to, the following:

(1)     Any public or private nuisance.

(2)     Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness.

(3)     Any noxious odor.

(4)     Use, storage, transportation, handling, manufacture, or emission of any noxious, toxic, caustic or corrosive fuel or gas or other hazardous or toxic substance or Hazardous Material unless such materials are handled in accordance with applicable governmental laws, regulations and codes.

(5)     Emission of microwave, radio wave, or other similar electronic, light or noise radiation at levels which are dangerous to health or which interfere with the proper operation of electronic, telephone, computer or other business equipment of tenants of the Shopping Center.

(6)     Any dust, dirt or fly ash in excessive quantities.

(7)     Any unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks.

(8)     Any warehouse (but any area for the storage of goods intended to be sold at any retail establishment in the Shopping Center shall not be deemed to be a warehouse), assembly, manufacture, distillation, refining, smelting, agriculture or mining operations. Excluded from this restriction shall be a brew pub.

(9)     Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising.

(10)     Any drilling for and/or removal of subsurface substances.

(11)     Any dumping of garbage or refuse (other than in dumpsters or compactors designed for such purpose).

(12)     Any commercial laundry or dry cleaning plant (except as to an establishment which receives and dispenses items for laundry and/or dry cleaning but the processing of which such items is done elsewhere so long as the same is located at least 170 feet from the Premises), laundromat, veterinary hospital, pet store (except that the foregoing shall not prohibit national or regional pet stores that are located at least 170 feet from the Premises), car washing establishment, bowling alley, mortuary or similar service establishment.

(13)     Any automobile body and fender repair work other than automobile services provided by any department store in connection with its operations as a retail department store.

(14)     No kiosk, pushcarts, temporary sales booths or other forms of so-called remote merchandising units ("RMUs") shall be allowed within the No-Change Area (defined in Section 18A). Additionally, no restaurant or entertainment use shall be allowed in any space contiguous to the Premises without Tenant's prior approval, which approval may be withheld in Tenant's sole discretion; provided, however, pre-prepared food shall be permitted to be sold in such space as an incidental part of such adjacent tenant's use so long as no food is cooked on premises. The preceding shall not prohibit the operation of a café and/or coffee bar in space contiguous to the Premises.

(15)     Upon prior notice to Landlord, all tenants of the Shopping Center, including Tenant shall be permitted to hold sidewalk sales, provided that the sidewalk sales is limited strictly to the sidewalk immediately adjacent to its premises, and provided further that such sales do not unreasonably interfere with pedestrian or vehicular access within the Shopping Center. Sidewalk sales located outside

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

of the No-Change Area shall not unreasonably interfere with pedestrian or vehicular access within the Shopping Center.

(16)   The operation of a "head shop," so-called, or other business devoted to the sale of marijuana, cocaine or other controlled drugs or substances, or articles, paraphernalia, or merchandise normally used or associated with the use of marijuana or illegal or unlawful activities.

- (17)   A massage parlor (except that the foregoing shall not prohibit a nationally recognized or regionally recognized business providing massages of a quality equal or better than those operated as of the Effective Date under the name "Massage Envy" and "Hand and Stone Massage"), and "second" hand store, used clothing or thrift store, pawn shop, salvation army type store, similar deep discount "surplus" store or deep discount liquidation outlet, tattoo or piercing parlor, or the business of the sale of so-called "adult" materials such as, without limitation, pornographic magazines, books, movies and photographs; provided that the foregoing shall not prohibit any bookstore from selling pornographic books, magazines or other publications so long as such materials do not exceed five percent (5%) of the floor area of such tenant.

(18)   Automotive sales (selling new or used cars, trailers or mobile homes) and service, other than automotive services permitted under subsection (13) above.

(19)   Factory.
(20)   Industrial usage.
(21)   Processing or rendering plant.
(22)   Any carnivals, flea markets, coin operated vending machines (except for vending machines intended for employee use only and located inside of individual stores), or video arcades (except that restaurants/entertainment uses such as Dave & Busters may operate video games, and retail facilities may operate video games incidentally to their primary use).

18.   COMMON AREA USE AND MAINTENANCE.

A.   Common Areas.

Landlord shall not change the size, location, nature or use of any Common Area identified as the "No-Change Area" on the Site Plan (the "**No-Change Area**"), make installations in the No-Change Area, use any portion of the No-Change Area for construction staging or valet parking, or erect, move or remove improvements in the No-Change Area without Tenant's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed, provided that routine cleaning, striping and maintenance by Landlord of Common Areas located within the No-Change Area shall not be deemed to be a violation of such prohibition.

29.   LANDLORD'S COVENANTS.

D.   Parking.

Subject to applicable laws and condemnation, no change shall be made to the parking area of the Shopping Center without Tenant's approval, which approval shall not be unreasonably withheld, conditioned or delayed. From time to time, Landlord may designate an employee parking area for the nonexclusive use by Shopping Center employees, except that: (1) up to 20 of Tenant's employees who work early or late shifts may park in locations that are closer to the Premises outside of the designated employee parking area, and (2) the designated employee parking area shall be at least 200 feet from the front door of the Premises. No parking spaces smaller than 9.5' x 18' shall be located within 200 feet of the front door of the Premises unless required by law to be located specifically within such 200 foot radius and not elsewhere.

SAKS OFF FIFTH

Section 15.1   Location of Buildings and Other Improvements

Landlord shall not erect, construct or expand, or permit the erection, construction or expansion of, any building or buildings or other structures or improvements, other than Common Area improvements, in the Shopping Center except within the areas designated as building areas on Exhibit B. Except as may be necessary prior to rebuilding or restoration following damage or destruction, or for a taking by condemnation, Landlord shall not raze or remove, nor permit to be razed or removed, any of the buildings constructed on the Shopping Center from their respective present building areas. Landlord represents and warrants that the Common Area improvements shown on Exhibit B will, on the Landlord Delivery Date, exist and be located as shown on Exhibit B; provided, however, that notwithstanding the foregoing or anything to the contrary herein, as long as any unfinished work on the Common Areas does not prevent or limit Tenant from obtaining Tenant's Permits or prevent or limit Tenant's ability to perform Tenant's Work, Landlord may finish such work after the Landlord Delivery Date, however, in any event, said work shall be completed on or before thirty (30) days prior to the date on which Tenant opens the Demised Premises to the public for business.

Landlord covenants and agrees that no changes, modifications or alterations, whether temporary or permanent, shall be made (including, but not limited to, with respect to the improvements or Common Areas) in the "**No Change Area**" shown on Exhibit B without the prior written consent of Tenant which may be granted, denied and/or withheld in Tenant's sole and absolute discretion.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

Landlord covenants and agrees that no changes, modifications or alterations, whether temporary or permanent, shall be made (including, but not limited to, with respect to the improvements or Common Areas) outside the No Change Area shown on Exhibit B if such changes, modifications or alterations would materially or adversely affect Tenant's ingress, egress or access to Tenant's Demised Premises without obtaining Tenant's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

Landlord has obtained Governmental Approvals for Landlord's landscaping plan dated May 22, 2015, last revised April 28, 2016, prepared by Menlo Engineering Associates, Inc. (the "**Approved Landscaping Plan**"), a copy of which is attached hereto as Exhibit M. Tenant hereby approves the Approved Landscaping Plan. Landlord covenants and agrees that no changes, modifications or alterations, whether temporary or permanent, shall be made to the landscaping shown on the Approved Landscaping Plan which would result in such landscaping being taller or larger or which would materially or adversely affect the visibility of the Demised Premises without obtaining Tenant's consent, which may be granted, denied and/or withheld in Tenant's sole and absolute discretion.

Without limiting the foregoing, the No Change Area shown on Exhibit B shall not be used for construction staging, valet parking, entertainment, outdoor shows or displays.

Notwithstanding anything to the contrary, no remodeling, expansion or other work (except for routine cleaning and maintenance, snow and ice removal and emergency repairs or replacements and, in any such case, Landlord shall use commercially reasonable efforts to minimize the extent and duration of such activities and any interference resulting therefrom) in the Common Area (excluding the Common Areas within Pad A Area and Pad B Area labeled on Exhibit B attached hereto and made a part hereof) shall be performed during the period from November 1 to January 15.

Section 15.3     Height Limitations

Except for Pad B Area, Landlord covenants and agrees that the buildings in the Shopping Center, excluding the Demised Premises, shall not, now or in the future, be constructed, reconstructed or expanded to exceed thirty-seven feet (37') six inches (6") in height and/or one (1) story; provided, however, any tenant which occupies more than 35,000 square feet of rentable area shall have the right, not as part of the initial development of the Shopping Center, but in the future, to construct, reconstruct or expand its premises to up to, but not more than, forty feet (40') (but such premises still shall not be more than one (1) story). Tenant acknowledges and agrees that Tenant shall not construct, reconstruct or expand the Demised Premises to exceed forty feet (40') or one (1) story. Furthermore, if Landlord in the future redevelops Pad B Area and it is no longer one (1) story, then: (1) Pad B Area shall provide enough parking within Pad B Area to accommodate all tenants and occupants thereof and their respective customers, employees, agents, invitees and contractors; (2) Landlord shall require that all tenants and occupants thereof and their respective customers, employees, agents, invitees and contractors park exclusively on Pad B Area and nowhere else in the Shopping Center; and (3) Landlord shall, at Landlord's sole cost and expense, enforce this restriction in such manner as is necessary to comply with the same.

Section 15.5     Limitation on Detrimental Characteristics

No use or operation shall be made, conducted or permitted in any part of the Shopping Center which use or operation is clearly objectionable to the development or operation of the Shopping Center. Included among the uses or operations which are prohibited because of their obvious detrimental effect upon the general appearance of the Shopping Center and conflict with the reasonable standards of appearance, maintenance and housekeeping required by this Lease, are uses or operations which produce or are accompanied by the following characteristics, which list is not intended to be all inclusive:

(1)     Any noise, litter, odor or other activity which may constitute a public or private nuisance;

(2)     Any unusual firing, explosion or other damaging or dangerous hazards;

(3)     Any assembly, manufacturer, distillation, refining, smelting, industrial, agriculture, drilling or mining operation;

(4)     Any trailer court, mobile home park, lot for sale of new or used motor vehicles, labor camp, junk yard, stock yard or animal raising (other than pet shops);

(5)     Any dumping, disposal, incineration or reduction of garbage or refuse other than handling or reducing such waste if produced on the Demised Premises from authorized uses and if handled in a reasonably clean and sanitary manner;

(6)     Any provision of social services;

(7)     Any governmental use (including embassy or consulate use but excluding United States Post Office);

(8)     Any customer service office (but excluding any customer service office which is part of a tenant's retail operations);

(9)     Any studios for radio, television or other media;

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

(10)   Any amusement arcade, "bingo" parlor, game center, pool hall or billiard parlor;

(11)   Any tavern, brew pub, bar, or other similar establishment selling alcoholic beverages for on- premises consumption, except the foregoing shall be permitted on Pad A, Pad A-1, Pad B and Proposed Retail B, all as labeled on Exhibit B attached hereto and made a part hereof;

(12)   Any pornographic use, which shall include, without limitation: (i) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational; or (ii) a store offering for exhibition, sale or rental DVD's, video cassettes or other media capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any similar industry-wide rating system;

(13)   Any second-hand or surplus store, pawn shop, check-cashing store, gun shop or tattoo parlor;

(14)   Any fire sale, bankruptcy sale (unless pursuant to a court order) auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(15)   Any hotel, motel, living quarters, sleeping apartment or lodging rooms;

(16)   Any veterinary office or hospital, animal raising or boarding facilities;

(17)   Any mortuary or funeral home;

(18)   Any dry cleaning plant (except for an establishment which receives and dispenses items for dry cleaning, but the processing of such items is done elsewhere);

(19)   Any separately demised newsstand within 200 feet of the Demised Premises;

(20)   Any "head shop" or other establishment featuring the sale or exhibition of drug-related paraphernalia;

(21)   Any live performance theater, movie theater or theater of any kind;

(22)   Any auditorium, meeting hall, sporting event, night club, dance hall, discotheque, amusement center, carnival or other entertainment facility, or like place of public assembly;

(23)   Any factories;

(24)   Any industrial usage;

(25)   Any facility used primarily for storage, or any warehouse, processing or rendering plant;

(26)   Any flea market or store with multiple vendors;

(27)   Any establishment where men or women are engaged in salacious activities or sexually oriented business including, without limitation, mud wrestling, table dancing, or topless, bottomless or nude servers, waitresses, waiters, dancers, hostesses or hosts;

(28)   Any gaming facility or operation, including but not limited to: off-track or sports betting parlor; casino operations including but not limited to table games such as black-jack or poker or gaming devices such as slot machines, video poker/black-jack/keno machines, or other similar or related businesses;

(29)   Any auto repair shop, a vehicle body and fender shop, a vehicle repair shop (mechanical or otherwise) or any business servicing motor vehicles, including, without limitation, any quick lube oil change services, tire centers, or any business selling gasoline or diesel fuel at retail or wholesale;

(30)   Any clothing rental (except that clothing rental shall be permitted as an incidental use to retail clothing sales);

(31)   Any catering or banquet facility;

(32)   Any restaurant, except the foregoing shall be permitted on Pad A, Pad A-1, Pad B and Proposed Retail B, all as labeled on Exhibit B attached hereto and made a part hereof; provided, however, that for purposes of this restriction, a "restaurant" shall mean a space primarily engaged in the preparation and sale of prepared foods for on and off premises consumption;

(33)   Any church, synagogue, mosque or other religious place of worship;

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

(34)  Any health clinic; a medical rehabilitative facility or other medical clinic, except that (A) dental, vision or physical therapy facilities shall be permitted provided that such dental, vision and physical therapy facilities do not to exceed 7,200 square feet of rentable area in the aggregate and further provided that same shall only located on Pad A, Pad B or Proposed Retail B, as labeled on <u>Exhibit B</u> attached hereto and made a part hereof; and (B) a medical walk in facility which is of the same or better quality as CityMD, as CityMD is being operated in its locations in Manhattan as of the date of this Lease, and which has the same first class appearance as CityMD's locations in Manhattan as of the date of this Lease, shall be permitted subject to the following: (i) there shall not be more than one such clinic in the Shopping Center, (ii) such clinic may only be located on either Pad A, Pad B or Proposed Retail B, as labeled on <u>Exhibit B</u> attached hereto and made a part hereof, (iii) such clinic shall not exceed 7,200 square feet of rentable area and (iv) notwithstanding anything to the contrary, such clinic shall not be operated as a primary care or specialty care physician's office, ambulatory, same day or other surgery center or emergency room or abortion clinic and shall not be a place that regularly receives patients at and/or transports patients by ambulance;

(35)  Gyms or gymnasiums except that "high end"/"upscale" exercise formats such as Pure Barre, Soul Cycle and Orange Theory shall be permitted provided that such exercise formats do not to exceed 8,000 square feet of rentable area in the aggregate and further provided that same shall only located on Pad A, Pad B or Proposed Retail B, as labeled on <u>Exhibit B</u> attached hereto and made a part hereof; and

(36)  Any dust, dirt or fly ash in excessive quantities.

Section 15.6  <u>Non-Interference with Circulation</u>

So as not to interfere with efficient automobile and pedestrian traffic flow between the Demised Premises and all other areas in the Shopping Center, there shall be no selling activities conducted outside the present building areas in the Shopping Center; provided, however, that tenants of the Shopping Center, including Tenant, shall be permitted to hold sidewalk sales, provided that the sidewalk sales are limited strictly to the sidewalk immediately adjacent to a tenant's premises, and provided further that such sales shall not unreasonably interfere with pedestrian or vehicular access within the Shopping Center. Landlord is also permitted to have outdoor seating areas on sidewalks immediately in front of a tenant's premises and, with respect to an end cap tenant's premises, also along the one side of such tenant's premises perpendicular to the front of such tenant's premises; however, notwithstanding the foregoing, Landlord shall not have outdoor seating areas on sidewalks in front of Tenant's Demised Premises without first obtaining Tenant's written consent, which consent may be withheld in Tenant's sole and absolute discretion. Landlord agrees to maintain an adequate and sufficient area adjacent to and adjoining Tenant's service entrance(s) and loading docks for unobstructed standing, loading, unloading and otherwise servicing the Demised Premises.

Section 15.7  <u>Fences; Obstructions</u>

No fence, structure or other obstruction of any kind (except as may be specifically permitted herein or as may be indicated on <u>Exhibit B</u> or except for decorative features and customer conveniences or as otherwise temporarily required to address safety issues or except if required by Requirements) to be placed, kept, permitted or maintained upon the Common Areas in the Shopping Center, except such of the foregoing as are reasonably necessary or proper for the construction, repair or rebuilding authorized hereunder. Without limiting the foregoing, Landlord covenants that Tenant at all times shall have unobstructed and adequate means of ingress and egress between each of the entrances to the Demised Premises and the adjacent public streets and highways.

Section 16.3  <u>Use of Parking Areas</u>

Except as otherwise expressly provided herein, Landlord shall not use nor permit the use of the parking area in the Shopping Center for any purpose other than pedestrian movement and the parking and passage of motor vehicles by the Landlord and tenants of the Shopping Center and their respective customers, employees and invitees.

<u>WHOLE FOODS</u>

7.1 Exclusive Use.

(d)  Related Land Restrictive Covenant. Except as prohibited by applicable Laws or shown on the Site Plan, Landlord shall not permit on any land that is within radius of one half (1/2) of a mile from the front door of the Demised Premises, including, without limitation, the entire development

known as **Chimney Rock Crossing East** ("<u>CRCE Development</u>" and collectively "<u>Related Land</u>") now or hereafter owned by Landlord or its Affiliate, any of the following:

(i)      Any market, supermarket, or specialty store which is primarily engaged in the sale of produce, meat, poultry, seafood, dairy, cheese, grains, fruits and vegetables, frozen foods, grocery products, bulk foods, gourmet foods and bakery goods.

(ii)      Any store engaged primarily in the sale of vitamins, medical herbs, naturopathic or homeopathic remedies or any natural drug store, but this restriction shall not prohibit a pharmacy such as a Walgreens or CVS and the sale of such products therein.

(iii)      Any "Salad Bar".

(e)      <u>Exceptions to Prohibited Uses, Prohibited Parking Intensive Uses and Restrictive Covenant - General</u>.      Notwithstanding the foregoing, but subject to the provisions of this Section 7.1(e) that constrain or prohibit the sale of the items described in Section 7.1(d)(i) above, the provisions of Sections 7.1(d) shall not prohibit "incidental sales" of any of the prohibited items described in Section 7.1(d)(i) by any tenant or occupant in the Development or on Related Land.  For purposes of the foregoing, a tenant or occupant shall be deemed to be conducting "incidental sales" of such prohibited items only if the aggregate floor area in such tenant's or occupant's premises devoted to the display of such items (other than those items the sale of which is completely prohibited as provided below) does not exceed the lesser of (1) two percent (2%) of the Rentable Area of such tenant's or occupant's premises, or (2) 250 square feet.  Notwithstanding the foregoing, however, the sale of the following (even if such sales be considered only "incidental sales") by any tenant or occupant in the Development or on Related Land is expressly prohibited (1) wine and/or beer for off premises consumption, (2) meat, poultry and/or seafood for off premises consumption, (3) cheese for off premises consumption, (4) vitamins for off premises consumption, (5) naturopathic and/or homeopathic remedies for off premises consumption, and (6) nutritional supplements for off premises consumption.  Notwithstanding the foregoing or anything to the contrary, a liquor store (including the sale of beer and wine or one other store selling such items) shall be permitted in the CRCE Development.


<u>THE CONTAINER STORE</u>

7.4      <u>Tenant's Exclusive Rights</u>.      Simultaneously with the execution of this Lease, Landlord shall cause the fee owner of the **Chimney Rock Crossing East development** to execute the Declaration of Restriction attached hereto as <u>Exhibit L</u> pursuant to which such fee owner agrees to a primary competitor exclusive whereby the **Chimney Rock Crossing East development** will not be leased to a direct competitor of Tenant whose primary use is the design, planning and sale of closet systems such as California Closet or Closet By Designs.


<u>COST PLUS</u>

Subject to the rights of tenants under Existing Leases and provided this Lease is in full force and effect and Tenant is then open and operating as a typical Cost Plus store (subject to Excused Periods), Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the display and/or sale of  pre-packaged gourmet foods and/or domestic or imported home décor products (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive Items").

The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], (iii) home improvement center [for example, Home Depot or Lowe's], or (iv) supermarket [for example, Whole Foods, Shoprite, Stop & Shop], commonly located in first-class shopping centers in the state in which the Shopping Center is located, with respect to clauses (i), (ii) and (iii), each occupying at least 80,000 square feet of Floor Area within the Shopping Center, and as such stores are currently operated (as of the Effective Date).  In addition, Tenant's exclusive shall not prohibit a full-line furniture store such as Bob's Furniture, Ethan Allen, Pottery Barn and Restoration Hardware (as same are known to operate as of the Effective Date).

5.2.2      No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the area designated as "Critical Area" on Exhibit B hereto (the "Critical Area"), from that shown on Exhibit B hereto; (ii) construct or permit to be constructed any structures in the Critical Area of the Shopping Center (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on Exhibit B hereto; or (iii) materially change the Critical Access Points to and from the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Critical Area, or the number, location or layout of parking spaces, located within the Critical Area from those shown on Exhibit B hereto. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center (not including repairs entirely within buildings) including the Premises (other than emergency repairs to the Shopping Center, utilities and Common Areas and those

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant                      _____

mandated by Legal Requirements) during the months of October, November or December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion. The restrictions in the preceding sentences shall not be construed to prevent Landlord from changing curbing, light poles, landscaping, signage or similar elements of the Common Area so long as access to and visibility of the Premises is not adversely affected or if mandated by Legal Requirements.

5.2.6  Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Critical Area of the Shopping Center shall:

(a)  not be performed during the months of October, November or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)  be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances or as may be mandated by applicable Legal Requirements); and

(c)  be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.8(a) No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.  Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant)  shall be permitted to conduct sidewalk sales and provide outdoor seating in the sidewalks located in front of their respective stores only or, with respect to the Outparcels and the premises identified on Exhibit B as "Retail B" and "Retail F" only, in the sidewalks located along the side wall of their respective stores, provided that such sales and/or outdoor seating shall: (i) be conducted in a manner consistent with sidewalk sales and outdoor seating in first-class shopping centers in the state in which the Shopping Center is located and in compliance with all applicable Legal Requirements, (ii) not interfere with reasonable pedestrian access over the sidewalks, and (iii) not interfere with the normal business operations of tenants or impair the visibility of any tenants' signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

5.2.3  Outparcels.  In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outparcels designated on Exhibit B hereto as "Outparcel A", "Outparcel G" and "Outparcel H" (collectively, the "Outparcels" and individually, an "Outparcel"): (a) no building shall exceed one story in height, except for "Outparcel A"; (b) the aggregate Floor Area of all buildings constructed on an Outparcel shall not exceed 20,000 square feet of Floor Area; and (c) with respect to "Outparcel H", the only customer entrance to such Outparcel shall face the "Staging" area immediately adjacent to such Outparcel (as shown on Exhibit B) and facing Chimney Rock Road.  For purposes of this Subsection 5.2.3, the Floor Area of any building constructed on an Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service) and exclusive of unenclosed sales and seating areas on sidewalks in front of or on the sides of buildings on an Outparcel.

Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center for any of the "Prohibited Uses" (as set forth in <u>Exhibit L</u> hereto annexed).

<u>Exhibit L</u>

A.  As used in this Lease, the term "Prohibited Uses" shall mean any of the following uses:

(1)  Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)  Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)  Any "second hand" store, "surplus" store;

(4)  Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)  Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)  Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant   

(7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located on the Outparcels and/or the building designated on Exhibit B as "Retail B" and/or the building designated on Exhibit B as "Retail C-1" but not immediately adjacent to the Premises);

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley or skating rink;

(10)    Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use, provided that the foregoing shall not prevent Tenant from having events within the Premises for its customers, which shall include without limitation product demonstrations, instruction sessions and promotional events; each such event shall at all times (i) be consistent with the operation of a first class shopping center in the Bridgewater, New Jersey Metropolitan Area, and (ii) comply with all applicable Legal Requirements;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit L];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, provided, however, that Tenant and any of its Affiliates occupying and operating stores in the Shopping Center shall be permitted to sell, on an incidental basis, alcoholic beverages for on- and/or off-premises consumption (including, without limitation, conducting on-premises sampling and tastings), subject to applicable Legal Requirements.  Notwithstanding the foregoing: (i) a restaurant, permitted pursuant to item (35) shall be permitted to engage in the incidental sale of alcoholic beverages provided such restaurant does not derive more than 60% of its sales from the sale of alcohol; and (ii) a supermarket permitted pursuant to item (27) shall be permitted to engage in the incidental sale of alcoholic beverages for on- or off-premises consumption.  Notwithstanding the foregoing, as long as Tenant is not selling alcoholic beverages at the Premises for on- or off-premises consumption,  one upscale liquor store shall be permitted to operate in the Shopping Center;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to customer instruction sessions referred to Clause (10) above or on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center.  The restriction in this item 19 shall not apply to the Outparcels;

(20)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

(23)     Any church or other place of religious worship;

(24)     Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)     Any carnival, amusement park or circus;

(26)     Any medical clinics or medical offices except as expressly permitted in item (28) hereafter;

(27)     Any supermarket, except that one (1) upscale, boutique-type food store of the type normally operated in the Bridgewater, NJ metropolitan area (such as, by way of example, Whole Foods, Sprouts, Fresh Market, and Trader Joe's) shall be permitted, provided, that such store: (a) shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises); or (b) shall be located in the space designated for Nordstrom Rack and/or Saks Off Fifth (as shown on Exhibit B);

(28)     Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; (y) retail offices providing services commonly found in similar first-class shopping centers in Morris, Somerset, and Warren counties, New Jersey (for example, financial services, real estate brokerage, insurance agency, banking, travel agency); and (z) medical offices providing services commonly found in similar first-class shopping centers in Morris, Somerset, and Warren counties, New Jersey, provided that such uses are located on the Outparcels and/or  the building designated on Exhibit B as "Retail B", and not more than seven thousand two hundred (7,200) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

(29)     hotel/motel;

(30)     daycare center;

(31)     veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and not located immediately adjacent to the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;  no pet or pet supply store shall be located immediately adjacent to the Premises;

(32)     children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)     karate center;

(34)     movie theater, except that one movie theater shall be permitted in the premises identified on Exhibit B as "Retail E" and/or "Retail F";

(35)     restaurant serving meals for on- or off-premises consumption, provided, however, that Tenant shall be permitted to operate a café within the Premises, subject to Tenant's full compliance with applicable Legal Requirements.  Notwithstanding the foregoing, restaurants shall be permitted to operate on the Outparcels and in the building designated on Exhibit B as "Retail B" provided however, (i) with respect to any restaurant operating on "Retail B", the entrance to such restaurant shall be located within forty (40) feet from the northern wall of "Retail B", and (ii) with respect to "Outparcel G", and "Outparcel H" (as shown on Exhibit B), the only customer entrance to any such restaurant shall face the "Staging" area located immediately adjacent to such premises as shown on Exhibit B and facing Chimney Rock Road and/or the side of the buildings to access the patio areas;

(36)     beauty parlor or nail salon immediately adjacent to the Premises.  Notwithstanding the foregoing, Ulta, as same is currently known to operate, may operate in the space designated for such tenant on Exhibit B, which may include a beauty parlor and/or nail salon within such space;

(37)     health spa, exercise facility or similar type business.  Notwithstanding the foregoing, the following shall be permitted: (A) "high end"/"upscale" exercise formats, such as Pure Barre, Soul Cycle and Orange Theory (as same are currently known to operate) shall be permitted to operate on the Outparcels and in the building designated on Exhibit B as "Retail B" provided however, (i) with respect to any business operating on "Retail B", such business shall not occupy more than 4,000 square feet of Floor Area, and (ii) with respect to "Outparcel G" and "Outparcel H"  (as shown on Exhibit B), the only customer entrance to any such businesses shall face the "Staging" area located immediately adjacent to such premises as shown on Exhibit B and facing Chimney Rock Road and/or the side of the buildings to access the patios and (B) one (1) upscale fitness center, such as Equinox, shall be permitted to operate in the premises identified on Exhibit B as "Retail F" and/or the half of "Retail E" furthest from the Premises; or

(38)     a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" and "And That" shall be deemed not to violate the foregoing restriction.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

ULTA

Tenant shall have the exclusive right ("**Tenant's Exclusive**") to conduct any portion of Tenant's Protected Uses in the Shopping Center, and all other tenants or other occupants of any portion of the Shopping Center shall be prohibited from engaging in any portion of Tenant's Protected Uses for so long as Tenant is operating any portion of Tenant's Protected Uses in the Premises (excepting Permitted Closures). Notwithstanding the foregoing, Tenant's Exclusive shall not apply to uses associated with (a) existing tenants in the Shopping Center who are as of the Effective Date entitled to sell such products and/or provide the services that are covered by Tenant's Exclusive pursuant to their respective leases and, except to the extent Landlord has any control thereover, their respective assignees, subtenants and licensees (and extensions thereof), (b) any national or regional retail tenant in excess of fifteen thousand (15,000) square feet that sells the goods and/or provides the services that are covered by Tenant's Exclusive as a part of its normal business operations, but not as its primary use, (c) incidental sales (i.e., less than four hundred (400) square feet total of such tenant's premises is used to sell any of the products that comprise Tenant's Protected Uses), (d) one nail salon, not to exceed 2,500 square feet, (e) one value oriented family hair care salon, such as, by way of example but not limitation, Hair Cuttery or Supercuts, (f) one primary men's upscale barber shop, such as, by way of example but not limitation, Floyd's, (g) one therapeutic massage spa, such as, by way of example but not limitation, Massage Envy, (h) one waxing salon, such as, by way of example but not limitation, European Wax, and (i) one nationally or regionally recognized drug store (i.e., CVS, Walgreens, Rite Aid, etc.). "Tenant's Protected Uses" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products and accessories, hair care products and accessories, personal care appliances; skin care products, and body care products; and (ii) the operation of a full service beauty salon. The term "full service beauty salon" for purposes of this Section shall be defined as the offering of any of or a combination of the following services:  hair care (including, without limitation, cutting, styling, hair treatments, highlighting, tinting, coloring, texturizing, smoothing and hair extensions); facials; esthetician services; skin care services (skin treatments for face and body); beauty treatments/services; hair removal (including, without limitation, waxing, threading and tweezing for face and body); eye lash extension services; nail services; and therapeutic massage.

The Prohibited Uses set forth on Exhibit E shall be prohibited throughout the Shopping Center.  Additionally, the following "Restricted Uses" shall not be permitted within the area identified on the Site Plan as the Restricted Area ("Restricted Area"):  drive-throughs; children's recreational, educational or day-care facilities; professional office uses (as opposed to "service" retail uses, such as a travel agency, a real estate agency, a UPS store, or a dental office, which are not restricted); health clubs or gyms, except that small-format health clubs and gyms occupying not more than 4,000 square feet are permitted in spaces C100 and B100, and full-sized health clubs and gyms are permitted in spaces F100 and in those portions of space E100 located at least fifty (50) feet from the nearest demising wall of the Premises, provided that such use shall not be deemed a Comparable Replacement Tenant for Nordstrom Rack or Saks Off Fifth under Sections 2.3(a) or 2.3(b) of this Lease; schools of any kind; restaurants occupying more than 6,000 square feet of Gross Floor Area; and the use of the word "beauty" in the name or signage of any other tenant or occupant.  It is the intent of this Section 5.3 that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use.  Notwithstanding the foregoing, such Prohibited Uses set forth on Exhibit E and Restricted Uses shall not apply to existing tenants in the Shopping Center (or their respective assignees, subtenants or licensees) who are not subject to such Prohibited Uses and Restricted Uses pursuant to their respective leases, or any renewals, replacements with a similar use or extensions thereof, provided, however, if Landlord has the right to approve or consent to a change of use thereunder in connection with an assignment, subletting or otherwise provided Landlord shall not be in violation of the provisions of such Lease, Landlord shall enforce the foregoing restrictions in exercising such right.  Notwithstanding anything herein to the contrary, restaurants shall be permitted in that area designated on the Site Plan as "Outparcel" and "B100".

AMENDMENT – 1st LMA – May 25, 2018
Section 5.4(d) of the Lease is hereby amended to reflect that Tenant's Exclusive shall not apply to uses associated with one nail salon that is less than 2,800 square feet.

b. Section 5.4 is further amended to add new subsection (j) to the end of the second sentence such that Tenant's Exclusive shall not apply to uses associated with "one
eyelash extension studio, such as, by way of example but not limitation, The Lash
Lounge, provided that (i) no eyebrow services other than tinting, threading, extensions, perming and permanent makeup are offered, (ii) no spa services are offered, and (iii) retail sales are limited to an area of no more than four hundred (400) square feet for branded products only."

EXHIBIT E

USE RESTRICTIONS

1.    Prohibited Uses.  The following uses (collectively referred to as "Prohibited Uses" and individually as a "Prohibited Use") are prohibited during the Term in any portion of the Shopping Center:

(a)    Any public or private nuisance.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

(b)     Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness.

(c)     Any noxious odor.

(d)     Use, storage, transportation, handling, manufacture, or emission of any noxious, toxic, caustic or corrosive fuel or gas or other hazardous or toxic substance or Hazardous Material unless such materials are handled in accordance with applicable governmental laws, regulations and codes.

(e)     Emission of microwave, radio wave or other similar electronic, light or noise radiation at levels which are dangerous to health or which interfere with the proper operation of electronic, telephone, computer or other business equipment of tenants of the Shopping Center.

(f)     Any dust, dirt or fly ash in excessive quantities.

(g)     Any unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks.

(h)     Any warehouse (but any area for the storage of goods, intended to be sold at any retail establishment in the Shopping Center shall not be deemed to be a warehouse), assembly, manufacture, distillation, refining, smelting, agriculture or mining operations.  Excluded from this restriction shall be a brew pub.

(i)     Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising.

(j)     Any drilling and/or removal of subsurface substances.

(k)     Any dumping of garbage or refuse (other than in dumpsters or compactors designed for such purpose).

(l)     Any commercial laundry or dry cleaning plant (except as to a so-called "green" dry cleaner or an establishment which receives and dispenses items for laundry and/or dry cleaning but the processing of which such items is done elsewhere so long as the same is no closer than space B-100, C-100 or the Outparcels), laundromat, veterinary hospital, car washing establishment, bowling alley, mortuary or similar service establishment.

(m)     Any automobile body and fender repair work other than automobile services provided by any department store in connection with its operations as a retail department store.

(n)     No kiosk, pushcarts, temporary sales booths or other forms of so-called remote merchandising units ("RMUs") shall be allowed within the Tenant's Protected Area (defined in Section 5.2).  Additionally, no restaurant or entertainment use shall be allowed in any space contiguous to the Premises  without Tenant's prior approval, which approval may be withheld in Tenant's sole discretion; provided, however, pre-prepared food shall be permitted to be sold in such space as an incidental part of such adjacent tenant's use so long as no food is cooked on premises;

(o)     The operation of a "head shop", so-called, or other business devoted to the sale of marijuana, cocaine or other controlled drugs or substances, or articles, paraphernalia, or merchandise normally used or associated with the use of marijuana or illegal or unlawful activities.

(p)     A massage parlor (except for up to one (1) therapeutic massage space such as "Massage Envy" or "Hand and Stone Massage"), and "second" hand store, used clothing or thrift store, pawn shop, salvation army type store, similar deep discount "surplus" store or deep discount liquidation outlet, tattoo or piercing parlor, or the business of the sale of so-called "adult" materials such as, without limitation, pornographic magazines, books, movies and photographs; provided that the foregoing shall not prohibit any bookstore from selling pornographic books, magazines or other publications so long as such materials do not exceed five percent (5%) of the floor area of such tenant.

(q)     Automotive sales (selling new or used cars, trailers or mobile homes) and service, other than automotive services permitted under subsection (13) above.

(r)     Factory.

(s)     Industrial usage.

(t)     Processing or rendering plant.

(u)     Any carnivals, flea markets, coin operated vending machines (except for vending machines intended for employee use only and located inside of individual stores), or video arcades (except that restaurants/entertainment uses such as Dave & Busters may operate video games, and retail facilities may operate video games incidentally to their primary use).

(v)     any facility storing or selling gasoline or diesel fuel in or from tanks, except in conjunction with a membership warehouse club;

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

(w)    cocktail lounge, bar or tavern or sale of alcoholic beverages, except in conjunction with a restaurant permitted hereunder, or a wine/liquor store typically found in first class retail centers; night club; cinema or theater (except in space F100 and that those portions of space E100 located at least fifty feet (50') from the nearest demising wall of the Premises, provided that such use shall not be deemed a Comparable Replacement Tenant for Nordstrom Rack or Saks Off Fifth under Sections 2.3(a) or 2.3(b) of the Lease);

(x)    place of recreation including, but not limited to, bowling alley, skating rink, carnival, game arcade, swimming pool, hot tub, gym, health club or exercise facility within 100 feet of the side demising walls of the Premises (except that small-format health clubs and gyms occupying not more than 4,000 square feet are permitted in space C100 through B100 as shown on the Site Plan and full-sized health clubs and gyms are permitted in space F100 and those portions of space E100 located at least fifty (50) feet from the nearest demising wall of the Premises, provided that such use shall not be deemed a Comparable Replacement Tenant for Nordstrom Rack or Saks Off Fifth under Sections 2.3(a) or 2.3(b) of the Lease); church; and any other use inconsistent with the operation of a high quality retail shopping center.

## BLAZE PIZZA

Landlord will not lease other space in the Shopping Center to any tenant that primarily serves pizza. As by way of example only and not a limitation, the foregoing exclusive would restrict the following operators as operated today: MOD Super Fast Pizza, Pieology, and Pizza Studio.

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease; provided, however, that Landlord agrees to withhold its consent to a proposed change in use under any such lease which the proposed change in use would violate Tenant's exclusive if (a) Landlord has the right to do so under the terms of any such lease, and (b) by doing so Landlord shall not be in breach or default under the terms of any such lease. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Shopping Center may sell one or more of the exclusive item(s) described above as an incidental part of its business (for purposes hereof, "incidental part" means twenty percent (20%) or less of such tenant's sales), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. This exclusive shall automatically terminate without the requirement of any notice and be of no further force or effect (i) should Tenant assign its interest in and to this Lease (unless pursuant to a Permitted Transfer), (ii) if the use of the Premises is changed and, as a result of such change, the exclusive item(s) described above are no longer the primary business of Tenant at the Premises, (iii) if Tenant ceases operations from the Premises, whether or not such cessation of operations is permitted by this Lease, or (iv) upon the occurrence, beyond applicable notice and cure periods, of any Event of Default by Tenant under this Lease.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Shopping Center without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially leasing more than 5,000 square feet of GLA (including any assignees, sublessees or other transferees thereof), it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

## THE HABIT BURGER

Landlord and its affiliates and their successors and assigns will not lease to, sell to, or permit in the future to any person or entity in the Shopping Center for the purpose of conducting within the Shopping Center as its primary business the sale of Hamburgers.

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease; provided, however, that Landlord agrees to withhold its consent to a proposed change in use under any such lease which proposed change in use would violate Tenant's exclusive if (a) Landlord has the right to do so under the terms of any such lease, and (b) by doing so Landlord shall not be in breach or default under the terms of any such lease. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Shopping Center may sell hamburgers as an incidental part of its business (for purposes hereof, "incidental part" means twenty-five percent (25%) or less of such tenant's sales within the Shopping Center), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. Additionally, Landlord shall not lease to, sell to, or permit in the future to any person or entity in the Shopping Center using the word "burger" in its trade name.
Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Shopping Center without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially occupying more than 4,000 square feet of GLA, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever. This exclusive use shall specifically not apply to any tenant with a drive thru lane.

INITIAL HERE
Landlord
Tenant

CHIPOTLE MEXICAN GRILL

For the Term of this Lease, as long as Tenant is not in default beyond any applicable notice and cure period and is open and operating a restaurant primarily for the sale of burritos, fajitas and tacos (except in the event of: a) casualty as governed by Article 22 or condemnation as governed by Article 24; b) remodeling not to exceed ninety (90) days; or c) if Tenant is actively negotiating an assignment or a subletting of this Lease for a period not to exceed ninety (90) days), Tenant shall have the exclusive right to sell as its principal business burritos, fajitas and tacos at the Center and neither Landlord nor its affiliates or successors or assigns shall permit or suffer any other tenant or occupant of the Center to engage in the sale of such items; provided, however, that the foregoing shall not prohibit the incidental sale of such items by other tenants or occupants, and further provided that the exclusive covenant set forth above shall not apply to any full service, sit down restaurant with waiter/waitress service occupying more than 5,000 square feet located in the Center and whose sales for takeout or off premises consumption shall not exceed fifteen percent (15%) of such tenant's gross sales.  For purposes of the preceding sentence, the "incidental sale of such items" shall mean that the cumulative sales of such items is less than fifteen percent (15%) of the such other tenant's or occupant's gross sales from its premises. Notwithstanding anything to the contrary contained herein, neither Landlord nor its affiliates or successors or assigns shall permit or suffer any other tenant or occupant of the Center to operate as a Mexican or Tex-Mexican restaurant.  Landlord agrees to enforce Tenant's rights under this Section against other tenants in the Center using all reasonable legal means; however, leases for premises in the Center dated prior in time to the date this Lease is fully executed are not subject to the restrictions of this Section 5.6.

Notwithstanding the above, the exclusive use covenants set forth herein shall not apply to the sale of breakfast items sold by a tenant or occupant before 11AM. However, commencing on the date that Tenant provides notice to Landlord that Tenant is selling breakfast items at the Premises and continuing for so long as Tenant sells breakfast items at the Premises ("Breakfast Sales Period") the sale of burritos, fajitas, and/or tacos as breakfast items shall be deemed included in Tenant's exclusive use covenant; provided however, if Landlord enters into a lease permitting such breakfast sales, or otherwise consents to such breakfast sales, prior to the Breakfast Sales Period (regardless if such right is granted after the date of this Lease) then such existing breakfast operations shall continue to be excluded and "carved out" of Tenant's exclusive use covenants, however such provision shall apply in the event Landlord is required to consent to a change of use under an existing lease during the Breakfast Sales Period.

This exclusive does not apply to any tenants occupying 30,000 square feet of space or greater.  Any abatement of Base Rent shall not affect or alter Tenant's obligations with respect to payments of Common Area Costs and Taxes.  Landlord covenants that leases in the Center dated later in time to this Lease shall require those tenants to honor Tenant's rights hereunder, other than those tenants not restricted hereunder.

Tenant expressly understands that the Exclusive Use provisions hereof do not apply to presently existing leases ("Existing Lease(s)"), or to successors or assigns of tenants under Existing Leases or to any lease renewals, expansions, extensions, or relocations of tenants pursuant to Existing Leases, or; provided, however, in the event that Landlord's consent is required to: (i) an assignment, sublet or other transfer of any Existing Lease, or (ii) a change in the use of a tenant under an Existing Lease, Landlord shall withhold its consent if granting such consent would result in a change in such tenant's existing use that violates Tenant's Exclusive Use (unless such withholding of consent would result in a termination of such Existing Lease).

Notwithstanding anything in the foregoing to the contrary contained herein, Tenant shall have no remedy other than as provided in this paragraph if an owner or tenant violates a provision of its lease or license agreement regarding its premises, which either does not permit or specifically prohibits the exclusive right granted to Tenant in this Section (a "Rogue Tenant").  Landlord shall have the obligation to use good faith efforts to enforce Landlord's rights, including filing an appropriate legal action to obtain a restraining order or injunction.  In addition, Tenant shall be entitled to seek injunctive relief against such Rogue Tenant.

Landlord, after receipt of notice from Tenant advising of a violation of the exclusive use covenant set forth in this Article 5 by a Rogue Tenant, shall commence an action (or arbitration, if required by such lease or license agreement) against such other tenant or occupant, and thereafter shall use good faith efforts to enforce its rights under such lease or license agreement and to obtain Judicial Relief. For purposes hereof, "Judicial Relief" shall mean a temporary restraining order, preliminary injunction, order of eviction, other court order, or order resulting from an arbitration proceeding enjoining the lease violation; provided, however, Landlord shall not be required to appeal any adverse decision denying Judicial Relief.

Landlord, after receipt of notice from Tenant advising of a violation of the exclusive use covenant set forth in this Article 5 by a Rogue Tenant, shall commence an action (or arbitration, if required by such lease or license agreement) against such other tenant or occupant, and thereafter shall use good faith efforts to enforce its rights under such lease or license agreement and to obtain Judicial Relief. For purposes hereof, "Judicial Relief" shall mean a temporary restraining order, preliminary injunction, order of eviction, other court order, or order resulting from an arbitration proceeding enjoining the lease violation; provided, however, Landlord shall not be required to appeal any adverse decision denying Judicial Relief.

FRUTTA BOWLS
Provided Tenant is opening and operating for the Permitted Use Landlord will not lease other space in the Shopping Center to any tenant whose principal business is a fast casual (ordering at the counter)

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant   

restaurant primarily offering Acaí, Pitaya, Kale, Oatmeal and/or fruit based bowls for on premises consumption.

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease or any replacement of such existing tenant (including any assignee, sublessee or other transferee thereof) for substantially the same permitted use, whether such replacement tenant shall occupy the same or different premises. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Shopping Center may sell one or more of the exclusive item(s) described above as an incidental part of its business (for purposes hereof, "incidental part" means thirty percent (30%) or less of such tenant's annual gross sales at its location in the Shopping Center), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. This exclusive shall automatically terminate without the requirement of any notice and be of no further force or effect (i) should Tenant assign its interest in and to this Lease, (ii) if the use of the Premises is changed and, as a result of such change, the exclusive item(s) described above are no longer the primary business of Tenant at the Premises, (iii) if Tenant ceases operations from the Premises, whether or not such cessation of operations is permitted by this Lease, or (iv) upon the occurrence of any Event of Default by Tenant under this Lease.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Shopping Center without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially leasing more than 5,000 square feet of GLA (including any assignees, sublessees or other transferees thereof) or to any tenant or occupant of any outparcel (including any assignees, sublessees or other transferees thereof) located in or adjacent to the Shopping Center, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

Notwithstanding anything to the contrary in this Article, (i) if Tenant's exclusive shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant"), then Landlord shall not be deemed to have violated Tenant's exclusive and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant; and (ii) Landlord shall not be obligated to maintain or enforce Tenant's exclusive use rights under this Article to the extent the same would cause a violation of any applicable anti-trust law.

PARIS BAGUETTE
Landlord will not enter into any lease for space in Landlord's Building with a tenant that will conduct as its primary business a bakery specializing in French and Asian inspired baked goods. The foregoing restriction shall not restrict or limit Landlord from allowing any tenant or occupant of Landlord's Building to use its premises as any type of restaurant, café, bagel shop, coffee store, doughnut store, sandwich store or any combination of such uses that also sells baked goods, so long as the primary use of such tenant or occupant is not a bakery specializing in French and Asian inspired baked goods. In addition, the foregoing restriction shall not be binding upon a supermarket, grocery store, department store, wholesale club, so-called "dollar store", drug store or convenience store. In addition, tenants or occupants of the Shopping Center shall be permitted to sell French and Asian inspired baked goods as an incidental part of their businesses.

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease or any replacement of such existing tenant (including any assignee, sublessee or other transferee thereof) for substantially the same permitted use, whether such replacement tenant shall occupy the same or different premises. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Landlord's Building may sell one or more of the exclusive item(s) described above as an incidental part of its business (for purposes hereof, "incidental part" means twenty percent (20%) or less of such tenant's sales), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. This exclusive shall automatically terminate without the requirement of any notice and be of no further force or effect (i) should Tenant assign its interest in and to this Lease, (ii) if the use of the Premises is changed and, as a result of such change, the exclusive item(s) described above are no longer the primary business of Tenant at the Premises, (iii) if Tenant ceases operations from the Premises, whether or not such cessation of operations is permitted by this Lease, or (iv) upon the occurrence of any Event of Default by Tenant under this Lease.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Landlord's Building without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially leasing more than 5,000 square feet of GLA (including any assignees, sublessees or other transferees thereof) or to any tenant or occupant of any outparcel (including any assignees, sublessees or other transferees thereof) located in or adjacent to the Shopping Center, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

Notwithstanding anything to the contrary in this Article, (i) if Tenant's exclusive shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant"), then Landlord shall not be deemed to have violated Tenant's exclusive and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant; and (ii) Landlord shall not be obligated to maintain or enforce Tenant's exclusive use rights under this Article to the extent the same would cause a violation of any applicable anti-trust law.

THE LASH LOUNGE
Provided Tenant is occupying the Premises, operating for business under the Permitted Use, and there is not an uncured Event of Default, Landlord will not enter into any lease for space in Landlord's Building with a tenant that will conduct as its primary use the operation of an eyelash salon offering eyelash and eyebrow extensions and refills, and eye enhancing services (including eyebrow and eyelash tinting, and eyelash perming). As used herein, "primary use" shall mean twenty-five percent (25%) or more of Gross Sales. The foregoing restriction shall not restrict or limit Landlord from allowing any tenant or occupant of Landlord's Building to use its premises as any type of day spa, hair salon, nail salon, barber shop, beauty supply store or any combination of such uses that also offers eyelash and eyebrow services, so long as the primary use of such tenant or occupant is not an eyelash salon specializing in eyelash and eyebrow extensions and refills and eye enhancing services. In addition, the foregoing restriction shall not be binding upon a department store or drug store. In addition, tenants or occupants of the Shopping Center shall be permitted to offer eyelash and eyebrow services as an incidental part of their businesses.

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease or any replacement of such existing tenant (including any assignee, sublessee or other transferee thereof) for substantially the same permitted use, whether such replacement tenant shall occupy the same or different premises. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Landlord's Building may sell one or more of the exclusive item(s) described above as an incidental part of its business (for purposes hereof, "incidental part" means less than twenty-five percent (25%) of such tenant's sales), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. This exclusive shall automatically terminate without the requirement of any notice and be of no further force or effect (i) should Tenant assign its interest in and to this Lease, (ii) if the use of the Premises is changed and, as a result of such change, the exclusive item(s) described above are no longer the primary business of Tenant at the Premises, (iii) if Tenant ceases operations from the Premises, whether or not such cessation of operations is permitted by this Lease, or (iv) upon the occurrence of any Event of Default by Tenant under this Lease.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Landlord's Building without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially leasing more than 5,000 square feet of GLA (including any assignees, sublessees or other transferees thereof) or to any tenant or occupant of any outparcel (including any assignees, sublessees or other transferees thereof) located in or adjacent to the Shopping Center, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

Notwithstanding anything to the contrary in this Article, (i) if Tenant's exclusive shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant"), then Landlord shall not be deemed to have violated Tenant's exclusive and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant; and (ii) Landlord shall not be obligated to maintain or enforce Tenant's exclusive use rights under this Article to the extent the same would cause a violation of any applicable anti-trust law.

CLUB PILATES
Landlord will not lease in the future to any tenant in the Landlord's Building for the purpose of conducting within the Landlord's Building as its primary business:

Pilates classes using reformers and/or spring boards:

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease; provided, however, that Landlord agrees to withhold its consent to a proposed change in use under any such lease which proposed change use would violate Tenant's exclusive if (a) Landlord has the right to do so under the terms of any such lease, and (b) by doing so Landlord shall not be in breach or default under the terms of any such lease. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Landlord's Building may sell one or more of the exclusive item(s) described above as an incidental part of its business (for purposes hereof, "incidental part" means twenty percent (20%) or less of such tenant's sales), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. This exclusive shall automatically terminate without the requirement of any notice and be of no further force or effect (i) should Tenant assign its interest in and to this Lease except as permitted under this Lease, (ii) if the use of the Premises is changed and, as a result

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

of such change, the exclusive item(s) described above are no longer the primary business of Tenant at the Premises, (iii) if Tenant ceases operations from the Premises, whether or not such cessation of operations is permitted by this Lease, subject to Permitted Closures, or (iv) upon the occurrence of any Event of Default by Tenant under this Lease.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Landlord's Building without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially leasing more than 7,500 square feet of GLA (including any assignees, sublessees or other transferees thereof) or to any tenant or occupant of any outparcel (including any assignees, sublessees or other transferees thereof) located in or adjacent to the Shopping Center, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

Notwithstanding anything to the contrary in this Article, (i) if Tenant's exclusive shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant"), then Landlord shall not be deemed to have violated Tenant's exclusive and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant; and (ii) Landlord shall not be obligated to maintain or enforce Tenant's exclusive use rights under this Article to the extent the same would cause a violation of any applicable anti-trust law.

REGENCY
CENTERS

INITIAL HERE
Landlord
Tenant

# EXHIBIT B

STARK & STARK
A Professional Corporation
Attn: Thomas S. Onder
Atty. I.D. No. 00579-2004
P.O. Box 5315
Princeton, New Jersey 08543-5315
(609) 896-9060
*Attorneys for Plaintiff, Bridgewater Regency, LLC*

Somerset County Superior Court
Special Civil Part/Landlord Tenant
20 North Bridge Street
Somerville, NJ 07601
(908) 332-7700

---

| | |
|---|---|
| BRIDGEWATER REGENCY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROMES URGENT CARE SERVICES, LLC dba MEDFIRST URGENT CARE, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br><br> SPECIAL CIVIL PART <br> LANDLORD/TENANT <br><br> SOMERSET COUNTY <br><br> DOCKET NO. <br><br> Civil Action <br><br> VERIFIED COMPLAINT <br> **LANDLORD/TENANT** <br> **NON-PAYMENT OF RENT** |

**Address:**
Romes Urgent Care Services, LLC
dba MedFirst Urgent Care
Chimney Rock East Shopping Center
338 Chimney Rock Rd., Unit A140
Bound Brook, NJ 08805

**NOTICE TO TENANT:** The purpose of this complaint is to permanently remove you and your belongings from 338 Chimney Rock Road, Unit A140 – Chimney Rock Crossing East Shopping Center, Bound Brook, NJ 08805 (the "Premises"). If you wish to contest this action, you must bring all witnesses, photos, documents, rent receipts, and other evidence to court for the trial. The phone number of the court is shown at the top of this form.

1.      Romes Urgent Care Services, LLC dba MedFirst Urgent Care (the "Tenant") is in possession of the Premises owned by Bridgewater Regency, LLC ("Landlord").

2.      338 Chimney Rock Road, Unit A140 – Chimney Rock Crossing East Shopping Center, Bound Brook, NJ 08805 being the Premises' mailing address for Tenant and the following being additional mailing addresses for notice purposes: 1) 5125 Glen Brook Rd., Stroudsburg, PA

18360; and 2) 101 Pocono Commons, Suite 101, Stroudsburg, PA 18360, Attn: Jean Paul Romes, MD.

3.  Tenant has been in possession of the Premises under written agreement dated December 20, 2018 (the "Lease") with Landlord. Herein attached as Exhibit "A" is a true and accurate copy of the Lease.

4.  Pursuant to the Lease, Tenant leased certain commercial real estate located inside or initially known as 338 Chimney Rock Road, Unit A140, Chimney Rock Crossing East Shopping Center, Bound Brook, NJ 08805. See Exhibit "A", page 3 of Lease.

**5.**  There is due, unpaid and owing from Tenant to Landlord **$74,193.77**, plus any additional rent that may be due at the time of hearing. Herein attached as Exhibit "B" is a true and accurate copy of the book account dated February 27, 2024.

6.  On or about February 8, 2024, Landlord sent Tenant a notice of default. Herein attached as Exhibit "C" is a true and accurate copy of the default notice dated February 8, 2024.

7.  Tenant is hereby notified that this complaint may be amended to include all later unpaid rents, as well.

8.  Pursuant to Articles 4 and 7 the Lease, Tenant covenanted and agreed that they would pay rent for the use and occupancy of the Premises at the time and in the manner provided in the Lease.

9.  Pursuant to Article 18 of the Lease, Tenant has breached Article 4 and 7 by failing to pay rent on a timely fashion.

10. Tenant's breaches of the Lease described in paragraphs eight (8) and nine (9) of this Complaint give Landlord the right to re-enter and re-take possession of the above-referenced Premises pursuant to Article 16.

11. The rent has not been paid nor has possession of the Premises been surrendered by Tenant to Landlord, but Tenant holds over and continues in possession without the consent of Landlord.

12. The Premises described in this complaint is commercial.

**These amounts do not include late fees or attorney fees for Section 8 and public housing tenants. Payment may be made to the landlord or the clerk of the court at any time before the trial date, but on the trial date payment must be made by 4:30 p.m. to get the case dismissed.**

Judgment is demanded for possession of the Premises together with costs.

-2-

I certify that the matter in controversy is not the subject of any other court action or arbitration proceeding, now pending or contemplated, except for a money judgment action contemplated in the Law Division of New Jersey and that no other parties should be joined in this action.

STARK & STARK
A Professional Corporation
Attorneys for Plaintiff, Bridgewater Regency, LLC

By:  /S/ THOMAS S. ONDER
        THOMAS S. ONDER

Dated: February 27, 2024

-3-

4874-8425-2073, v. 4

## VERIFICATION

I, Elizabeth Donley, do certify and say:

1.      I am a Property Manager for Bridgewater Regency, LLC (the "Landlord"). I make this certification based upon my personal knowledge and review of the books and records of Landlord. I am authorized to make this certification.

2.      I have read the Verified Complaint and certify that all statements made therein are true and correct to the best of my knowledge.

3.      The matter in controversy is not the subject of any other court or arbitration proceeding now pending or contemplated, except for a money judgment action contemplated in the Law Division of New Jersey and no other parties should be joined in this action.

        I certify that the foregoing statements made herein are true. I am aware that if any of the foregoing statements made herein are willfully false, I am subject to punishment.

                                        By:   /S/ Elizabeth Donley
                                              Elizabeth Donley

Dated: February 26, 2024

-4-

4874-8425-2073, v. 4

Name:  Thomas S. Onder
Attorney ID Number:  00579-2004
Address:  100 American Metro Boulevard, Hamilton, NJ
         08619
Telephone Number:  609-219-7458      ext.
Email Address:  tonder@stark-stark.com

Bridgewater Regency, LLC
Plaintiff/ Landlord

v.

Romes Urgent Care Services, LLC dba Medfirs
Defendant/ Tenant(s)

Superior Court of New Jersey
Law Division, Special Civil Part
Landlord-Tenant
Somerset          County
Docket Number: LT- _____

**Certification of Lease and
Registration Statement**

☐ **Residential**   ■ **Commercial**

Thomas S. Onder _____, (Esq.) of full age, being duly sworn according to law,
certify and say (select one option for each of the following):

1. I am: ☐ the plaintiff/landlord   ■ an attorney at law duly licensed to practice in the state of
   New Jersey in the above-captioned landlord tenant action.

2. The lease that is the subject of this action is: ■ attached in full   ☐ attached in pertinent part
   and the full lease document is in excess of 10 pages   ☐ not the subject of a written
   agreement.

3. ☐ I have attached a copy of any registration statement for the residential rental property
   required by the Landlord Registration Act N.J.S.A. 46:8-27.
   ■ The property is exempt from registration pursuant to N.J.S.A. 46:8-28.5(b).

I certify that the foregoing statements made by me are true.  I am aware that if any of the
foregoing statements made by me are willfully false, I am subject to punishment.

02/29/2024 _____                    /s/ Thomas S. Onder _____
Dated                                          (Signature of Attorney/Self-Represented Landlord)

                                               Thomas S. Onder, Esq. _____
                                               (Printed Name of Attorney/Self-Represented Landlord)

<h3 style="text-align:center">Tenancy Summons and Return of Service (R. 6:2-1)</h3>



**NOTICE:** This is a public document, which means the document as submitted will be available to the public upon request. Therefore, do not enter personal identifiers on it, such as Social Security number, driver's license number, vehicle plate number, insurance policy number, active financial account number, active credit card number or military status.

**Plaintiff or Filing Attorney Information:**
Name: THOMAS S ONDER
NJ Attorney ID Number: 005792004
Address: 100 AMERICAN METRO BOULEVARD

HAMILTON, NJ 08619-0000
Telephone: 609-896-9060

**Superior Court of New Jersey**
**Law Division, Special Civil Part**
**SOMERSET County**
**SOMERSET County Courthouse**
**40 NORTH BRIDGE STREET, FIRST FLOOR, P.O. BOX 3000**
**SOMERVILLE, NJ 08876-0000**

Bridgewater Regency, LLC
Plaintiff(s)
**versus**
Romes Urgent Care Services
Defendant (s)

**Docket Number: SOM-LT-000451-24**
(to be provided by the court)

**Civil Action**
**SUMMONS**
**LANDLORD/TENANT**

**Defendant Information:**
Name: Romes Urgent Care Services
Address: Chimney Rock East Shopping Center
338 Chimney Rock Rd., Unit A140
Bound Brook, NJ 08805-0000
Phone:

**NOTICE TO TENANT: The purpose of the attached complaint is to permanently remove you and your belongings from the premises. You will be notified when a court proceeding is scheduled. Please contact the Office of the Special Civil Part at 908-332-7700 ext.13085 regarding your case. Please go to njcourts.gov for general information on landlord/tenant actions.**

If you cannot afford to pay for a lawyer, contact Legal Services at 908-231-0840 to see if you qualify for free legal advice. If you can afford to pay a lawyer but do not know one, you may call the Lawyer Referral Services of your local county Bar Association at 908-685-2323

You might be eligible for housing assistance. To determine your eligibility, you must immediately contact the welfare agency in your county at 73 E. HIGH ST., P.O. BOX 936, SOMERVILLE, NJ, 08876-0936, telephone number 908-526-8800. If you need an interpreter or an accommodation for a disability, you must notify the court immediately.

**NOTIFICACIÓN AL (A LA) INQUILINO(A) El objetivo de la denuncia adjunta es desalojarle a usted y sacar sus pertenencias permanentemente del sitio alquilado. Se le notificará la fecha cuando se haya programado el procedimiento judicial. Sírvase comunicarse sobre su caso con la Oficina de la Parte Civil Especial llamando al 908-332-7700 ext.13085. Para obtener información general sobre las acciones de propietarios/inquilinos, vaya a njcourts.gov.**

Si no puede pagar los servicios de un abogado, póngase en contacto con la oficina de Servicios Legales llamando al 908-231-0840 para averiguar si reúne las condiciones para recibir asesoramiento legal gratis. Si puede pagarle a un abogado, pero no conoce a ninguno, llame al Servicio de Referencia de Abogados del Colegio de Abogados local de su condado llamando al 908-685-2323.

Es posible que reúna los requisitos para recibir ayuda con la vivienda. Para que se haga esa determinación, tiene que ponerse en contacto inmediatamente con la agencia de bienestar social de su condado en 73 E. HIGH ST., P.O. BOX 936, SOMERVILLE, NJ, 08876-0936, número de teléfono 908-526-8800. Si necesita un intérprete o un arreglo especial por una discapacidad, tiene que notificárselo al tribunal de inmediato. acomodación para un impedimento físico, tiene que notificárselo inmediatamente al tribunal.

**Date: 02/29/2024**

/s/ Michelle M. Smith
CLERK OF THE SUPERIOR COURT

**Court Officer's Return of Service (For Court Use Only)**

Docket Number: _____ Date _____ Time _____

WM _____ WF _____ BM _____ Other _____ Ht _____ Wt _____ Age _____ Mustache _____ Beard _____ Glasses _____

Name: _____ Relationship _____

Efforts Made to Personally Serve _____

_____

Description of Premises if Posted _____

_____

I hereby certify the above to be true and accurate: _____

Special Civil Part Officer

Docket Number: LT- _____

# Landlord Case Information Statement

**Case Details:** SOMERSET - Special Civil Part Docket# SOM-LT-000451-24

**Caption:** Bridgewater Regency, LLC VS Romes Urgent Care Services

## Plaintiff/Landlord

**Name of Plaintiff/Landlord:** Bridgewater Regency, LLC

**Email Address:**
**Home/Office Phone:**
**Cell Phone:**

**Attorney Name and Firm:** THOMAS S ONDER , STARK & STARK PC
**Email Address:** TONDER@STARK-STARK.COM
**Office Phone:** 609-896-9060
**Cell Phone:**
**Attorney/Plaintiff Mailing Address:** 100 AMERICAN METRO BOULEVARD  HAMILTON NJ 08619

## Defendant/Tenant

**Name of Defendant/Tenant(s):** Romes Urgent Care Services
**Rental Property Address:** Chimney Rock East Shopping Center 338 Chimney Rock Rd., Unit A140 Bound Brook NJ 08805
**Municipal Code:** 1804

**Email Address:**
**Home/Office Phone:**

**Cell Phone:**

**Type of Tenancy:** [ ] Residential    [ X ] Commercial

**Cause of Action:** [ X ] Non-Payment
          [ ] Other (Holdover for Cause)

**Holdover Cause of Action:**

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

[ ] Subsidized Housing

   Type: [ ] Public Housing   [ ] Section 8 Voucher   [ ] Section 8 HAP Contract   [ ] Other Subsidy Program

[ ] Notice(s) that are required for Holdover, Public Housing and/or Subsidized Housing are attached to the complaint.
[ ] Rental property is not a covered property under the Federal CARES Act, 15 U.S.C. § 9057(f) or 9058(a).
[ ] The tenancy is subject to a municipal rent control ordinance.

 The total number of months of unpaid rent is: 4
 The first month of unpaid rent was: November 2023
 The amount due and owing by the tenant in this case is: $ 74193.77

I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

I certify that the foregoing statements made by me are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: 02/29/2024          Attorney/Plaintiff Signature: /S/ THOMAS S ONDER



# Landlord
# Civil Case Information Statement
## (LCIS)

### Holdover Causes of Action

**Residential Tenancy**

| | | |
|---|---|---|
| 1 | Disorderly Tenant | N.J.S.A. 2A:18-61.1(b) |
| 2 | Willful or Gross Negligent Damage to Premises | N.J.S.A. 2A:18-61.1(c) |
| 3 | Violation of Rules and Regulations | N.J.S.A. 2A:18-61.1(d) |
| 4 | Violation of the Lease Covenants | N.J.S.A. 2A:18-61.1(e) |
| 5 | Violation of the Lease Covenants Under the Control of a Public Housing Authority or Redevelopment Agency | N.J.S.A. 2A:18-61.1(e) |
| 6 | Failure to Pay Rent After Increase | N.J.S.A. 2A:18-61.1(f) |
| 7 | Demolish/Board Up Premises | N.J.S.A. 2A:18-61.1(g) |
| 8 | Permanently Retiring Residential Building/Mobile Home Park from Residential Use | N.J.S.A. 2A:18-61.1(h) |
| 9 | Reasonable Changes to Lease at End of Lease Term that Tenant Refuses to Accept | N.J.S.A. 2A:18-61.1(i) |
| 10 | Habitual Late Payment of Rent | N.J.S.A. 2A:18-61.1(j) |
| 11 | Converting Property to Condominium or Cooperative Ownership | N.J.S.A. 2A:18-61.1(k) |
| 12 | Personal Occupancy by Owner or Purchaser of Unit (property converted to condo/cooperative or fee simple ownership) | N.J.S.A. 2A:18-61.1(l)(1) |
| 13 | Personal Occupancy by Owner or Purchaser of Unit (owner of a building with 3 or fewer condo/cooperative units. | N.J.S.A. 2A:18-61.1(l)(2) |
| 14 | Personal Occupancy by Owner or Purchaser of Unit (building with 3 or fewer residential units) | N.J.S.A. 2A:18-61.1(l)(3) |
| 15 | Rental is Conditioned on Tenant's Employment by Landlord | N.J.S.A. 2A:18-61.1(m) |
| 16 | Convicted or Pleaded Guilty to Offenses under the 1987 Comprehensive Drug Reform Act, or Harbors such Person | N.J.S.A. 2A:18-61.1(n) |
| 17 | Convicted or Pleaded Guilty to Assault/Threats against Landlord, Landlord's Family or Employee, or Harbors such Person | N.J.S.A. 2A:18-61.1(o) |
| 18 | Tenant or Tenant Harbors such Person previously found Liable in a Civil Action for Certain Criminal Acts on the Rental Premises | N.J.S.A. 2A:18-61.1(p) |
| 19 | Tenant or Tenant Harbors Such Person who pleaded or was convicted of theft of property from the Landlord, the Rental Premises, or Other Tenants | N.J.S.A. 2A:18-61.1(q) |
| 20 | Tenant or Tenant Harbors such Person previously found Liable in a Civil Action for Human Trafficking on the Rental Premises | N.J.S.A. 2A:18-61.1(r) |
| 21 | Residents at Residential Health Care Facilities (non-payment or holdover) | N.J.S.A. 30:11A-1 *et. seq.* |

**Commercial Tenancy; Owner-Occupied Premises with Two or Less Residential Units; Rental Unit Held in Trust on behalf of Immediate Family Member Who Permanently Occupies the Unit not Developmentally Disabled**

| | | |
|---|---|---|
| 22 | Tenant Stays after Expiration of Lease Term | N.J.S.A. 2A:18-53 |
| 23 | Tenant Disorderly as to Destroy Peace and Quiet | N.J.S.A. 2A:18-53 |
| 24 | Tenant Willfully Destroys, Damages or Injures the Premises | N.J.S.A. 2A:18-53 |
| 25 | Tenant Constantly Violates Landlord's Written Rules and Regulations | N.J.S.A. 2A:18-53 |
| 26 | Tenant Breaches/Violates any Agreement in Lease that Provides for Right of Reentry | N.J.S.A. 2A:18-53 |
| 27 | Violation of Alcoholic Beverages Laws by Commercial Tenant | N.J.S.A. 33:1-54 |

# EXHIBIT C

| Invoice Date | Remark | Open Amount |
|---|---|---|
| 11/01/2023 | BASE RENT | $ 14,261.87 |
| 12/01/2023 | BASE RENT | $ 14,261.87 |
| 01/01/2024 | BASE RENT | $ 14,261.87 |
| 02/01/2024 | BASE RENT | $ 14,261.87 |
| 03/01/2024 | BASE RENT | $ 14,261.87 |
| 04/01/2024 | BASE RENT | $ 14,261.87 |
| 11/01/2023 | CAM | $ 1,293.41 |
| 12/01/2023 | CAM | $ 1,293.41 |
| 01/01/2024 | CAM | $ 1,244.38 |
| 02/01/2024 | CAM | $ 1,244.38 |
| 03/01/2024 | CAM | $ 1,244.38 |
| 04/01/2024 | CAM | $ 1,244.38 |
| 11/01/2023 | WASTE | $ 137.75 |
| 12/01/2023 | WASTE | $ 137.75 |
| 01/01/2024 | WASTE | $ 142.41 |
| 02/01/2024 | WASTE | $ 142.41 |
| 03/01/2024 | WASTE | $ 142.41 |
| 04/01/2024 | WASTE | $ 142.41 |
| 11/01/2023 | INSURANCE | $ 193.53 |
| 12/01/2023 | INSURANCE | $ 193.53 |
| 01/01/2024 | INSURANCE | $ 216.15 |
| 02/01/2024 | INSURANCE | $ 216.15 |
| 03/01/2024 | INSURANCE | $ 216.15 |
| 04/01/2024 | INSURANCE | $ 216.15 |
| 12/13/2023 | Late Fees | $ 915.83 |
| 01/12/2024 | Late Fees | $ 908.41 |
| 02/14/2024 | Late Fees | $ 908.41 |
| 03/13/2024 | Late Fees | $ 908.41 |
| 04/12/2024 | Late Fees | $ 908.41 |
| 11/01/2023 | REAL ESTATE TAX | $ 2,130.02 |
| 12/01/2023 | REAL ESTATE TAX | $ 2,130.02 |
| 01/01/2024 | REAL ESTATE TAX | $ 2,003.33 |
| 02/01/2024 | REAL ESTATE TAX | $ 2,003.33 |
| 03/01/2024 | REAL ESTATE TAX | $ 2,003.33 |
| 04/01/2024 | REAL ESTATE TAX | $ 2,003.33 |
| 12/11/2023 | REAL ESTATE TAX REC PRIOR YEAR | $ (1,508.32) |
| 11/01/2023 | PYLON SIGN | $ 300.00 |
| 12/01/2023 | PYLON SIGN | $ 300.00 |
| 01/01/2024 | PYLON SIGN | $ 300.00 |
| 02/01/2024 | PYLON SIGN | $ 300.00 |
| 03/01/2024 | PYLON SIGN | $ 300.00 |
| 04/01/2024 | PYLON SIGN | $ 300.00 |
| 05/01/2024 | BASE RENT | $ 14,617.73 |
| 05/01/2024 | CAM | $ 1,244.38 |
| 05/01/2024 | WASTE | $ 142.41 |
| 05/01/2024 | INSURANCE | $ 216.15 |

| | | | |
|---|---|---|---|
| 05/01/2024 | REAL ESTATE TAX | $ | 2,003.33 |
| 05/01/2024 | PYLON SIGN | $ | 300.00 |
| 06/01/2024 | BASE RENT | $ | 14,617.73 |
| 06/01/2024 | CAM | $ | 1,244.38 |
| 06/01/2024 | WASTE | $ | 142.41 |
| 06/01/2024 | INSURANCE | $ | 216.15 |
| 06/01/2024 | REAL ESTATE TAX | $ | 2,003.33 |
| 06/01/2024 | PYLON SIGN | $ | 300.00 |
| | | **$** | **149,394.87** |
| | | | |
| 07/01/2024 | BASE RENT | $ | 14,617.73 |
| 07/01/2024 | CAM | $ | 1,244.38 |
| 07/01/2024 | WASTE | $ | 142.41 |
| 07/01/2024 | INSURANCE | $ | 216.15 |
| 07/01/2024 | REAL ESTATE TAX | $ | 2,003.33 |
| 07/01/2024 | PYLON SIGN | $ | 300.00 |
| | | **$** | **13,743.61** |

**$   163,138.48**

**Outstanding Arrears thru July 23, 2024**

**ıru July 23, 2024**

# Civil Case Information Statement

## Case Details: SOMERSET | Civil Part Docket# L-000987-24

**Case Caption:** BRIDGEWATER REGENCY, LLC VS ROMES URGENT CARE S

**Case Initiation Date:** 07/26/2024

**Attorney Name:** THOMAS S ONDER

**Firm Name:** STARK & STARK PC

**Address:** 100 AMERICAN METRO BOULEVARD HAMILTON NJ 08619

**Phone:** 6098969060

**Name of Party:** PLAINTIFF : Bridgewater Regency, LLC

**Name of Defendant's Primary Insurance Company** (if known): Unknown

**Case Type:** BOOK ACCOUNT (DEBT COLLECTION MATTERS ONLY)

**Document Type:** Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Bridgewater Regency, LLC?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
        **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
        **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

07/26/2024
Dated

/s/ THOMAS S ONDER
Signed